UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re:<br><br>USA SPRINGS, INC.,<br><br>Debtor.[1] | Case No. 08-11816 (JMD)<br><br>Chapter 11 |

## MOTION OF DEBTOR FOR ENTRY OF AN ORDER (A) APPROVING LETTER OF INTENT, (B) AUTHORIZING TERMINATION FEES IN CONNECTION THEREWITH, AND (C) GRANTING RELATED RELIEF
### *[Expedited Determination Requested]*

USA Springs, Inc., a Delaware corporation, as a debtor and debtor-in-possession (the "Debtor") hereby submits this motion (the "Motion") for entry of an order (A) approving the letter of intent with a third party plan sponsor (the "Plan Sponsor") dated September 30, 2009 (the "LOI"), to acquire substantially all of the assets of the Debtor and the Related Entities (as defined below) and to fund the plan of reorganization involving the Debtor and the Related Entities, (B) authorizing certain Termination Fees (as defined below) in connection therewith, and (C) granting related relief. A redacted copy of the LOI is attached to this Motion as *Exhibit A*.[2] In support of this Motion, the Debtor respectfully represents as follows:

### Background

1.  On June 27, 2008, the Debtor filed its voluntary petition for relief in the United States Bankruptcy Court for the District of New Hampshire (the "Bankruptcy Court") under Chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The office of the United States

---

[1] The Debtor related entities are: USA Springs, Inc., a New Hampshire corporation; Garrison Place Real Estate Investment Trust; Just Cause Realty Trust; and Sweet Review Realty Trust.

[2] The attached LOI is redacted slightly with respect to the names of the Plan Sponsor and the financing institution expected to provide financing to the Plan Sponsor. An unredacted copy of the LOI may be provided in confidence to parties in interest, including interested parties that have executed a confidentiality agreement with the Debtor.

Trustee has approved an official committee of unsecured creditors (the "Creditors' Committee") on July 15, 2008, as amended on June 24, 2009.

2. The Debtor owns 100% of the common stock of USA Springs., Inc., a New Hampshire corporation ("N.H. Corp."), and is the sole beneficiary under the Garrison Place Real Estate Investment Trust ("Garrison Trust"), Just Cause Realty Trust ("Just Cause Trust"), and Sweet Review Realty Trust ("Sweet Review Trust", and collectively with N.H. Corp., the Garrison Trust, and the Just Cause Trust, the "Debtor Related Entities").

3. On April 1, 2009, the Debtor's chapter 11 proceeding was converted to a proceeding under chapter 7 of the Bankruptcy Code. The Debtor filed an Emergency Motion to Reconsider Order Converting Case to Chapter 7 ("Motion to Reconsider") on April 6, 2009.

4. The Debtor, the Debtor Related Entities, and the Debtor's secured lender, Roswell Commercial Mortgage, LLC ("Roswell"), subsequently entered into a certain Stipulation on Motion to Reconsider Order Granting Motion to Convert Case, dated as of April 27, 2009, as amended, supplemented and in effect from time to time (the "Stipulation").

5. In connection with the Stipulation, the Debtor Related Entities entered into a Jurisdiction Agreement, dated as of May 27, 2009, submitting themselves and their assets to the jurisdiction of the Bankruptcy Court. Amici Real Estate Trust ("Amici", and collectively with the Debtor Related Entities, the "Related Entities") also entered into a separate Jurisdiction Agreement, dated as of May 27, 2009, submitting itself and its assets to the jurisdiction of the Bankruptcy Court.

6. On April 27, 2009, the Debtor filed a Motion to Approve Stipulation on the Motion to Reconsider, which the Court allowed on May 21, 2009. The Court also docketed an Order Re-Converting Case to Chapter 11 on that same date.

7.  On July 7, 2009, the Debtor filed a Motion For Order Extending Plan Related Deadlines, which was allowed by the Court on July 15, 2009 (the "Extension Order"). Pursuant to the Stipulation, as amended by the Extension Order, the following relevant deadlines are in effect: (i) filing of the Debtor's chapter 11 plan and related disclosure statement by October 5, 2009 (the "Plan Filing Deadline"); and (ii) confirmation of such Plan by November 17, 2009 (the "Confirmation Deadline"). Also, pursuant to the Stipulation, a hearing is to be held on a motion to approve a sale of all assets in the Debtor's Chapter 11 case by November 17, 2009 (the "Sale Hearing Deadline", and collectively with the Plan Filing Deadline and the Confirmation Deadline, the "Stipulation Deadlines").

8.  The exclusive periods under Section 1121 of the Bankruptcy Code were reinstated when the Court converted the Debtor's case to chapter 11 pursuant to section 706 of the Bankruptcy Code. In connection with the Extension Order, the Debtor's exclusive period to file its chapter 11 plan (the "Exclusive Filing Period") was extended for only 15 days to October 5, 2009; the Debtor's exclusive period to solicit votes for such plan (the "Exclusive Solicitation Period", and collectively with the Exclusive Filing Period, the "Exclusivity Periods") is November 17, 2009.

9.  The Debtor recently filed a motion to further extend the Stipulation Deadlines and the Exclusivity Periods on an expedited basis ("Motion to Extend Exclusivity"). A hearing is currently scheduled on the Motion to Extend Exclusivity for October 5, 2009. The Debtor contemplates filing a separate motion to employ and retain CRG Partners Group LLC ("CRG Partners") as the Debtor's financial advisor.

## Jurisdiction

10. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.

11. Venue of this proceeding and this Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

12. The statutory predicates for the relief sought herein are (i) sections 105(a), 363, 503, and 507 of the Bankruptcy Code; (ii) Rules 2002(a)(2), 6004, and 9007 of the Federal Rules of Bankruptcy Procedure; and (iii) LBR 6004-1.

## Letter of Intent

13. For the last several months, the Debtor continued to actively pursue all available restructuring alternatives. To that end, the Debtor and its counsel have been engaged in numerous meetings, productive dialogues, and/or negotiations with several potential investors, acquirers, and other interested parties. In fact, counsel for the Debtor has started dialogues and negotiations with counsel for the Plan Sponsor since the day after the Court entered the order reconverting the Debtor's case to chapter 11 (i.e., May 21, 2009).

14. Such negotiations have thus far resulted in the LOI, which memorializes a transaction (the "Transaction") valued at approximately $55,000,000, pursuant to which the Plan Sponsor will, among other things, acquire all assets of the Debtor and the Related Entities (collectively, the "Assets") free and clear of all liens, claims and encumbrances, and fund completion of the Debtor's bottling facility and the start-up of the water distribution operation. The Debtor anticipates that the Transaction will be sufficient to pay the allowed prepetition secured claims, administrative expense and priority claims, as well as to provide sufficient funds

for the unsecured creditors holding allowed claims, if not full payment based on anticipated objections to claims raised by the Creditors' Committee, to confirm a chapter 11 plan.

15. While the LOI provides that the Debtor cannot file, solicit or support any proposed filing involving any transaction concerning the Assets or the equity of the Debtor after execution of the LOI and before the Court enters an order (the "LOI Order") approving the terms and conditions of the LOI on or before October 8, 2009 (the "Initial Exclusivity Period"), after such date, the Debtor may continue to negotiate with other interested parties, provided that the Plan Sponsor reserves in the LOI the right to extend the Initial Exclusivity Period through and including the earlier of (i) the effective date of the plan of reorganization incorporating the terms of the LOI, (ii) termination of the proposed Transaction by the Plan Sponsor, or (iii) ninety (90) days. The Plan Sponsor would be entitled to take such action within three (3) business days following receipt of written notice from the Debtor of an alternative transaction, which extension is subject only to the Plan Sponsor waiving the financing contingency in the LOI (to the extent the alternative transaction has no financing contingency).

16. A copy of the LOI is attached hereto as Exhibit A. The material terms of the LOI include the following:[3]

| *General Terms/ Transaction* | The Plan Sponsor will provide funding to support a plan of reorganization premised upon a sale of substantially all of the assets of the Debtor and the Related Entities, free and clear of all liens, claims and encumbrances. |
|---|---|
| *Funding Amount* | The proposed plan funding amount is $55,000,000 ("Plan Funding"). |
| *Use of Proceeds* | Up to $12,000,000 of the Plan Funding will be disbursed pursuant to a chapter 11 plan to pay and/or satisfy all claims of all creditors (whether secured, |

---

[3] The summary of the terms and conditions of the LOI described in this Motion are qualified in their entirety by the terms and conditions of the LOI which is annexed hereto as Exhibit A. To the extent that this Motion and the terms of the LOI are inconsistent, the terms of the LOI will control.

|  | administrative, priority or unsecured) against the Debtor's estate, inclusive of the Related Entities. Up to $1,000,000 of the Plan Funding will fund certain Professional Fee and Expense Claims (as defined in the LOI). The balance of the proceeds from the Plan Funding will be made available to NewCo (as defined below), for general working capital purposes and to complete the bottling facility. |
|---|---|
| *New Co* | The Plan Sponsor will form a new company ("NewCo") to own the Assets. The assets of NewCo will be encumbered by a first priority lien to the funding source arranged by the Plan Sponsor. |
| *Structure of NewCo* | The Plan Sponsor will own sixty-five (65%) percent equity interest in NewCo; the remaining thirty five (35%) percent will be owned by the existing shareholders of the Debtor. |
| *Board Representation* | NewCo's board of directors will have 5 members, 4 of which will be chosen by the Plan Sponsor, including the Chairman. |
| *Exclusive Dealing and Alternate Transactions* | As discussed above, from the date of the execution of the LOI until entry of the LOI Order, the LOI provides that the Debtor will deal exclusively with the Plan Sponsor. After the entry of the LOI Order and to the extent the Debtor seeks to pursue an alternative transaction, the Plan Sponsor will have the right to extend the Initial Exclusive Period (as defined in the LOI) pursuant to the terms of the LOI and as described above. |
| *Conditions to Transaction* | The obligations of the Plan Sponsor to complete the Transaction will be subject to certain conditions, including: (i) the filing of the various documents with and entry of the various orders by the Bankruptcy Court within the time periods and upon the terms set forth in the LOI; (ii) the Plan Sponsor to receive financing to support the transaction in an amount of no less than $55,000,000; (iii) all necessary permits, approvals, groundwater |

|  | rights and mineral rights necessary for the operations of the business; |
|---|---|
|  | (iv) appraisal of the real estate and valuation of the mineral rights; |
|  | (v) execution and enforceability of certain third party agreements or letter of intent; |
|  | (vi) maximum construction amount, and time period to complete construction of the facility; |
|  | (vii) the Plan Sponsor to be satisfied that the costs to complete the facility will not exceed $17,555,000; |
|  | (viii) satisfactory insurance commitment; and |
|  | (ix) certain employment or consulting agreements. |
| *Termination and Termination Fees* | In the event the conditions to consummate the Transaction as set forth in the LOI are not timely achieved or otherwise satisfied, the Plan Sponsor shall have the right to terminate the Transaction. In the event the Transaction is not consummated, as discussed below, the Plan Sponsor will be entitled to a Termination Fee or Reduced Termination Fee (both as defined below) under the LOI. |
| *Bankruptcy Court Approval* | To the extent the Bankruptcy Court does not approve the terms and conditions of the LOI on or before October 8, 2009, the Plan Sponsor may terminate the Transaction. The LOI also provides for certain other deadlines, including with respect to approval by the Bankruptcy Court of the chapter 11 plan and related disclosure statement. |
| *Deposit* | Within 5 days from entry of the LOI Order, the Plan Sponsor will deposit $50,000 to be held in escrow by an escrow agent. |

## Relief Requested

17.     The Debtor believes that the best process for maximizing the value of its assets and business is one that seeks an investment to fund a chapter 11 plan or reorganization that capitalizes on the entities' potential. The LOI is the first written offer received that would further that process. Under the circumstances, by this Motion, the Debtor seeks entry of an order, on or before October 8, 2009, (i) approving the terms and conditions of the LOI, including authorization of the Termination Fees (as defined below), and (ii) granting related relief.

18.     Considering the Initial Exclusivity Period discussed above, the Debtor requests that the Court either approve or deny the Motion, as appropriate, on the hearing date.

## Basis For Relief

19.     The LOI is subject to approval by the Bankruptcy Court. Section 363(b) of the Bankruptcy Code provides that the debtor in possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Also, pursuant to section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

### A.     Authority to Enter Into the LOI

20.     Where a debtor seeks authority to act under Bankruptcy Code § 363, the debtor's actions should be approved if such debtor demonstrates good faith, the exercise of sound business judgment, and a benefit to its bankruptcy estate. See, e.g., In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001). See also Committee of Asbestos-Related Litigants v.

Johns-Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), court will generally not entertain objections to debtor's conduct."); In re Logical Software, Inc., 66 B.R. 683, 686 (Bankr. D. Mass. 1986) (a debtor's business decision should be accepted by the bankruptcy court unless it is shown to be "so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.").

21. The Debtor has demonstrated its good faith and sound business judgment for entering into the LOI. The LOI represents the best restructuring alternative currently available to the Debtor. The Debtor has been on record regarding the necessary significant investment commitment before the Debtor can complete building its facility and begin operation of its business. To induce the Plan Sponsor to negotiate definitive documentation and incur further fees and expenses, however, the Debtor requests authority from this Court to enter into the LOI. The LOI remains subject to definitive documentation and the Transaction proposed in the LOI remains subject to approval by this Court and related procedures set forth for a plan in the Bankruptcy Code. Most importantly, the Debtor may pursue alternative transactions.

**B. The Termination Fees Under the LOI**

22. Pursuant to the LOI, and assuming the Plan Sponsor is able and willing to consummate the Transaction, in the event (i) the Transaction is not consummated, (ii) a plan not involving the Plan Sponsor is confirmed, or (iii) the Assets or equity interests of the Debtor or the Related Entities are sold or transferred to a third party, and the Plan Sponsor terminates the Transaction, the Plan Sponsor shall be entitled to a termination fee equal to the reasonable out-

of-pocket costs and expenses incurred by the Plan Sponsor in connection with the Transaction, plus a sum equal to $1,500,000.00 (collectively, the "Termination Fee"). The LOI also provides that to the extent the Plan Sponsor terminates the Transaction but an alternative transaction is otherwise consummated, the Plan Sponsor shall be entitled to a termination fee in a reduced amount equal to reasonable out-of-pocket costs and expenses incurred by the Plan Sponsor in connection with the Transaction, plus a sum equal to $750,000 (the "Reduced Termination Fee", and collectively with the Termination Fee, the "Termination Fees").

23. Pursuant to the LOI, such Termination Fees, as applicable, shall be due and payable pursuant to Section 503(b) of the Bankruptcy Code upon the earlier of (i) the effective date of such alternative plan; or (ii) consummation of such asset sale, or (iii) conversion or dismissal of the Bankruptcy Proceeding, provided that upon such conversion or dismissal the Termination Fees, as applicable, shall be subject to certain allowed Professional Fee and Expense Claims (as defined in the LOI) and any administrative expense claims of the United States Trustee.

24. Incentives such as the Termination Fees encourage a potential plan sponsor to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives, including traditional break-up fees and expense reimbursement provisions under the business judgment rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 657 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (establishing three basic factors for determining whether to permit such fees in

bankruptcy: whether ( i) relationship of parties which negotiated the termination fee is tainted by self-dealing or manipulation; (ii) the fee hampers, rather than encourages, bidding; and (iii) amount of fee is unreasonable relative to purchase price). See also In re RSL COM Primecall, Inc., 2002 Bankr. LEXIS 367 (Bankr. S.D.N.Y. 2002) (confirmed the business judgment rule approach in the Integrated Resources case); In re Bidermann Industries U.S.A., Inc., 203 B.R. 547 (Bankr. S.D.N.Y. 1997) (applying the business judgment rule in rejecting an expense reimbursement of approximately $2,000,000 and a topping fee of approximately $2,000,000);[4] 995 Fifth Ave. Assocs. L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking"). Cf. In re Public Service Co of New Hampshire, 160 B.R. 404 (Bankr. N.H. 1993) (citing to the Integrated Resources case in stating that allowance of break-up fees has occurred in situations where all parties and the Court were on proper notice that such bidding incentive will be requested). The Debtor submits that the Termination Fees are necessary to convince the Plan Sponsor to agree to the Transaction and otherwise meet the tests set forth above.

25. Other courts have used more restrictive approaches, such as the requirement that the fee or other buyer protections be in the best interest of creditors and equity holders. See In re Wintz Companies, 230 B.R. 840 (Bankr. 8th Cir. 1999); S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Ill. 1995); In re Hupp Industries, Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992). Cf. In re Commercial Mortgage and Finance, Co., 2009 Bankr. LEXIS 593 (Bankr. N.D. Ill. 2009) (citing to In re S.N.A. Nut Co., 186 B.R. at 105) (stating that the best interest of the estate test is used

---

[4] The Court denied the fee without considering its reasonableness in relation to the purchase price because the first criteria had not been met (e.g., the fee was tainted by self-dealing and manipulation).

11

instead of the business judgment rule when a chapter 11 case involved liquidation, rather than reorganization).

26. The totality of the circumstances dictates the reasonableness of a break-up fee under the fact of each case. Some of the factors considered by the courts using the best interest of creditors approach include the following:

> (a) whether the fee requested correlates with a maximization of value to the debtor's estate;
>
> (b) whether the underlying negotiated agreement is an arm's-length transaction between the debtor's estate and the negotiating acquirer;
>
> (c) whether the principal secured creditors and the creditors' committee are supportive of the concession;
>
> (d) whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;
>
> (e) whether the dollar amount of the break-up fee is so substantial that it provides a "chilling effect" on other potential bidders;
>
> (f) the existence of available safeguards beneficial to the debtor's estate; and
>
> (g) whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

In re Nashville Senior Living, 2008 Bankr LEXIS 3197 (Bankr. M.D. Tenn. 2008) (citing to In re Hupp Industries, Inc., 140 B.R. at 194). In any event, according to literature in the field, courts often approve break-up fees equal to 1-3% of the size of the deal. Here, a $750,000 fee in the face of an alternative transaction would equal but 1.4% based on the $55 million proposal.

27. The Termination Fees satisfy both the "business judgment rule" as adopted in the Integrated Resources case and the "best interest of the estate" standard used by other courts. The decision to enter into the LOI with the Plan Sponsor would benefit the Debtor's estate and its creditors, and reflects an exercise of the Debtor's business judgment. The LOI and the

Termination Fees are the product of good faith, arm's-length negotiations between the Debtor and the Plan Sponsor. In addition, the Plan Sponsor would not have entered into the stalking horse LOI without the Termination Fees.

28. The Debtor's ability to offer the Termination Fees as a protection for the benefit of the Plan Sponsor enable the Debtor to ensure the Transaction while, at the same time, providing the Debtor with the potential of greater benefit to the Debtor's estate.

## Notice

29. The Debtor will serve notice of this Motion on (a) the United States Trustee, (b) counsel to Roswell, (c) all known creditors of the Debtor, (d) counsel for the Creditors' Committee, (e) parties that have requested notice of all pleadings, (f) counsel to the Plan Sponsor, and (g) all parties that have expressed an interest in investing in or purchasing the assets of the Debtor. In light of the nature of the relief requested, the Debtor submits that no further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto, granting the Motion and such other relief as may be just and proper.

Dated: October 2, 2009

Respectfully submitted,

USA Springs, Inc.
By its attorneys

/s/ Alan L. Braunstein
Alan L. Braunstein (BNH 01544)
Guy B. Moss (BNH pending)
Macken Toussaint (BNH 06943)
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000
abraunstein@riemerlaw.com
mtoussaint@riemerlaw.com

- and -

/s/ Bruce A. Harwood
Bruce A. Harwood (BNH 01519)
Sheehan Phinney Bass + Green, P.A.
1000 Elm Street
P.O. Box 3701
Manchester, NH 03105-3701
(603) 627-8139
bharwood@sheehan.com