UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re )<br><br>USA Springs, Inc.[1] )<br><br> )<br>Debtor. ) | Chapter 11<br>Case No. 08-11816 (JMD) |

# DISCLOSURE STATEMENT RELATING TO PLAN
## OF USA SPRINGS, INC. AND RELATED ENTITIES
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED MAY 24, 2010

THIS DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN REFERRED TO ABOVE. SUCH ACCEPTANCES MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED.

Alan L. Braunstein, Esq.
Macken Toussaint, Esq.
Riemer & Braunstein LLP
Three Center Plaza
Boston, MA 02108
(617) 523-9000
abraunstein@riemerlaw.com
mtoussaint@riemerlaw.com

COUNSEL TO THE DEBTOR

DATED: May 24, 2010

Bruce A. Harwood, Esq.
Sheehan Phinney Bass + Green P.C.
1000 Elm Street
Manchester, NH 03105
(603) 627-8139
bharwood@sheehan.com

[1] The affected entities are: USA Springs, Inc., a Delaware corporation (the Debtor), USA Springs, Inc., a New Hampshire corporation, Garrison Place Real Estate Investment Trust, Just Cause Realty Trust, Sweet Review Realty Trust, and Amici Real Estate Trust.

TABLE OF CONTENTS

Page

   A.     Introduction ............................................................................................ 5
   B.     Overview of Chapter 11 ...................................................................... 6
   C.     Purpose and Effect of Plan/ Loan Transaction ............................... 6
   D.     Plan Supplement .................................................................................. 7
   E.     Confirming and Consummating the Plan ......................................... 7

II.    BACKGROUND ................................................................................................ 7

   A.     Overview of USA Springs' Project .................................................... 7
   B.     Corporate/ Capital Structure ............................................................. 8
   C.     Permits and Water Rights ................................................................... 9
   D.     Third Party Contracts and Relationships ....................................... 11
   E.     The USA Springs Project and the Nottingham Community ......... 11

III.   ASSETS OF, CLAIMS AGAINST AND INTERESTS IN THE PLAN
       PARTIES .......................................................................................................... 12

   A.     Assets Related to the USA Springs' Project .................................. 12
   B.     Asset Valuation .................................................................................. 13
   C.     Secured Claims .................................................................................. 13
   D.     Administrative Expense Claims and Priority Tax Claims ............ 15
   E.     General Unsecured Claims ............................................................... 15
   F.     Equity/ Beneficial Interests ............................................................. 15
   G.     Insider Claims .................................................................................... 16

IV.   CHAPTER 11 CASE ....................................................................................... 16

   A.     Overview-- Events Leading to The Chapter 11 Case .................... 16
   B.     The Bankruptcy Proceeding ............................................................ 16
   C.     Appointment of The Official Committee of Unsecured Creditors ......... 20
   D.     Employment of Debtor Professionals ............................................. 20
   E.     Claims Bar Date ................................................................................ 20

V.    SUBSTANTIVE CONSOLIDATION .......................................................... 21

   A.     Substantive Consolidation In General ........................................... 21
   B.     Prior Substantive Consolidation Motion ....................................... 21
   C.     Substantive Consolidation of the Plan Parties Under the Plan .............. 21
   D.     Legal Authority in Support of Substantive Consolidation ........... 22
   E.     Substantive Consolidation of the Plan Parties Is Appropriate .............. 25
   F.     Substantive Consolidation Order .................................................... 26
   G.     Reservation of Rights ........................................................................ 27

VI.   LOAN TRANSACTION ................................................................................. 27

   A.     Initial Commitment ........................................................................... 27
   B.     Material Terms of Commitment ...................................................... 28

VII.   SUMMARY OF THE CHAPTER 11 PLAN....................................................................**30**

    A.    Introduction..........................................................................................30
    B.    Unclassified Claims and Treatment ......................................................31
    C.    Classification and Treatment of Classified Claims and Interests ..........32
    D.    Acceptance or Rejection of the Plan .....................................................35
    E.    Means For Implementation of the Plan..................................................36
    F.    Treatment of Executory Contracts and Unexpired Leases .....................39
    G.    Provisions Governing Distributions.......................................................40
    H.    Procedures for Resolving Disputed Claims ...........................................42
    I.    Conditions Precedent to Confirmation and Consummation of the Plan..................43
    J.    Retention of Jurisdiction ......................................................................44
    K.    Effect of Confirmation.........................................................................46
    L.    Miscellaneous Provisions.....................................................................48

VIII.  VOTING ON AND CONFIRMATION OF THE PLAN ...............................................**50**

    A.    General..................................................................................................50
    B.    Acceptance Necessary for Confirmation ...............................................51
    C.    Voting Procedures.................................................................................51

IX.    CONFIRMATION AND CONSUMMATION PROCEDURE ......................................**51**

    A.    Solicitation of Votes .............................................................................51
    B.    The Confirmation Hearing.....................................................................52
    C.    Confirmation.........................................................................................52
    D.    Consummation......................................................................................55

X.     RISK FACTORS.....................................................................................................**55**

    A.    General..................................................................................................55
    B.    Certain Bankruptcy Law Considerations ...............................................55
    C.    Approval and Closing of the Loan Transaction......................................56

XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ................................**56**

XII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
       PLAN.....................................................................................................................**56**

    A.    Liquidating Plan Under Chapter 11 .......................................................57
    B.    Liquidation Under Chapter 7 .................................................................57
    C.    Dismissal of the Chapter 11 Case ..........................................................57

XIII.  CONCLUSION AND RECOMMENDATION ...........................................................**58**

# INTRODUCTION

USA Springs, Inc., a Delaware corporation (the "Debtor") and the Related Entities submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the Bankruptcy Code, to Holders of Claims and Interests in connection with the *Plan of USA Springs, Inc. and Related Entities Under Chapter 11 of the Bankruptcy Code,* dated May 24, 2010, as the same may be amended from time to time (the "Plan").

**All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Plan.**

The information contained herein has been prepared by the Debtor in good faith and in reliance upon its books and records. The financial information herein has not been subject to an audit.

The Debtor believes that this Disclosure Statement complies with the requirements of the Bankruptcy Code.

The statements contained in this Disclosure Statement are generally made as of the date hereof, unless another time is specified, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the information set forth herein since the date of this Disclosure Statement or the date of the materials relied upon in preparation of this Disclosure Statement.

This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Plan Parties or any other party, or be deemed conclusive advice on the tax or other legal effects of the Plan on Holders of Claims or Interests.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself. Each Holder of a Claim or an Interest should read, consider and carefully analyze the terms and provisions of the Plan. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling.

In connection with the closing of the contemplated Loan Transaction, below is a summary of classification and treatment of classified Claims and Interests. In the event the Loan Transaction is not consummated and the Plan is amended to incorporate an Alternative Transaction or a Liquidating Plan, the classification and treatment of such Claims and Interest may change.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Impaired | Entitled to Vote |
| 2 | First Lien Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Interests | Impaired | Entitled to Vote |

## A.    Introduction

The Debtor has prepared this Disclosure Statement in connection with its solicitation of acceptances of the Plan filed with the Bankruptcy Court.  The purpose of this Disclosure Statement is to provide Holders of Claims and Interests with sufficient information to make an informed decision as to whether to accept or reject the Plan.  The Plan is a legally binding arrangement and should be read in its entirety.  No summary of the Plan should be relied upon in determining whether to accept or reject the Plan.

Each Class of Claims or Interests entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting on the Plan. The Ballot for acceptance or rejection of the Plan will be enclosed with this Disclosure Statement Order and Disclosure Statement if you are entitled to vote to accept or reject the Plan.

As prescribed by the Bankruptcy Code and the Bankruptcy Rules, Claims asserted against, and Interests in, the Plan Parties are placed into "Classes." The Plan designates five (5) separate Classes of Claims and Interests.  The classification of Claims and the treatment of each Class is discussed in the Plan and in Article VII of this Disclosure Statement.

Under the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" are entitled to vote to accept or reject the Plan.  The Claims in Classes 1 to 5 are Impaired.  Each Class of Claims or Interests who are entitled to vote on the Plan may do so by completing and mailing the Ballot to the address set forth on the Ballot so that it is received by the deadline set forth in the Disclosure Statement Order or any separate notice  (the "Voting Deadline").

The following are **NOT** entitled to vote on the Plan or are deemed to have rejected the Plan without voting.  Therefore, they will not receive Ballots with the approved Disclosure Statement and the Disclosure Statement Order:

- **Administrative Expense Claimants**
- **Holders of Fee Claims**
- **Holders of Priority Tax Claims**
- **Claimants whose Claims have been fully disallowed**
- **Claimants whose Claims are Disputed Claims**

If you are not listed above and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please call the Debtor's counsel, Alan L. Braunstein, Esq. at (617) 880-3516 or Macken Toussaint, Esq., at (617) 880-3461.

If you are not entitled to vote solely because your Claim is a Disputed Claim or is the subject of a pending objection, you may apply to the Bankruptcy Court for an order allowing your Claim for voting purposes.

The Bankruptcy Code defines "acceptance" of a plan by a Class of Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the claims of that class that cast ballots for acceptance or rejection of the plan. The Debtor is seeking acceptance of the Plan by Holders of Claims and Interests in Classes 1 to 5.

After carefully reviewing this Disclosure Statement, including the Exhibits, each Impaired Class of Claims or Interests that is entitled to vote should vote on the enclosed Ballot and return the Ballot so that it is *actually received* by the Voting Deadline. If you have a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots for each Claim.

All Holders of Claims or Interests entitled to vote should vote and return their Ballots as set forth in the Disclosure Statement Order to be served with the approved Disclosure Statement.

To be counted, your Ballot must be *ACTUALLY RECEIVED* at the appropriate address by the Voting Deadline. Ballots must be delivered by mail, courier, or delivery service. Facsimile ballots will *NOT* be accepted. Any completed Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will be counted as accepting the Plan.

## B.  Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, Chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

Consummating a plan is the principal objective of a chapter 11 case. The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind and in sufficient detail to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

## C.  Purpose and Effect of Plan/ Loan Transaction

The Debtor is committed to pursue the Loan Transaction under the Transaction Documents in the absence of more attractive alternatives. On the Effective Date, the Plan Parties

expect to consummate the Loan Transaction. The Debtor also expects to receive a final commitment from the Lender after the due diligence period expires on or about June 7, 2010. Assuming the Lender submits such final commitment to the Debtor, the loan closing is expected to take place approximately 45 to 60 days thereafter.

Subject to the due diligence referred to above, the Lender is committed to fund the USA Springs Project with a $55,000,000 loan to be collateralized by substantially all assets of the Plan Parties. Entry of the Confirmation Order will constitute the approval, pursuant to sections 105(a), 363 and 364 of the Bankruptcy Code, effective as of the Effective Date, of the Loan Transaction. A summary of the commitment terms related to the Loan Transaction is set forth in Article VI.

In the event the Loan Transaction is not consummated, the Debtor may have the benefit of certain Alternative Transaction(s) and the Plan will be amended or modified to incorporate such Alternative Transaction. The Debtor also reserves its right to amend the Plan as to a Liquidating Plan, if necessary.

**D.      Plan Supplement**

The Plan Supplement will be filed with the Bankruptcy Court at least five (5) Business Days prior to the commencement of the Confirmation Hearing.

**E.      Confirming and Consummating the Plan**

It shall be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order. In addition, certain other conditions contained in the Plan shall have been satisfied or waived pursuant to the provisions of Article X of the Plan.

Following confirmation, the Plan will be consummated on the Effective Date (as provided for and defined in the Plan).

## II.      BACKGROUND

**A.      Overview of USA Springs' Project**

The Debtor, a Delaware corporation, was formed in 1997 by Francesco Rotondo (Mr. "Rotondo"), the current president of the Debtor, to develop and operate a commercial water bottling production facility in Nottingham, New Hampshire. The completed facility is expected to be on approximately 200 acres, with 4,000 plus feet of frontage on a highway that connects Portsmouth (approximately 9 miles away) and Concord (approximately 18 miles away). Prior to the Petition Date, the necessary power and infrastructure were on site and the Debtor commended construction of a 176,000 square feet manufacturing facility. In summary, the USA Springs Project achieved the following milestones before the bankruptcy filing:

- The building foundation and steel frame are in place and the overall building is 45% completed.

- Site engineering, surveying, structural design are 100% completed.

- Architectural design is 75% completed.

- Bottling equipment design and development is 50% completed.

- Three wells have been drilled, tested, and capped on-site, resulting in an initially certified sustainable pumping rate of 307,528 gallons per day [(214 gallons per minute)] of pure water.

- The State's Large Ground Water Withdrawal Permit, among others, has been acquired.

- An extensive groundwater and wetland-monitoring program required by the Large Ground Water Withdrawal Permit has been in place and active.

- Perimeter surveys of the land and all engineering design for the plant has been completed and approved.

- Excavation and construction of new wetlands, detention ponds, entrance roads, parking lots, production well roads, and easements have been brought to near completion.

- Wetlands identification and intensity soil mapping, and topographic land survey have been completed.

- Land use master plan completed- including septic and water discharge designs.

The involved parties have spent approximately $17,000,000 with respect to the USA Springs Project, including, but not limited to land acquisition, engineering, well drilling and monitoring, hydrogeology, construction, power service access, utilities, permitting, remediation, security, closing costs and loan interest payments, public relations, real estate taxes, land development, and existing building improvements.

## B. Corporate/ Capital Structure

As of the Petition Date, Mr. Rotondo owned approximately 46% of the Debtor's common stock. Approximately 37 other individuals or entities owned common stock in the Debtor ranging from 0.125% to 10%. The officers and directors of the Debtor prior to the bankruptcy were as follows: Mr. Rotondo (president, treasurer, and director); Jeffrey DeLucia (vice president and director); Rocci DeLucia (clerk); Marco Rotondo (director); William Gianopoulos (director); and William Barlett (director).

The Debtor owns 100% shares of common stock of U.S.A. Springs, Inc., a New Hampshire corporation ("N.H. Corp."). N.H. Corp. was organized in [June 9, 1997]. Its President and Chairman of the Board is Mr. Rotondo. N.H. Corp.'s main asset is the Large Ground Water Withdrawal Permit discussed herein.

The Debtor is also the sole beneficiary under the following trusts with Mr. Rotondo named as the sole trustee for each:

(i) The Garrison Place Real Estate Investment Trust ("Garrison Trust"): The Garrison Trust was created by a Declaration of Trust dated April 23, 1998. The Garrison Trust is the title holder for the 100 acre parcel located in Nottingham, NH (with a portion of the land in Barrington, NH) on which the water production wells and the bottling facility are to be located.

(ii) Just Cause Realty Trust ("Just Cause Trust"): The Just Cause Trust was created by a Declaration of Trust dated June 2, 2003. Just Cause Trust is the title holder for the 14 - acre parcel, located in Nottingham, NH to the west of the bottling plant site, on which certain office building and industrial warehouse are to be located.

(iii) Sweet Review Realty Trust ("Sweet Review Trust"): The Sweet Review Trust was created by a Declaration of Trust dated April 25, 2006. Sweet Review Trust holds title to the 76 acre parcel of vacant land, located in Nottingham, NH immediately to the west of the Just Cause Trust site, on which a cellular tower is located.[2]

## C.   Permits and Water Rights

The Debtor, through the Debtor Related Entities, has obtained and maintained all relevant permits, including building permit and the Large Groundwater Withdrawal Permit issued by the New Hampshire Department of Environmental Services. The permits that the USA Springs Project benefits from include the following:

| Permit | Agency/ Bureau/Division | Permit Type |
|---|---|---|
| Large Groundwater Withdrawal [(LGWP-2004-003] | State of NH; DES | Operating |
| NHDOT Highway Entrance (06-351-9296] | State of NH; DOT | Construction |
| Site Specific [WPS-7147] | State of NH; DES | Construction |
| Site Specific [WPS-7147-A] | State of NH; DES | Construction |
| Site Specific – Alteration of Terrain [WPS-7147-C] | State of NH; DES | Construction; see new permit WPS-7147-D |
| Site Specific – Alteration of Terrain [WPS-7147-D] | State of NH; DES | Construction |

---

[2] The Debtor has an arrangement with a third party who pays approximately $842 per quarter with respect to the cellular tower].

| | | |
|---|---|---|
| Dredge & Fill (Wetlands) [2001-00716] | State of NH; DES | Construction |
| Dredge & Fill (Wetlands) [2004-02817] | State of NH; DES | Construction |
| Dam Permit [184.22] | N/A | Construction and Operating |
| Septic System [CA 2005572713] | DES/ Subsurface Systems | Construction |
| Groundwater Management [GWP-200302008-N-01] | State of NH; DES | Construction |
| Certificate of No Further Action [20302008] | State of NH; DES | Construction |
| Site Plan Review State Permit Conditions [2001-00716] | State of NH; DES | Construction |
| Non-Domestic Waste Hold Tank [DES# 200211005] | State of NH; DES | Operating |
| New Source Bottled Water [USA-1, USA-2, USA-4] | State of NH; DES | Operating |
| Building Permit (foundation) [141-06] | Town of Nottingham; Building Department | Construction |
| Building Permit (building) [085-07] | Town of Nottingham; Building Department | Construction |
| Declaration of Restrictive Covenant [NAE-2004-2551] | State of NH; DES | Construction |
| Declaration of Restrictive Covenant-Attachment A [NAE-2004-2551] | State of NH; DES | Construction |
| Work Stat Notification [NAE-2004-2551] | US Army Corps of Engineers; New England District | Construction |

The permits are transferrable and, if expired, are renewable (subject to certain perquisites). The permitting process and permit structure has been handled by the Debtor's professionals throughout the 7 year process with great care and attention. Although the permits have been obtained at various times over the past 6 years, all actions necessary to activate the permits and to

maintain them have been taken and the Debtor believes that its interests in the various permits have in effect been vested.

Also, pursuant to the Large Ground Water Withdrawal Permit discussed above, prepetition, three 500+ feet deep bedrock wells have been drilled on the property, from which the water was tested by the University of New Hampshire for quality. These wells have a permitted capacity to pump 307,528 gallons per day (214 gallons per minute) to supply the production of water for three production lines. The Debtor will use for the USA Springs Project the most highly recognized bottling process equipment in the industry and intends to continue working closely with the leading companies of designing water bottling facilities, such as Sidel Solutions, Inc. together with Husky Injection Molding Systems, Inc. who have designed the manufacturing processes for the USA Springs Project.

## D.      Third Party Contracts and Relationships

The USA Springs Project has in place several third party relationships and/or contracts related to building construction, site work, acceleration and deceleration lane construction; wetlands monitoring; ground water monitoring; civil surveying and engineering; Large Ground Water Withdrawal Monitoring program; site land management; site security; and Storm Water Pollution Protection Plan, which include the following:

(i) Agreement, dated as of February 5, 2010, with Aho Construction Inc. with respect to building construction. Aho is a major creditor and the Debtor intents to assume the contract in connection with this Plan.

(ii) Letter agreement, dated as of July 7, 2006, with MyKrowaters with respect to certain monitoring requirements. This entity is a Committee Member.

(iii) Independent Contractor Agreement, as of 2007, with Diom Inc. (n/k/a Dynamic Industrial Operations Management) with respect to security services. This entity is a Committee Member.

(iv) Letter Agreement, dated as of December 26, 2006, with Frank DeLucia & Son Inc. with respect to site work. Certain principal owner of this entity acts as an officer of the Debtor.

(v) Post-petition agreement(s) with NHSC Inc., as of 2009, with respect to wetlands monitoring and reporting. This entity is a Committee Member.

## E.      The USA Springs Project and the Nottingham Community

Despite an apparent contentious relationship between the Nottingham Community and the Debtor that pervaded the pre-petition and post-petition period, counsel to the Debtor has endeavored to (1) ascertain the nature of the concerns and disputes; and (2) make a serious effort to reach out and/or respond to community representatives and certain individuals in the Community raising particular issues. The Debtor will also attempt to address many of these concerns within the context of the Plan and engage in the negotiation process with third parties. (In fact, Debtor's counsel has made inquires of the prospective lenders, investors and even acquirers as to their intentions as they relate to the Community and the environmental

infrastructure. Each of those parties that have advanced proposals thus far have recognized the significance of the Debtor's request that there be an effort to understand the concerns of the Community so that efforts will be undertaken to provide jobs, and other potential benefits to the Community. The efforts to promote harmony contemplated by the Debtor are sincere; and while the Debtor is aware that there remains several recalcitrant individuals who claim they will "stop at nothing" to derail and destroy the Debtor's efforts to successfully reorganize, the Debtor will, as it has done, challenge those who seek to deprive the Debtor of its vision for success and to foster an optimum working relationship within the Community.

Among the contemplated interrelated concessions are (1) retention of local employees; (2) retention of local companies, including Aho Construction, Inc. of Nashua to complete the building; (3) retention and utilization of local vendors to provide services; and (4) sponsorship of community activities. All of these and other potential contemplated commitments to the Community are predicated on the financing contemplated in the Plan. In the event one of the Alternative Transactions becomes necessary then the Debtor will advocate with undaunted resolve to ensure that efforts to work with the Community is part of any lender, partner or acquirers budget. However, none of these commitments are likely absent a successful reorganization.

Specifically, once operational, the Reorganized Debtor expects to create approximately 200 new jobs, including new positions for management, sales and marketing, warehouse positions, quality control, and plan operations. Also, the projected tax revenue to the community would be substantial, including with respect to real estate taxes.

## III. ASSETS OF, CLAIMS AGAINST AND INTERESTS IN THE PLAN PARTIES

As discussed below in Article IV.E, the order approving the Initial Bar Date Motion (as defined below) is limited to Creditors asserting claims against the Debtor and does not apply to Creditors of the Related Entities, if any. The Claim estimates below are subject to any additional Claims that may be filed by separate Creditors of the Related Entities.

### A. Assets Related to the USA Springs' Project

The Debtor has listed in its bankruptcy Schedules its ownership interests in the Debtor Related Entities and/or their assets as discussed above. In addition to the main assets discussed above, the Debtor also made a deposit of $125,000 prepetition related to a water right option. There are also the following water supply letters of interest that the Debtor received pre-petition through personal relationships of Mr. Rotondo:

   (i)     A conditional contract with the International Organization for Diplomatic Relations in Malta (the "IODR") for the supply of bottled water by the Debtor to the IODR for a period of ten (10) years with annual payments by the IODR of Seventy Million Dollars ($70,000,000).

   (ii)    A preliminary letter of intent with Martini & Rossi for the supply of bottled water by the Debtor to Martini & Rossi for a period of five (5) years with annual payments by Martini & Rossi of: (1) Eighty Five Million Dollars ($85,000,000) in

year 1; (2) Eighty Eight Million Dollars ($88,000,000) in year 2; (3) Ninety One Million Dollars ($91,000,000) in year 3; (4) Ninety Three Million Dollars ($93,000,000) in year 4; and (5) Ninety Six Million Dollars ($96,000,000) in year 5.

(iii)      A preliminary letter of intent with the presso Hotel Escuela for the supply of bottled water by the Debtor to presso Hotel Escuela for a period of two (2) years with an annual payment by presso Hotel Escuela of Seventy Five Million Dollars ($75,000,000) in year 1 and Seventy Seven Million Dollars ($77,000,000) in year 2.

Moreover, post-petition, pursuant to the Jurisdiction Agreement discussed below in Article IV, the Debtor received the benefit of certain tract or parcel of land in the town of Raymond, County of Rockingham, New Hampshire, title of which is held by the Amici Trust. Certain shareholder and director of the Debtor is the beneficiary of this Amici Trust. The Amici Trust was created by a Declaration of Trust dated April 10, 2007. Its sole trustee is Ralph Faiella, Jr., a business associate of Mr. Rotondo.

## B.    Asset Valuation

Prepetition, the real estate assets were valued at approximately $27,000,000.00 (excluding mineral rights). In connection with a prepetition pollution liability insurance quote, a value of approximately $100,000,000.00 was associated with the water rights for the USA Springs Project. Post-petition, the Debtor ordered an appraisal and the value of the real estate assets is expected to be approximately $22,000,000.00 (not including water rights).[3]

## C.    Secured Claims

In addition to raising equity, the Debtor has funded its activities prepetition through various private loans and a first mortgage construction loan from Roswell Commercial Mortgage, LLC ("Roswell").

### 1.    First Lien Secured Claim

The Debtor Related Entities, as borrowers (the "Borrowers") are indebted to Roswell pursuant to a certain Term Commercial Note, dated March 26, 2007, in the amount of $8,400,000.00 by the Borrowers for the benefit of Roswell in connection with the Prepetition Credit Agreement. The Debtor and Mr. Rotondo have each guaranteed the obligations of the Borrowers to Roswell pursuant to certain Continuing Guaranty, dated as of March 26, 2007. The interest rate under the Term Commercial Note is the fix rate of twelve and 9/10[th] percent (12.9%) per annum.[4]

---

[3] References to real estate assets do not include Amici Trust real estate.

[4] During the term of the note, payments of interest are to be paid only on an initial advance of principal in the amount of $5,452,334.00 and upon such principal as may from time to time have been advanced and outstanding until the maturity date or sooner if the note is accelerated for an event of default.

The funds related to the Prepetition Credit Agreement were used, among others, for certain mortgage and loan payoffs, payment of site development costs to certain contractors, closing costs, and some construction related to the USA Springs Project. The Roswell loan matured on March 31, 2009. Roswell filed its revised proof of claim on October 27, 2008 (as amended on 8/28/09) in the amount of $8,559,170.80 as prepetition claim, not including certain fees, and post petition interests (this proof of claim amount includes $7,744,798.20 as principal, $759,416.54 for interest, and $44,936.14 for late fees). According to the Stipulation (as defined below), the Roswell proof of claim is allowed as of the Petition Date *provided that* the Debtor reserved its right to challenge any accounting issues, interest calculations, or the reasonableness of other charges incurred from the Petition Date to the date of final payment. In connection with the Stipulation (as defined below), the Debtor paid $10,000.00 to Roswell to reduce Roswell's claim, including interest, costs and attorneys' fees.

Also, under the Stipulation (as defined below), Roswell assigns to Riemer and SPB+G the first $35,000.00 of recoveries arising under the Roswell's mortgages and security interests, and also assigned to counsel to the Committee the next $7,500.00. Roswell shall be entitled to an unsecured claim in the bankruptcy case in an amount equal to the carveout as set forth in the Stipulation.

In addition, pursuant to the Stipulation (as defined below), all claims existing at the Petition Date or as of the date of such Stipulation in favor of the Debtor, or any of the Debtor Related Entities or Mr. Rotondo and against Roswell, or any of its officers, directors, shareholders, members, managers or agents were waived, released, and discharged. Such claim allowance, waivers and releases contained in the Stipulation shall not be binding upon a subsequent Chapter 7 Trustee in the Debtor's case.[5]

2.    Other Mortgages

In addition to the Roswell loan, in connection with the improvements, construction and development of the USA Springs Project, the Debtor and/or the Debtor Related Entities raised additional funds from individuals and entities by granting additional mortgages. As of the Petition Date, the following mortgages remained outstanding:

(a) On about July 2007, Garrison Trust granted mortgage(s) to Dorothy Sajous in connection with two loans in the original amount of $250,000 each.

(b) On or about August 2007, Garrison Trust granted a mortgage to Richard Mignault and Donna L. Mignault in connection with a loan in the original amount of $200,000.

(c) On or about August 2007, Garrison Trust granted a mortgage to William C. Gianopoulos in connection with a loan in the original amount of $480,000.

---

[5] Moreover, the Debtor has contended that the Roswell secured claim may be vulnerable to a trustee. Additionally, the amount of the claim is similarly believed subject to a potential challenge and reduction for penalties and other potential charges that may not be permissible, especially if the case were to be converted to Chapter 7.

(d) On or about December 2007, Just Cause Trust granted a mortgage to Frank Carozza in connection with a loan in the original amount of $300,000.

3.    Secured Debt of Amici Trust

By mortgage, dated May, 2007, the Amici Trust granted a mortgage in connection with a $200,000 note executed by the Amici Trust for the benefit of Richard and Donna Mignault. The August 2007 mortgage for the benefit of Richard Mignault and Donna Mignault by the Garrison Trust discussed above relates to the same obligation.

## D.    Administrative Expense Claims and Priority Tax Claims

1.    Administrative Expense Claims

Certain entities who were rendering services pre-petition have submitted or allege claims in the total amount of $200,000.00 for post-petition services in connection with the USA Springs Project.   Such services related to among other things, voluntary monitoring of the site and security.  Pursuant to the Initial Bar Date Motion, the Debtor reserves its rights to object to all Administrative Expense Claims.

2.    Priority Tax Claims

The real estate tax bills, of May 6, 2010, from Town of Nottingham reflect taxes due of approximately $302,000.00. The Debtor also expects to pay real estate taxes due to Town of Barrington (with respect to the portion of the Garrison Trust land) and Town of Raymond (with respect to Amici Trust real estate) on a smaller scale. The real estate taxes will be paid in full under the Plan while in a chapter 7 a significant portion of the taxes comprising of penalties will be subordinated and not capable of being repaid pursuant to section 726 of the Bankruptcy Code.

3.    Fee Claims

Taking into account further services to be incurred, the Debtor anticipates that the Fee Claims of all retained professionals that will be outstanding and unpaid as of the Effective Date to be approximately $1,350,000.00 net of the interim awards, retainers and the carve-out.

## E.    General Unsecured Claims

The total of General Unsecured Claims, as scheduled and/or filed by the Debtor, is approximately $2,850,000.00 (not including the Breach of Contracts Claims).  This amount includes General Unsecured claims that are Insider Claims.

## F.    Equity/ Beneficial Interests

As noted above, as of the Petition Date, Mr. Rotondo owned approximately 46% of the Debtor's common stock. Approximately 37 other individuals or entities owned common stock in the Debtor ranging from 0.125% to 10%.  The Debtor owns 100% of N.H. Corp. and is the sole

beneficiary of the Garrison Trust, Just Cause Trust, and the Sweet Review Trust. As stated above, certain shareholder and director of the Debtor is the beneficiary of the Amici Trust.

## G.    Insider Claims

Certain of the Plan Parties are also obligated to certain Insiders, which may include secured or unsecured loans, or services rendered. According to the Plan, the Insider's Claims will be subordinated to payment of the Allowed Claims of non-Insiders.

## IV.    CHAPTER 11 CASE

### A.    Overview-- Events Leading to The Chapter 11 Case

During and after its battle during the licensing and permitting stages, the USA Springs Project encountered significant operational and financial difficulties. The Roswell loan was not sufficient to complete construction of the bottling plant and development initiatives. On or about December 2007, the Borrowers stopped making payments under the Roswell loan and Roswell started foreclosure proceedings on or about May 2008. Suffering from the weakened credit lending environment, the Debtor could not timely obtain a refinancing loan and was forced to seek chapter 11 protection.

### B.    The Bankruptcy Proceeding

#### 1.    Conversion to Chapter 7 and Reconversion to Chapter 11

On June 27, 2008, the Debtor filed its voluntary petition for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code. On April 1, 2009, the Debtor's Chapter 11 proceeding was converted to a proceeding under chapter 7 of the Bankruptcy Code[6] due to certain oversight of prior counsel to the Debtor. The Debtor filed an Emergency Motion to Reconsider Order Converting Case to chapter 7 ("Motion to Reconsider") on April 6, 2009. The Court allowed the Motion to Reconsider on May 21, 2009 in connection with the Stipulation (as defined below). The Court also docketed an Order Re-Converting Case to chapter 11 on that same date.

#### 2.    Stipulation with Roswell

In connection with the Debtor's request for the Court to reconvert the Debtor's case to Chapter 11 pursuant to the Motion to Reconsider, the Debtor, the Debtor Related Entities, and Roswell entered into certain Stipulation on Motion to Reconsider Order Granting Motion to Convert Case, dated as of April 27, 2009, as amended, supplemented and in effect from time to time (the Stipulation"). Pursuant to the Stipulation, a sale of assets of the Debtor and the Related Entities is contemplated in the absence of a confirmed chapter 11 plan.

The Stipulation, which was approved on May 21, 2009, provides for the following relevant initial deadlines: filing of the Debtor's chapter 11 plan and related disclosure statement

---

[6] During the Chapter 11 Case and prior to conversion, the Debtor had filed a boilerplate "plan" – but without any disclosure statement, (which plan was never pursued), and the Committee had filed a motion to conduct a public auction sale which Roswell objected to.

by August 19, 2009 (90 days from the date the Court approved the Stipulation) (the "Plan Filing Deadline"); confirmation of such chapter 11 plan by October 18, 2009 (the "Confirmation Deadline"); and a hearing to be held on a motion to approve sale of all assets in the Debtor's Chapter 11 Case by November 17, 2009 (the "Sale Hearing Deadline", collectively with the Plan Filing Deadline and the Confirmation Deadline, the "Stipulation Deadlines").

The Debtor has extended such initial Stipulation Deadlines and the Exclusivity Period (as defined below) several times. The most recent motion to extend the Stipulation Deadlines and the Exclusivity Period (as defined below) was filed by the Debtor on April 2, 2010 which was allowed by the Bankruptcy Court on April 6, 2010 (the "Extension Order"). Pursuant to the Stipulation, as amended by the Extension Order, the following relevant deadlines are in effect: (i) May 24, 2010 as the Plan Filing Deadline; July 1, 2010 as the Confirmation Deadline; and August 2, 2010 as the Sale Hearing Deadline. In connection with the filing of the Plan, the Debtor may file a separate motion to extend further the Confirmation Deadline and the Sale Hearing Deadline to allow the Debtor adequate time to, among other things (i) accommodate the Lender and/or third parties related to an Alternative Transaction, as applicable, (ii) focus on the negotiation of the Plan with Creditors, and (iii) focus on the negotiation and documentation of the Transaction Documents.

3.    Jurisdiction Agreements

In connection with the Stipulation, the Debtor and the Debtor Related Entities entered into a Jurisdiction Agreement, dated as of May 27, 2009 (as in effect from time to time, the "Related Entities Jurisdiction Agreement") submitting themselves and their assets to the jurisdiction of the Bankruptcy Court. Amici Trust also entered into a separate Jurisdiction Agreement, dated as of May 27, 2009 (as in effect from time to time, the "Amici Jurisdiction Agreement", collectively with the Related Entities Jurisdiction Agreement, the "Jurisdiction Agreements") submitting itself and its assets to the jurisdiction of the Bankruptcy Court. The Amici Trust's property value, net of any outstanding mortgage, has been made available to the Debtor's estate, intended to be solely for the benefit of creditors of the USA Springs Project exclusive of Roswell.

4.    Exclusivity Extensions

The exclusivity period under Section 1121 of the Bankruptcy Code was reinstated when the court converted the Debtor's case to Chapter 11 pursuant to Section 706 of the Bankruptcy Code. The initial period for the Debtor to file its chapter 11 plan (the "Exclusive Filing Period") was September 18, 2009 and the Debtor's exclusive period to solicit votes for such plan (the "Exclusive Solicitation Period," collectively with the Exclusive Filing Period, the "Exclusivity Periods") was November 17, 2009. The Debtor has extended the Exclusivity Period (with the Stipulation Deadlines) several times. In connection with the Extension Order discussed above, the Debtor's Exclusive Filing Period was extended to May 24, 2010; the Debtor's Exclusive Solicitation Period was extended to July 1, 2010. In connection with the filing of the Plan, the Debtor may file a separate motion to extend further the Exclusive Solicitation Period (together with the Confirmation Deadline and the Sale Hearing Deadline) for the reasons set forth above.

5.    Recovery/ Avoidance Actions; Other Litigation

In connection with the closing of the Prepetition Credit Agreement, certain parties received payments from the Borrowers. As requested by the Committee, the Debtor's counsel has (i) sent demand letters to all such third parties in connection with the prepetition payments, and (ii) requested for execution of tolling agreements by such third parties. As discussed in Article V.F of the Plan, Reorganized Debtor shall retain and have the exclusive right to pursue all Causes of Action, including such Chapter 5 Actions; *provided that* the Committee may enforce, sue on, settle, or compromise all claims, rights, suits and proceedings related to the Chapter 5 Claims as set forth in the Plan and Article VII.E of this Disclosure Statement.

The Debtor also paid, prepetition, certain deposits to three financial institutions in connection with loan applications totaling approximately $150,000.00. The Debtor has sent demand letters and as of the filing of this Disclosure Statement, the Debtor has not received any response to the demand letters to the recipients of such payments. The Debtor intends to file formal adversary proceedings seeking to recover such deposits.

Both prepetition and post-petition, certain third parties have made every efforts to interfere with the Debtor obtaining financing and the completion of the USA Springs Projects.[7] This includes post petition attacks which have included false and misleading statements and efforts to "relitigate" decided matters, the purpose of which is apparently to interfere with any transaction relating to the USA Springs Project. The Debtor believes that such actions may constitute violations of the automatic stay under the Bankruptcy Code (to the extent taken place post-petition) or civil torts. The Debtor reserves all rights to seek appropriate redress for any stay violations or any torts, including intentional interference by third parties with the Debtor's contractual or advantageous relations. The Debtor or the Reorganized Debtor, as applicable, may bring any such actions post-Confirmation.

6.    Committee's 2004 Examination Motions

The Committee filed several motions for 2004 examinations and for production of documents in this Chapter 11 Case which were allowed by the Bankruptcy Court, including:

---

[7] There are third party non-creditors including non-residents of Nottingham or Barrington who have crusaded against the Debtor in every respect, going so far as to repeatedly (1) delivering unsolicited inflammatory communications with at least one known interested party (who has disregarded and dismissed such third party's characterization of the permit status and other contentions adverse the Debtor); and (2) communicating with the press in a manner that even goes so far as to attack neutral professionals and neutral officials. Whether or not these third parties were initially retained by a competitor, as some suspect, or not, the Debtor (and even the creditors who have expertise in the particular environmental, permitting, monitoring and remediation process) have contradicted each of these allegations. It is the Debtor's contention that the manner in which such misguided and vindictive commentary has been provided is unsubstantiated and arguably in violation of the automatic stay. In fact, at the least one party remains convinced that these efforts are being orchestrated by potential competitors who are seeking to thwart the efforts of the Debtor so as to eliminate competition and/or force a liquidation and create a means to acquire the site and water rights at a price significantly less than their optimum value.

(i) Motion for Order Compelling Roswell Commercial Mortgage, LLC to Appear for Rule 2004 Examination and to Produce Documents, which was allowed by the Bankruptcy Court on June 26, 2009;

(ii) Motion for Order Compelling Debtor to Appear for Rule 2004 Examination and to Produce Documents, which was allowed by the Bankruptcy Court on July 15, 2009;

(iii) Assented to Motion for Order Compelling TD Bank, NA and to Produce Documents Pursuant to Rule 2004, which was allowed by the Bankruptcy Court on April 14, 2010;

(iv) Motion for Order Compelling Dale Cornwell to Appear for Rule 2004 Examination and to Produce Documents, filed on May 24, 2010;

(v) Motion for Order Compelling Joseph Fitzgibbons to Appear for Rule 2004 Examination and to Produce Documents, filed on May 24, 2010;

(vi) Motion for Order Compelling Armand Hyatt to Appear for Rule 2004 Examination and to Produce Documents, filed on May 24, 2010; and

(vii) Motion for Order Compelling the McLane Graf Law Firm to Appear for Rule 2004 Examination and to Produce Documents, filed on May 24, 2010.

On or about March 25, 2010, the Debtor made available to the Committee several documents in response to the 2004 examination motion related to the Debtor.

7.      Prior LOI and Related Pleadings

On or about September 30, 2010, the Debtor received a letter of intent from a third party plan sponsor (the "LOI") to acquire substantially all of the assets of the Debtor and the Related Entities and to fund a plan of reorganization involving the Debtor and the Related Entities. On October 2, 2009, the Debtor filed a Motion for Entry of an Order (A) Approving the Letter of Intent, (B) Authorizing Termination Fees in Connection Therewith, and (C) Granting Related Relief, which was allowed on October 13, 2009. While this plan funder remained interested in the USA Springs Project, the LOI was subsequently terminated by the Debtor because the plan sponsor did not timely meet certain conditions under the LOI, including with respect to the required third party financing commitment. Recently (i.e. on May 21, 2010) such third party sponsor has informed the Debtor that it has received a commitment and would be prepared to close on August 2, 2010. To the extent that the Loan Transaction contemplated in the Plan does not close then the Debtor would pursue this as one of the contemplated Alternative Transactions.[8]

---

[8] The other potential Alternative Transaction is from a manufacturing team that has been engaged in negotiations with the Debtor for the past 8 months and has recently informed the Debtor that it is prepared to submit an LOI. Neither of these alternatives – although more favorable than any liquidation provide an immediate payment of 100% to all non-insider creditors as the Loan Transaction with Lower Falls.

## C.     Appointment of The Official Committee of Unsecured Creditors

On July 15, 2008, the United States Trustee for the District of New Hampshire (the "U.S. Trustee") appointed the official committee of unsecured creditors of the Debtor (the "Committee") pursuant to section 1102 of the Bankruptcy Code, as reconstituted or changed on June 24, 2009. The original members of the Committee were: (i) W.C. Cammett Engineering, Inc., (ii) DIOM, LLC (Dynamic Industrial Operations Management), and (iii) NHSC, Inc. (n/k/a Morse & Long, Inc.). On June 24, 2009, the U.S. Trustee appointed a new committee comprising of the original members and added Mykrowaters, Inc. as an additional member.

The Committee initially retained Harman Law Office of New Hampshire as its legal advisor. After the reconversion of the Debtor's case to Chapter 11 (discussed above), the Committee retained Bernstein, Shur, Sawyer, & Nelson, P.A. as co-counsel. Each of these professionals submitted an application to the Bankruptcy Court for an order authorizing its retention and the Bankruptcy Court entered the respective orders on July 18, 2008 and May 22, 2009.

Since the formation of the Committee, the Debtor has kept the Committee informed about its affairs and negotiations with interested parties and have sought the concurrence of the Committee in connection with certain actions and certain transactions taken by the Debtor outside of the ordinary course of business.

## D.     Employment of Debtor Professionals

To assist it in carrying out its duties as Debtor in possession and to otherwise represent its interests in the Chapter 11 Case, the Debtor initially employed, with authorization from the Bankruptcy Court, the following professionals: (a) Earl D. Munroe, Esq. at Munroe & Chew as bankruptcy counsel, and (b) Brian McCaffrey, as local counsel.[9] Pursuant to the Stipulation and in connection with the reconversion of the Debtor's case to chapter 11, the Debtor agreed to employ going forward (i) Riemer & Braunstein LLP ("Riemer") as new bankruptcy counsel, and (ii) the law firm of Sheehan Phinney Bass + Green, Professional Association ("SPB+G") as local bankruptcy counsel. The Debtor filed separate applications to employ Riemer and SPB+G which were allowed on May 28, 2009 and May 27, 2009, respectively. On or about October 5, 2009, the Debtor also filed an application to employ CRG Partners Group LLC as its financial advisors which was allowed on October 8, 2009.

## E.     Claims Bar Date

The bankruptcy docket reflects the initial deadlines for creditors to file proofs of claim in the Chapter 11 Case as October 27, 2008 (for creditors other than governmental authorities) and December 29, 2008 (for governmental authorities). On June 24, 2009, the Debtor filed a Motion for Order (I) Establishing Procedures and Bar Date for Filing Proofs of Claim and Certain Administrative Expense Claim Requests, and (II) Approving Form and Manner of Notice Thereof (the "Initial Bar Date Motion") which was allowed. The order approving the Initial Bar Date

---

[9] The initial application to employ was with respect to Munroe & Chew, and Hyatt & Flynn PLLC. The request to employ Hyatt & Flynn PLLC was subsequently replaced with Brian McCaffrey.

Motion established September 1, 2009 as the deadline for creditors to file proofs of claim for prepetition liabilities and certain administrative expense claim requests in the Chapter 11 Case (the "Initial Bar Date Order").[10]

The Bar Date pursuant to the Initial Bar Date Order does not apply to claims (i) of professionals employed in the Chapter 11 Case for compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code, (ii) of the United States Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6), and (iii) of employees of the Debtor, if any, employed as of the date of the Initial Bar Date Order in respect of a claim arising on or after the Petition Date.

At the request of the Committee, the order approving the Initial Bar Date Motion is limited to creditors asserting claims against the Debtor and shall not affect the rights of creditors of the Related Entities. The Creditors of the Debtor and the Debtor Related Entities are expected to be substantively the same. In an abundance of caution, the Confirmation Order will establish a separate bar date with respect to prepetition claims against assets of the Related Entities.

## V.  SUBSTANTIVE CONSOLIDATION

### A.  Substantive Consolidation In General

Substantive consolidation is an equitable remedy whereby the assets and liabilities of different entities may be consolidated and dealt with as if the assets were held by, and the liabilities were incurred by, a single entity. Thus, if the Plan Parties are substantively consolidated under the Plan, the assets of the substantively consolidated Plan Parties would be collapsed into a common fund for the payment of their prepetition liabilities, and any intercompany claims between and among the substantively consolidated Plan Parties would be extinguished. Consequently, a creditor of one of the substantively consolidated Plan Parties is treated as a creditor of the substantively consolidated group of Plan Parties, and issues of individual corporate ownership of property and individual corporate liability on obligation are ignored.

### B.  Prior Substantive Consolidation Motion

In connection with and as required under the LOI, on October 15, 2009, the Debtor filed a motion to substantively consolidate the Related Entities with the Debtor's Estate, which was subsequently withdrawn on April 6, 2010.

### C.  Substantive Consolidation of the Plan Parties Under the Plan

Pursuant to the Stipulation and the Jurisdiction Agreements, the Plan contemplates and is predicated upon entry of the Confirmation Order effecting the substantive consolidation of the

---

[10] The Initial Bar Date Order also provides that any person or entity that holds a claim that arises from the rejection of an executory contract or unexpired lease authorized by this Court by an order dated on or before the date of the Initial Bar Date Order  must file a proof of claim on or before the latest of (a) the bar date; (b) thirty (30) days following the effective date of any chapter 11 plan confirmed by this Court; (c) such date as the Court may fix in the applicable order authorizing the rejection of such contract or lease; and (d) thirty (30) days following the effective date of such rejection.

Plan Parties and their assets for the purposes of all actions associated with confirmation and consummation of the Plan. On the Confirmation Date, subject to the occurrence of the Effective Date: (a) all inter-company Claims by and among the Plan Parties shall be eliminated and extinguished; (b) all assets and liabilities of the Plan Parties shall be treated as though they were merged; (c) all prepetition cross-corporate guarantees of the Plan Parties, if any, shall be eliminated; (d) any obligation of any Plan Party and all guarantees thereof executed by one or more of the Plan Parties shall be deemed to be one obligation of the consolidated Plan Parties; (e) any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against the consolidated Plan Parties; (f) each and every Claim filed in the Chapter 11 Case shall be deemed filed against the consolidated Plan Parties and shall be deemed a single obligation of all of the Plan Parties under the Plan on and after the Confirmation Date; (g) all duplicative claims (identical in both amount and subject matter) filed against more than one of the Plan Parties will be automatically expunged so that only one Claim survives against the consolidated Plan Parties but in no way shall be deemed Allowed solely by reason of this section of the Plan; and (h) the consolidated Plan Parties will be deemed, for purposes of determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one entity, so that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to a particular Plan Party may be offset against claims against such Plan Party or another Plan Party. On the Confirmation Date, and subject to the occurrence of the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Plan Parties, all Claims based upon guarantees of collection, payment or performance made by the Plan Parties as to the obligations of another Plan Party or of any other Person shall be discharged, released and of no further force and effect. The foregoing shall be effective without necessity of any merger or like transaction under applicable non-bankruptcy laws.

**D.     Legal Authority in Support of Substantive Consolidation**

The authority of a bankruptcy court to substantively consolidate the estates of multiple entities is not specifically provided in the Bankruptcy Code. The Bankruptcy Court's ability to order substantive consolidation derives from its general equitable powers under section 105(a) of the Bankruptcy Code, which provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). See also F.D.I.C. v. Colonial Realty Co., 966 F.2d 57, 59 (2d Cir. 1992); In re Bonham, 229 F.3d 750, 764 (9th Cir. 2000) ("[T]he power of substantive consolidation derives from the bankruptcy court's general equity powers as expressed in [section] 105 of the Bankruptcy Code"); see 2 COLLIER ON BANKRUPTCY §105.09[1][b] (15th ed. rev. 2007); In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988) (substantive consolidation is within the court's equitable powers). Despite the absence of a specific Bankruptcy Code provision regarding substantive consolidation, courts, including courts within the First Circuit, are willing to allow debtors to substantively consolidate their cases under certain circumstances. See In re Dehon, Inc., 2004 WL 2181669 (Bankr. D. Mass. 2004); In re Smith and Kourian, 216 B.R. 686 (1st Cir. BAP 1997) (substantive consolidation permissible); In re Hemingway Transport, Inc., 954 F.2d 1 (1st Cir. 1992) (in dicta, describing broad factors for allowing substantive consolidation); In re Snider Bros., Inc., 18 B.R. 230 (Bankr. D. Mass. 1982).

Invocation of the doctrine of substantive consolidation is not limited to situations where the related entities are all debtors in pending bankruptcy cases. This is so because either way the

doctrine addresses the underlying relationship of the "parties," the lack of separateness and the impact on creditors, as discussed below. See, e.g., In re Bonham, supra, 229 F. 3d at 762; In re Munford, Inc., 115 B.R. 390, 397-398 (Bankr. N.D. Ga. 1990); In re Kroh Bros. Dev. Co., 117 B.R. 499, 501-502 (W.D. Mo. 1989); In re Tureaud, 45 B.R. 416, 417-418 (Bankr. N.D. Okla. 1985), aff'd, 59 B.R. 973 (N.D. Okla. 1986); Soviero v. Franklin Nat'l Bank, 328 F. 2d 446 (2d Cir. 1964).

Courts have moved away from the traditional "veil piercing" analysis[11] and have adopted the more liberal test that balances the benefits of consolidation against the potential harms. Augie/Restivo, supra; In re Auto-Train Corp., Inc., 810 F.2d 270 (D.C. Cir. 1987) (the tests from these leading cases are referred to by most commentators, and shall be referred to herein, as the "Augie/Restivo" and "Auto-Train" tests, respectively). Although the respective tests set forth different factors, both tests are aimed at the same general equitable policy, namely, balancing the benefits of consolidation against potential harms. Standard Brands, 154 B.R. 563, 568 (Bankr. C.D. Cal. 1993); see also 2 COLLIER ON BANKRUPTCY §105.09[2][b]. The tests are more liberal than those for veil piercing because they focus upon economic factors rather than on the existence of fraud or misconduct. For that reason, courts tend to permit substantive consolidation in a wider range of cases. The United States Court of Appeals for the Eleventh Circuit explained this trend as follows:

> There is a "modern" or "liberal" trend toward allowing substantive consolidation, which has its genesis in the increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business purposes.

Eastgroup Properties v. Southern Motel Assoc., Ltd., 935 F.2d 245, 249 (11th Cir. 1991) (citations omitted).

The Auto-Train test examines three factors, all of which must be satisfied in order to warrant substantive consolidation:

> (a)    The movant must show a unity of interest and identity between the entities to be consolidated;

---

[11] The doctrine of substantive consolidation was formerly compared to a corporate "veil piercing" analysis. See In re Standard Brand Paints Co., 154 B.R. 563, 567 (Bankr. C.D. Cal. 1993) (citations omitted) (discussing history of doctrine). Implicit in such analysis was an examination of whether there was fraud or misconduct in the way the corporations were maintained and used. Courts applying the veil piercing standard would cite to a myriad of factors when considering whether consolidation was appropriate. Consolidation under the historical analysis was reserved for cases involving "fraud or neglect of corporate formalities and accounting procedures." Id. at 568. See also, In re Vecco Constr. Indus., Inc., 4 B.R. 407 (Bankr. E.D. Va. 1980) (discussing the seven "Vecco factors"). Ultimately, the Vecco factors became merely "examples of information that may be useful to courts charged with deciding whether there is a substantial identity between the estates to be consolidated and whether consolidation is necessary to avoid some harm or realize some benefit". East Group Properties v. Southern Motel Assoc., Ltd., 935 F. 2d 245, 250 (11th Cir. 1991).

(b)     The movant must show that consolidation is necessary to avoid some harm or to realize some benefit; and

(c)     Where a creditor will be prejudiced, the benefits of consolidation must heavily outweigh the harm.

Auto-Train, supra, 810 F.2d at 276. Once a movant has made a prima facie case for consolidation, "[t]he burden then shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation." In re Bonham, supra, 22 F.3d at 766 (following the Augie/Restivo test, but explaining the Auto-Train analysis).

In contrast to the Auto-Train test, the analysis developed by the Second Circuit in Augie/Restivo is a simple, two-factor disjunctive test. Under the Augie/Restivo test, where a court is asked to substantively consolidate two or more entities, the court should consider:

(a)     whether creditors dealt with the entitles as a single economic unit and did not rely on their separate identity in extending credit; or

(b)     whether the affairs of the debtor are so entangled that consolidation will benefit all creditors.

Augie/Restivo, supra, 860 F.2d at 518.

The Auto-Train and Augie/Restivo tests are similar in that they balance the benefits and harms of consolidation; however, the Augie/Restivo test is decidedly more liberal, as satisfaction of either factor is sufficient to find in favor of consolidation. Notably, the United States Court of Appeals for the First Circuit, in dicta, cited to and echoed the language of Augie/Restivo when discussing substantive consolidation:

Consolidation is permitted only if it is first established that the related debtors' assets and liabilities are so intertwined that it would be impossible, or financially prohibitive, to disentangle their affairs ... The trustee may request consolidation to conserve for creditors the monies which otherwise would be expended in prolonged efforts to disentangle the related debtors' affairs Nevertheless, the bankruptcy court must balance the potential benefits of consolidation against any potential harm to interested parties.

In re Hemingway Transport, Inc., supra, 954 F.2d at 11 n. 15, citing Augie/Restivo, among other cases. In In re Birch, 72 B.R. 103 (Bankr. D. N.H. 1987) (joint husband and wife proceeding) the Court applied tests strikingly similar to Augie/Restivo, but with somewhat greater emphasis on whether or not there was an ability to unscramble the affairs of the target parties. Other courts within the First Circuit have referred to the Auto-Train test when considering whether to order substantive consolidation *nunc pro tunc* in order to take account of the alleged harm to creditors. See In re Mars Stores, Inc., 150 B.R. 869, 879-880 (Bankr. D. Mass. 1993) (noting that after a prima facie showing has been made that substantive consolidation will benefit creditors, the burden at trial rests with the objecting creditor to prove it relied upon the separate credit of one of

the entities to be consolidated and would accordingly be prejudiced by consolidation); In re Dehon, Inc., supra. And, more recently the Third Circuit adopted the Augie/Restivo test in In re Owens Corning, 419 F. 3d 195, 211 (3d Cir. 2005).

In the First Circuit, bankruptcy courts appear unsettled as to which standard should be used. In re Dehon, Inc., supra, 2004 WL 2181669 at *4. But, "(o)ne principle…remains constant: substantive consolidation should be approached with a concern for equitable treatment to all *creditors* involved." Id. None of the tests weighs the interests of outside third parties, a point "consistent with the core goal…to maximize the assets of Debtors to satisfy their creditors' claims." Id.

## E.    Substantive Consolidation of the Plan Parties Is Appropriate

The Debtor believes that substantive consolidation of the substantively consolidated Plan Parties is required for purposes of the Plan and the distributions to be effected under the Plan. The Debtor believes that substantive consolidation of the Plan Parties will facilitate the implementation of the Plan, enabling the Debtor (i) to pledge to the Lender all the assets, as contemplated, and (ii) to treat Holders of Claims with greater similarity and fairness and avoid the enormous difficulties of otherwise attempting to parse out the assets and liabilities, such as they may be, of the entities that are separate in name only. Also, substantive consolidation of the Debtor and the Debtor Related Entities is appropriate in this case because, in every real sense, the USA Springs Project was operating as though the Debtor Related Entities were not separate and distinct entities from the Debtor. Substantive consolidation with respect to the Amici Trust is appropriate in this case because along with the Debtor Related Entities the Amici Trust agreed of record to submit its assets to the jurisdiction of this Court for purposes of a sale or plan.

The Debtor believes that, in addition to being justified pursuant to applicable law, substantive consolidation of the substantively consolidated Plan Parties is in the best interests of the creditors. Given the consolidated nature of the USA Springs Project, the Debtor's creditors, as well as the creditors of the Debtor Related Entities, functionally dealt with the Debtor and the Debtor Related Entities as one entity. It would be an injustice to such creditors to subject them to the uncertainties that would flow from a failure to recognize the reality of their dealings in connection with the USA Springs Project. The Debtor is not aware of any creditors of the Debtor Related Entities who or which do not consider themselves creditors of the USA Springs Project, and, therefore, none should be prejudiced by substantive consolidation. The Debtor believes that the recovery of virtually all creditors of the substantively consolidated Plan Parties will be higher or approximately equal, under the Plan, as it would be if there was no substantive consolidation. Substantive consolidation is an essential element of the Plan.

In addition, based on the facts identified herein, it is clear that the applicable tests are met in this case:

Auto-Train Test. There is a unity of interest and identity among the Debtor and Debtor Related Entities, consolidation is necessary both to avoid harm and realize benefit, and while the Debtor is not aware of any prejudice to creditors, if there is any such prejudice the harm is significantly out-weighed by the benefit to the creditor body, especially through the promulgation of a plan under the Loan Transaction. The unity of

interest and identity, as noted earlier, flows from over a decade of doing business as essentially one entity and attempting to finance such entity, and now reorganize such entity as one integral operation, recognized by the creditors as such. The Debtor and Debtor Related Entities shared common owners and managers; they maintained consolidated financial and payment systems; they failed to maintain separate bank accounts or inter-company records; they failed to draw distinctions among the entities in their dealings with creditors; they borrowed money on a joint basis; and they operated out of a common location. Substantive consolidation will be beneficial to the Debtor's Estate and to all the creditors of the USA Springs Project because it will enable the Loan Transaction to occur and will save administrative costs by simplifying administration of the assets and liabilities.

Augie/Restivo Test. Based on the facts identified herein, and without limiting the generality of the foregoing, and as noted above, creditors dealt with the Debtor and Debtor Related Entities as a single economic unit without relying on their separate identities in extending credit or, in the alternative, the affairs of the Debtor and the Debtor Related Entities are so entangled that consolidation will benefit all creditors. Not only has the Debtor and its management and ownership considered the Debtor and Debtor Related Entities as one enterprise, as evidenced in the Schedules, but also the creditors have. Billing was commonly done to USA Springs or USA Springs, Inc. Roswell's secured loan required the joint liability of the Debtor (as a guarantor) and the Debtor Related Entities. The formation of the USA Springs Project was geared toward an anticipated, but unrealized, unified business goal, a successful bottling facility, that has yet to be finalized. Business was done from one location. There was no separation of management. The accounting, banking and tax preparation were essentially done jointly. There were no separate employees. There is nothing to suggest to the Debtor that the creditors viewed the Debtor and the Debtor Related Entities as other than a unified entity in all material dealings. Lastly, as noted earlier the Debtor and the Garrison Trust made certain payments or pledged certain assets as an accommodation to the Amici Trust.

Furthermore, the Debtor and Related Entities have in effect admitted that substantive consolidation with respect to the USA Springs Project is warranted. The Debtor's Schedules reflect the indebtedness of the Debtor Related Entities. Likewise, each of the Debtor Related Entities and the Amici Trust filed the Jurisdiction Agreements described above, by which they agreed to submit their assets to a plan or sale put forward by the Debtor in the pending case. The Debtor submits that under the facts of this case, substantive consolidation of the Plan Parties is not only warranted, but is the only equitable means of protecting creditors' interests.

## F.    Substantive Consolidation Order

The Plan will serve as a motion seeking entry of an order substantively consolidating the Plan Parties and their assets, as set forth herein and in the Plan. Unless an objection to substantive consolidation is made in writing by any Creditor affected by the Plan as herein provided on or before the plan objection deadline, an order substantively consolidating the Plan Parties and their assets, including as part of the Confirmation Order may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto will be scheduled by the Bankruptcy Court, which hearing may coincide with the Confirmation Hearing.

## G. Reservation of Rights

The Debtor believes that it is appropriate that the effectiveness of the Substantive Consolidation Order be subject to (i) entry of an order confirming the Plan and the occurrence of the Effective Date, or (ii) confirmation or approval, as the case may be, of an Alternative Transaction as is supported by the Debtor that requires substantive consolidation.

The Debtor reserves the right at any time up to the conclusion of the Confirmation Hearing to withdraw its request for substantive consolidation, to seek Confirmation of the Plan as if there were no substantive consolidation, and to seek Confirmation of the Plan with respect to one or more Plan Parties even if Confirmation with respect to other Plan Parties is denied.

# VI. LOAN TRANSACTION

## A. Initial Commitment

Since the case was reconverted to Chapter 11 in May 2009, the Debtor continued to actively pursue all available restructuring alternatives. To that end, the Debtor, CRG Partners Group LLC (as the Debtor's financial advisor), and the Debtor's counsel have been engaged in numerous meetings, productive dialogues and/or negotiations with several potential investors, acquirers, and /or other interested parties. After termination of the LOI, the Lender submitted to the Debtor certain commitment letter, dated as of April 14, 2010, and related loan application (as amended). The Debtor and the Lender have conducted dialogues and negotiations since late 2009.

The initial terms of the commitment documents required certain fees and deposit of $275,000.00 (the "Initial Deposit Amount"). On April 15, 2010, the Debtor filed a motion for order (A) authorizing the Debtor to borrow funds related to the Initial Deposit Amount from third party in connection with the commitment documents, and (B) granting certain protections to such third party, including a priming lien (the "Initial Motion to Borrow Funds"). The Committee and Roswell objected to the Initial Motion to Borrow Funds. The Court held a preliminary hearing on the Initial Motion to Borrow Funds on April 20, 2010.

Subsequent to the initial hearing on April 20, 2010, the Lender agreed to reduce the required fees and deposit to $137,500.00 (the "Fees and Deposit"). The Debtor's counsel also continued to negotiate with counsel to Roswell as to the required subordination of Roswell's security interest with respect to the Initial Deposit Amount. During such discussions with Roswell, certain other third party agreed to loan the Fees and Deposit to the Debtor subject to certain non-priming lien protections. On May 10, 2010, the Debtor filed a Motion for Order (A) Authorizing the Debtor to Borrow $137,500.00 from Third Party Under Section 364(c)(2) and (3) of the Bankruptcy Code in Connection with Certain Loan Commitment, and (B) Granting Certain Non-Priming Lien Protections to Such Third Party (the "Second Motion to Borrow Fees and Deposit"). The Bankruptcy Court allowed the Second Motion to Borrow Fees and Deposit and entered an order withdrawing the Initial Motion to Borrow Funds on May 17, 2010.

The Debtor expects to receive a final commitment from the Lender after the due diligence period expires on or about June 7, 2010 (20 days from the May 17, 2010 order approving the

Second Motion to Borrow Fees and Deposit). Assuming the Lender submits such final commitment to the Debtor, the loan closing is expected to take place approximately 45 to 60 days thereafter. The Transaction Documents, including the commitment documents referred to above will be filed as Plan Supplement.[12]

## B.     Material Terms of Commitment

The material terms of the commitment letter and related loan application (as amended) include the following:[13]

| *General Terms/ Transaction* | Subject to the satisfaction of certain conditions, the Lender will loan $55,000,000.00 to the Debtor (the "Loan"). |
| --- | --- |
| | Borrower shall be a wholly owned entity controlled by Debtor, whose activities will be limited to owning and operating the property assets whose form, structure and organizational documents shall be acceptable to Lender. |
| *Interest Payments* | Interest rate is fixed at 6.50%. |
| | Interest will be payable monthly, in arrears, on the 10th day of each month until maturity or pre-payment. |
| *Loan Term/ Prepayment* | 5 years interest only with a balloon payment due at the end of the 60th month. The Loan may be prepaid in whole or in part at any time with no penalty. |
| *Equity* | Lender shall receive a 20% equity interest in the Debtor, its assigns or any subsidiary companies that are formed. |
| *Loan/Administration/ Brokerage Fees* | Two (2) points due and payable as loan fee at the closing out of loan proceeds. |
| | 0.1% of each Loan draw as administration fee. |
| | Certain other brokerage fee arrangements in connection with the Loan |
| *Fees and Deposit* | The Debtor to pay Fees and Deposit of $137,500.00 to Lender representing a commitment/application fee and expense deposit (the "Deposit"). |

---

[12] The Debtor expects that the first tranche of the loan will be in an amount sufficient to fund confirmation and payment to all allowed and allowable secured, administrative and general unsecured claims.

[13] The summary of the terms and conditions of the commitment documents described in this Disclosure Statement are qualified in their entirety by the terms and conditions of such commitment documents. To the extent that this Disclosure Statement and the terms of the commitment documents are inconsistent, the terms of the commitment documents will control.

| | |
|---|---|
| **Due Diligence** [14] | Lender' obligations under the commitment letter are subject, among other things, to the satisfaction by Debtor of such conditions to closing which are customarily required by Lender in connection with construction loans similar in size and purpose to the transaction described in the commitment letter including, without limitation, review of appraisal, engineering report, environmental report, plans and specifications and budgets for the contemplated construction, construction contracts, financial statements, leases, all required licenses and permits and other information and documentation required by Lender in connection with the USA Springs Project, the Debtor, and/or the Loan.<br><br>Lender's due diligence shall be deemed completed within twenty (20) days after delivery to the Lender of the Deposit (the "Due Diligence Period"). |
| **Final Commitment** | Upon expiration of the Due Diligence Period, the Borrower shall receive a final commitment from the Lender and confirmation that the funds for the funding of the Loan are available. |
| **Disbursements** | The Lender shall make disbursements of the loan proceeds in accordance with (i) the Debtor's plan of reorganization which shall pay all allowed unsecured claims in full, and (ii) Lender's standard draw conditions pursuant to the construction budget agreed upon by Debtor and Lender. |
| **Expiration Date** | If the Loan does not close within 45 days after the Due Diligence Period (as such date may be extended, the "Commitment Expiration Date"), the commitment letter will be deemed terminated and Lender shall have no further obligations hereunder unless Lender otherwise elects in writing to extend the Commitment Expiration Date (which may be due up to 60 days after the Due Diligence Period). |
| **Closing Date** | The closing date shall be on or before the Commitment Expiration Date. |
| **Loan Documents** | The Loan shall be subject to execution of loan documents and other agreements consistent with the terms and conditions set forth in the commitment letter and the loan application. |

---

[14] As of the date of the filing of the Plan and Disclosure Statement, the Lender has continued with its due diligence, including further document review, site visit, discussions with company representatives and relevant third parties.

| Bankruptcy Court Approval | The parties understand that Debtor's authority to enter into any agreement related to the Loan is subject to approval of the Bankruptcy Code. In the event the Loan transaction is not approved by the Bankruptcy Court, the entire Deposit (without deduction for due diligence) shall be returned to Debtor by Lender and Debtor shall not be responsible for any fees or costs hereunder. |
|---|---|
| *Reimbursement of fees and deposit after due diligence* | If, as a result of Lender's own due diligence investigation, Lender's findings are inconsistent with Debtor's oral or written representations regarding the property assets, Lender may terminate its obligations under the commitment letter. If Lender chooses to terminate the commitment Letter as a result of its due diligence investigation, Lender will reimburse to Debtor the Deposit (without deduction for due diligence). |
| *Reimbursement upon termination of commitment letter* | Upon termination or expiration of the commitment letter, the entire Deposit (without deduction for due diligence) shall be returned to Debtor by Lender, and Debtor shall not be responsible for any fees or costs hereunder. |
| *Reimbursement after final commitment* | In the event the Lender fails to fund the Loan after the final commitment for reasons other than approval of the Bankruptcy Court or defaults in making any required payments after the initial funding of the Loan, all fees paid by or on behalf the Debtor, including the Deposit (without deduction for due diligence) and all actual expenses incurred by or on behalf of Debtor including, but not limited to the reasonable costs of Debtor's legal counsel, shall be immediately reimbursed to Debtor by Lender, and Debtor shall not be responsible for any fees or costs hereunder. |

## VII.   SUMMARY OF THE CHAPTER 11 PLAN

## A.   Introduction

THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN. THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN. THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.

## B. Unclassified Claims and Treatment

### 1. Administrative Expense Claims

*Payment of Administrative Expense Claims:* Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Claim in Cash (a) on or as soon as practicable after the Effective Date; (b) or if such Claim is Allowed after the Effective Date, on or as soon as practicable after the date such Claim is Allowed; or (c) upon such other terms as may be agreed upon by such Holder and the Debtor. Notwithstanding the foregoing, the Holder of an Allowed Administrative Expense Claim may receive such other, less favorable treatment as may be agreed upon by such Holder and the Debtor. Each Holder of an Allowed Fee Claim who is a Professional retained by the Debtor shall be paid from the Retained Professional Escrow Account. Other Allowed Claims (other than with respect to Fee Claims) shall be paid from the Creditors Escrow Account.

*Bar Date for Professional Compensation and Fee Claims:* Each Professional who holds or asserts a Fee Claim incurred before the Effective Date shall be required to file with the Bankruptcy Court and serve on all parties required to receive notice a fee application within sixty (60) days after the Confirmation Date or such earlier date as may be set forth in the Disclosure Statement Order. The failure to file and serve the fee application timely and properly shall result in the Fee Claim being forever barred and discharged unless otherwise ordered by the Court. A Fee Claim, with respect to which a fee application has been properly filed and served, shall become an Allowed Fee Claim to the extent allowed by Final Order of the Bankruptcy Court.

*Bar Date for Other Administrative Expense Claims:* The Holder of an Administrative Expense Claim must file with the Bankruptcy Court and serve on the Debtor and its counsel, notice of such Administrative Expense Claim within sixty (60) days after entry of the Confirmation Date or such earlier date as may be set forth in the Disclosure Statement Order. Such notice of Administrative Expense Claims must include, at a minimum, (i) the name of the Holder of the Claim, (ii) the amount of the Claim, and (iii) the basis of the Claim. Failure to file and serve this notice timely and properly shall result in the Administrative Expense Claim being forever barred and discharged. An Administrative Expense Claim with respect to which notice has been properly filed and served shall become an Allowed Administrative Expense Claim if no objection is filed within forty-five (45) days of the filing and service of notice of such Administrative Expense Claim. If an objection is filed within such forty-five (45) day period, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order of the Bankruptcy Court.

### 2. Priority Tax Claims

On the later of the Effective Date or the date within five Business Days after the date a Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, such Holder of an Allowed Priority Tax Claim will receive on account of such Claim Cash in an amount equal to the amount of such Allowed Priority Tax Claim, which amount shall be payable out of the Creditors Escrow Account; *provided, however*, any payment on account of any pre-Effective Date interest, fees and/or other charges, as applicable, shall be as

agreed upon between the Debtor and the Holder of the Priority Tax Claims or as determined by the Bankruptcy Court if no such agreement is reached. Notwithstanding the foregoing, the Holder of an Allowed Priority Tax Claim may receive such other less favorable treatment as may be agreed upon by such Holder and the Debtor.

**C.      Classification and Treatment of Classified Claims and Interests**

1.      Classification and Treatment of Claims and Interest

The following table summarizes the classification and treatment of the Claims under the Plan which are Unimpaired as discussed in Article III of the Plan.

| **Class 1:**<br><br>Other Priority Claims | *Classification*:    Class 1 consists of the Other Priority Claims against the Plan Parties.<br><br>*Treatment*:  On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date within five Business Days after the date such Other Priority Claim becomes an Allowed Other Priority Claim, or (c) the date such Other Priority Claim becomes payable pursuant to any agreement between the Debtor and the Holder of such Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim from the Creditors Escrow Account Cash equal to the unpaid portion of such Allowed Other Priority Claim; *provided, however*, no Holder of an Allowed Other Priority Claim shall be entitled to any payments on account of any pre-Effective Date interest, fees, other charges and/or penalty, as applicable, arising after the Petition Date with respect to or in connection with such Allowed Other Priority Claim. Notwithstanding the foregoing, the Holder of an Allowed Other Priority Claim may receive such other less favorable treatment as may be agreed upon by such Holder and the Debtor. |
|---|---|
| **Class 2:**<br><br>First Lien Secured Claim | *Classification*:  Class 2 consists of the First Lien Secured Claim against the Debtor and the Debtor Related Entities.<br><br>*Treatment*:  On, or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed First Lien Secured Claim shall receive, in full and final satisfaction of such Allowed First Lien Secured Claim, from the Creditors Escrow |

| | |
|---|---|
| | Account Cash equal to such Allowed First Lien Secured Claim; _provided, however_, any payment on account of any pre-Effective Date interest, fees and/or or other charges, as applicable, shall be as agreed upon between the Debtor and the Holder of the First Lien Secured Claim or as determined by the Bankruptcy Court if no such agreement is reached; and _provided further_, (i) in the event of an Alternative Transaction or a Liquidating Plan, the Holder of Allowed First Lien Secured Claim shall recover only with respect to assets of the Debtor and Debtor Related Entities, not assets owned by Amici Trust; and (ii) payment to the First Lien Secured Claim shall be after deduction of the Roswell Carveout which amount may be added as a General Unsecured Claim as provided for in the Stipulation. Notwithstanding the foregoing, the Holder of the Allowed First Lien Secured Claim may receive such other less favorable treatment as may be agreed upon by such Holder and the Debtor. |
| **Class 3:**<br><br>Other Secured Claims | _Classification_: Class 3 consists of the Holders of Other Secured Claims against the Plan Parties.<br><br>_Treatment_: On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date within five Business Days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (c) the date such Other Secured Claim becomes payable pursuant to any agreement between the Debtor and the Holder of such Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, from the Creditors Escrow Account Cash equal to such Allowed Other Secured Claim; _provided, however_, no Holder of an Allowed Other Secured Claim shall be entitled to any payments on account of any pre-Effective Date accrued interest, fees, other charges and/or penalty, as applicable, arising after the Petition Date with respect to or in connection with such Allowed Other Secured Claim. Notwithstanding the foregoing, the Holder of an Allowed Other Secured Claim may receive such other less favorable treatment as may be agreed upon by such Holder and the Debtor. |

| Class 4:<br><br>General Unsecured Claims | *Classification*: Class 4 consists of the Holders of General Unsecured Claims against the Plan Parties.<br><br>*Treatment*: On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date within five Business Days after the date such General Unsecured Claim becomes an Allowed General Unsecured Claim, or (c) the date such General Unsecured Claim becomes payable pursuant to any agreement between the Debtor and the Holder of such General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Allowed General Unsecured Claim, from the Creditors Escrow Account Cash equal to such Allowed General Unsecured Claim; *provided, however*, no Holder of an Allowed General Unsecured Claim shall be entitled to any payments on account of any other amount with respect to or in connection with such Allowed General Unsecured Claim. Notwithstanding the foregoing, the Holder of an Allowed General Unsecured Claim may receive such other less favorable treatment as may be agreed upon by such Holder and the Debtor. |
| Class 5:<br><br>Interests | *Classification*: Class 5 consists of all Interests in the Plan Parties.<br><br>*Treatment*: On the Effective Date, all Class 5 Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. On, or as soon as reasonably practicable after the Effective Date, each Holder of an allowed Interest shall receive a pro rata share of the Remaining Shares. The terms and provisions of the New Common Stock, and the rights of the holders thereof, shall be described, in and otherwise governed by the Certificate of Incorporation and any investors rights agreement or similar agreement. |

2.      Intercompany Claims

All Intercompany Claims, if any, will be cancelled as of the Effective Date, and Holders thereof will not receive a distribution under the Plan in respect of such Claims.

Pursuant to the Jurisdiction Agreements and the Stipulation, the Plan incorporates the substantive consolidation of the Plan Parties and their assets. Pursuant to the Plan, and in consideration for the distribution and other benefits under the Plan, upon the Effective Date, all Intercompany Claims shall be extinguished. All parties who have held, hold or may hold Claims or Interests in any or all of the Plan Parties are permanently enjoined from asserting or continuing in any manner any action related to the enforcement of the Intercompany Claims.

3. Special Provisions Regarding Subordinated Claims

All Subordinated Claims shall be deemed Disputed Claims and to the extent Allowed by the Bankruptcy Court shall be subordinated to payment in full of all other Allowed Claims.

4. Special Provisions Regarding The Treatment of Allowed Secondary Liability Claims

The classification and treatment of Allowed Claims under the Plan take into consideration all Allowed Secondary Liability Claims. On the Effective Date, Holders of Allowed Secondary Liability Claims will be entitled to only one distribution in respect of such underlying Allowed Claim from the substantively consolidated Plan Parties. No multiple recovery on account of any Allowed Secondary Liability Claim will be provided or permitted.

5. Special Provisions Regarding Insider Claims

All payments related to Insider Claims shall be subordinated to and deferred until payment in full of all Allowed Claims of non-Insiders. The Holder of an Allowed Insider Claim may receive such other less favorable treatment as may be agreed upon by such Holder and the Debtor, including shares of New Common Stock.

D. **Acceptance or Rejection of the Plan**

1. Each Impaired Class Entitled to Vote

Each Impaired Class that is to receive a distribution under the Plan shall be entitled to vote separately to accept or reject the Plan. Each such Impaired Class shall receive a Ballot which will be used to cast its vote in respect to the Plan.

2. Acceptance by Impaired Classes

A Class of Impaired Claims shall have accepted the Plan if the Plan is accepted by Holders of Claims that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims of such Class that have voted to accept or reject the Plan (not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code).

3. Classes Entitled to Vote

Classes 1 to 5 are Impaired Classes under the Plan and are entitled to vote to accept or reject the Plan.

4.    Non-Consensual Confirmation

The Debtor reserves the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable (including with respect to any amended Plan contemplating an Alternative Transaction or a Liquidating Plan). The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**E.    Means For Implementation of the Plan**

1.    Proposed Transaction

On the Effective Date, the Plan Parties expect to consummate the Loan Transaction. The Debtor expects to receive a final commitment from the Lender after the due diligence period expires on or about June 7, 2010. Assuming the Lender submits such final commitment to the Debtor, the loan closing is expected to take place approximately 45 to 60 days thereafter.

Subject to the due diligence referred to above, the Lender is committed to fund the USA Springs Project with a $55,000,000 loan to be collateralized by all or substantially all assets of the Plan Parties. A summary of the commitment terms related to the Loan Transaction is set forth in the Disclosure Statement. Entry of the Confirmation Order will constitute the approval, pursuant to sections 105(a), 363 and 364 of the Bankruptcy Code, effective as of the Effective Date, of the Loan Transaction. On the Effective Date, the Reorganized Debtor will establish (i) a Retained Professionals Escrow Account with respect to Fee Claims, and (ii) a Creditors Escrow Account for payment of all other Allowed Claims; *provided that* in the event the initial funds deposited in the Escrow Accounts are not sufficient to pay all Allowed Claims, the Reorganized Debtor shall supplement the Escrow Account to pay such Allowed Claims. Any balance or unused amount in the Escrow Accounts after payment in full of the applicable Allowed Claims shall be property of the Reorganized Debtor.

The net proceeds from the Loan Transaction (after applicable loan and closing fees) shall be used to complete the construction of the USA Springs Project and to fund the business operations.

In the event the Loan Transaction is not consummated, the Debtor may have the benefit of certain Alternative Transaction(s) and the Plan will be amended or modified to incorporate such Alternative Transaction. The Debtor also reserves its right to amend the Plan as to a Liquidating Plan, if necessary in the event the Loan Transaction is not consummated and no Alternative Transaction remains viable.

2.    Substantive Consolidation

The Plan is predicated on the Substantive Consolidation of the Plan Parties and their assets as set forth in the Plan and Article V of this Disclosure Statement.

3. Corporate Existence and Vesting of Assets in Reorganized Debtor

The Reorganized Debtor will exist after the Effective Date as a corporate entity, with all the powers of a corporation under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law. Except as otherwise provided in the Plan, as of the Effective Date, all property of the Estate and of the Plan Parties, including title to real estate assets, by transfer or otherwise, will vest in Reorganized Debtor free and clear of Claims, Interests and liens and security interests of any sort. On and after the Effective Date, Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, Reorganized Debtor may pay the charges that it incurs after the Effective Date for professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

4. Issuance of New Common Stock and Transmission of Instruments

On the Effective Date, Reorganized Debtor shall be authorized to (a) issue the New Common Stock in accordance with the provisions of the Plan without further act or action under applicable law, regulation, order, or rule; (b) execute, as appropriate, and distribute to each holder of New Common Stock a copy of the Certificate of Incorporation, any investors rights agreement or similar agreement; and (c) file with applicable governmental authorities any necessary transaction document.

5. Cancellation and Surrender of Existing Securities and Agreements

On the Effective Date, except as otherwise provided for herein, all exiting notes, stock certificates, instruments, and any other documents or certificates evidencing Interests in any Plan Party or related indebtedness or obligation of a Plan Party shall be cancelled and the obligations of the Plan Parties thereunder or in any way related thereto shall be discharged.

6. Preservation of Rights of Actions; Settlement of Causes of Action

Except as otherwise provided in the Plan, the Confirmation Order, or any previous order of this Court, the Reorganized Debtor shall, under 1123(b) of the Code retain and have the exclusive right, in its sole discretion, to enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, Causes of Action, suits, and proceedings, whether in law or equity, whether known or unknown, that the Plan Parties may hold against any Person. Reorganized Debtor or its successor(s) may pursue such retained claims, rights, Causes of Action, suits, or proceedings as appropriate, in accordance with the best interests of Reorganized Debtor or its successor(s); *provided that*, the Committee, at its sole discretion, may enforce, sue on, settle, or compromise all claims, rights, suits and proceedings related to the Chapter 5 Claims until the Allowed Claims of the non-insider unsecured creditors receive 100% of such claim amount.

7. Certificate of Incorporation and By-Laws

The Certificate of Incorporation shall expressly authorize the issuance of the New Common Stock contemplated herein. On the Effective Date, the by-laws of Reorganized Debtor shall be deemed to be fully effective. Such new Certificate of Incorporation shall be in accordance with the Transaction Documents and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities by Reorganized Debtor for a period of one year following the Effective Date.

8. Directors and Officers

On the Effective Date, the operation of Reorganized Debtor shall become the general responsibility of the Board of Directors of Reorganized Debtor, subject to, and in accordance with, the Certificate of Incorporation and the Transaction Documents. The number of directors on Reorganized Debtor's Board of Directors shall initially be as set forth in the Transaction Documents. On the Effective Date, the Board of Directors of Reorganized Debtor shall be deemed elected pursuant to the Confirmation Order, but shall not take office and shall not be deemed to be elected until the occurrence of the Effective Date.

9. Release of Liens

Except as otherwise provided in the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III, all interests, mortgages, deeds of trust, liens or other security interests against the property of the Estate and any Plan Party will be fully released and discharged.

10. Exemption From Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code: (i) the issuance, transfer or exchange of any securities, instruments or documents; (ii) the creation of any other lien, mortgage, deed of trust or other security interest; or (iii) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with the Plan or the sale or assignment of any assets of the Debtor and any deeds (including deeds of real estate assets held by certain Plan Parties), bills of sale or assignments executed in connection with the Plan or the Confirmation Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for or allowable under section 1146(a) of the Bankruptcy Code.

11. Implementations; Effectuating Documents; Further Transactions

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan and the Transaction Documents involving the structure, corporate or otherwise, of the Plan Parties will be deemed authorized and approved without any requirement of further action by the Plan Parties, the Plan Parties' shareholders, boards of directors or trustees, as applicable.

Pursuant to the Confirmation Order and upon Confirmation of the Plan, (i) the Plan Parties or Reorganized Debtor, as applicable, shall be authorized to take all necessary steps, and perform

all necessary acts, to consummate the terms and conditions of the Plan; (ii) the Plan Parties or Reorganized Debtor, as the case may be, may execute such documents and take such further actions as necessary to effectuate the transactions provided for in the Plan, without the need for any additional approvals, authorizations or consents; and (iii) the chairman of the Board of Directors, president, trustee or any other appropriate officer of each Plan Parties or Reorganized Debtor, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such other agreements and documents as may be necessary or appropriate to effectuate or further evidence the terms and conditions of the Plan and the other agreements referred to herein.

**F.    Treatment of Executory Contracts and Unexpired Leases**

    1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Confirmation Date, all Executory Contracts or unexpired leases, if any, of the Plan Parties shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except those Executory Contracts and unexpired leases that (a) have been rejected by order of the Bankruptcy Court, (b) are the subject of a motion to reject pending on the Confirmation Date, (c) are identified on a list to be filed with the Bankruptcy Court on or before the Confirmation Date  as to be rejected, or (d) are rejected pursuant to the terms of the Plan.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections.

Each such Executory Contract and unexpired lease that is assumed shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or unexpired lease, and (b) all Executory Contracts or unexpired leases appurtenant to the USA Springs Project, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, or other agreements, and any other interests in real estate or rights *in rem* related to such premises.

    2.    Payments Related to Assumption of Contracts and Leases

Any monetary amounts by which any Executory Contract or unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or unexpired lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur, at the Debtor's or Reorganized Debtor's option, following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption and/or assumption.

3. <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>

Any Claim for damages based upon the rejection of any Executory Contract or unexpired lease shall be a Disputed Claim and to the extent Allowed by the Bankruptcy Court, such Claims shall be classified as a Class 4 General Unsecured Claim and may be objected to in accordance with applicable provisions of the Bankruptcy Code and Bankruptcy Rules. The failure to file a Claim for damages based upon the rejection of an Executory Contract or unexpired lease within forty-five (45) days following the Effective Date shall forever bar such a Claim.

4. <u>Contracts of Entered Into After the Petition Date</u>

Contracts entered into after the Petition Date, if any, by any Plan Party, including any Executory Contracts and unexpired leases assumed by the Debtor, will be performed by such Plan Party or Reorganized Debtor, as the case may be, in accordance with the terms and conditions of such contracts in the ordinary course of its business. Such contracts and other obligations (including any assumed Executory Contracts and unexpired leases) will survive and remain unaffected by entry of the Confirmation Order, unless provided otherwise in such contract.

## G. Provisions Governing Distributions

1. <u>Distributions for Claims Allowed as of the Effective Date</u>

The Reorganized Debtor will make all distributions of Cash, New Common Stock, and other instruments or documents required under the Plan. Except as otherwise provided herein or as may be ordered by the Bankruptcy Court, all distributions with respect to all Allowed Claims (other than Fee Claims) shall be made from the Creditors Escrow Account, as set forth in the Plan. Except as otherwise provided in this Article VII, distributions to be made on the Effective Date to Holders of Claims that are Allowed as of the Effective Date will be deemed made on the Effective Date or as promptly thereafter as practicable. Distributions on account of Claims that become Allowed Claims after the Effective Date shall be made in accordance with the provisions of Article VIII of the Plan.

2. <u>Interest on Claims</u>

Except as otherwise provided herein, or as required under applicable law, Holders of Claims shall not be entitled to interest payments on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. <u>Place of Delivery of Distributions</u>

Distributions to holders of Allowed Claims shall be made by Reorganized Debtor (a) at the addresses set forth on the proofs of Claim filed by such Holders (or the last known address of such Holders if no proof of Claim is filed or if the Debtor has been notified of a change of address); (b) at the address set forth in any written notices of address changes delivered to Reorganized Debtor after the date of any related proof of Claim, or (c) at the addresses reflected

in the Schedules if no proof of Claim has been filed and Reorganized Debtor has not received a written notice of a change of address.

4.    Undeliverable Distributions

Holding of Undeliverable Distributions.  If any distribution to a Holder of an Allowed Claim is returned to Reorganized Debtor as undeliverable, no further distributions shall be made to such Holder unless and until Reorganized Debtor is notified in writing of such Holder's then-current address.  Undeliverable distributions shall remain in the possession of Reorganized Debtor pursuant to this Article VII.D until such time as a distribution becomes deliverable.

Failure to Claim Undeliverable Distributions.  Any Holder of an Allowed Claim or Interest that does not assert a Claim for an undeliverable distribution within 90 days after the later of (a) the Effective Date or (b) the date such claim became an Allowed Claim shall have its claim for such undeliverable distribution discharged and such Holder or successor to such Holder with respect to such property shall be forever barred from asserting any such Claim against Reorganized Debtor, the Plan Parties or their properties.  Any Cash held for distribution on account of such claims shall be property of Reorganized Debtor, free of any restrictions thereon and any New Common Stock held for distribution on account of any such Claims or Interests shall be canceled and of no further force or effect.

No Duty to Locate.  Nothing contained in the Plan shall require the Debtor or Reorganized Debtor to attempt to locate any holder of an Allowed Claim or Interest beyond a normal general search, including use of the internet.

5.    Compliance with Tax Requirements

In connection with the Plan and all distributions hereunder, to the extent applicable, Reorganized Debtor will comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim or Interest that is to receive a distribution of New Common Stock pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

6.    Setoffs

Reorganized Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Plan Parties may have against the Holder of such Claim; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Parties of any such claim that the Plan Parties may have against the Holder of such Claim.

### H. Procedures for Resolving Disputed Claims

#### 1. Resolution of Disputed Claims

After the Confirmation Date, the Reorganized Debtor shall have the exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims or Interests. From and after the Effective Date, Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Reorganized Debtor may object to a Claim or Interest by the Claims Objection Bar Date.

#### 2. Claims Allowance

The Debtor or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including to the extent possible during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

#### 3. Payments and Distributions on Disputed Claims

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim.

#### 4. Voting Rights of Holders of Disputed Claims

Pursuant to Bankruptcy Rule 3018(a), to the extent it becomes applicable, a Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is a Disputed Claim, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a). Such disallowance for voting purposes shall be without prejudice to the holders of such Disputed Claim seeking to have such Disputed Claim become an Allowed Claim for purposes of distribution under the Plan.

**I.    Conditions Precedent to Confirmation and Consummation of the Plan**

1.    <u>Conditions Precedent to Confirmation</u>

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be satisfied or waived in accordance with Article X.C of this Plan:

An order shall have been entered finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code.

The Confirmation Order in form and substance reasonably acceptable to the Debtor shall have been entered approving all provisions, terms and conditions of the Plan, and any amendments thereto, including approval of the Loan Transaction.

The Substantive Consolidation Order in form and substance reasonably acceptable to the Debtor shall have been entered.

2.    <u>Conditions Precedent to Consummation</u>

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Article X.C of the Plan:

The Confirmation Date shall have occurred and the Confirmation Order shall have been entered.

All actions, documents and agreements necessary to implement the Plan, including without limitation, such documents relating to the Loan Transaction, shall have been effected or executed and, as necessary, filed with the appropriate governmental authorities. All conditions precedent to such documents and agreements shall have been satisfied or been waived in accordance with the terms of such agreements or documents.

The Certificate of Incorporation shall have been executed, delivered, and filed with the appropriate governmental authorities, and all conditions precedent thereto shall have been satisfied.

Reorganized Debtor shall have executed, as appropriate, and distributed to each holder of New Common Stock a copy of the investors rights agreement or similar document.

All conditions precedent to the obligations of the Lender pursuant to  the Transaction Documents shall have been satisfied or waived in accordance with the terms thereof.

The amounts payable by Lender in accordance with the Transaction Documents shall have been paid.

The closing of the Loan Transaction shall have occurred.

The Retained Professionals Escrow Account and the Creditors Escrow Account shall have been opened.

3.     <u>Waiver of Conditions</u>

Except where prohibited by law, each of the conditions set forth in Article X.A and B of this Plan may be waived in whole or in part by the Debtor without any other notice to parties in interest or the Bankruptcy Court and without hearing.

## J.     Retention of Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code and in compliance with LBR 3021-1, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters involving the Plan Parties and arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest not otherwise allowed under the Plan, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan, including under sections 330, 331, and 503(b) of the Bankruptcy Code; *provided, however,* that from and after the Effective Date, the payment of the fees and expenses of Professionals retained by Reorganized Debtor shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)     Hear and determine all matters with respect to the assumption or rejection of any Executory Contract or unexpired lease to which a Plan Party is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(d)     Hear and determine the Causes of Action of the Debtor or any other Plan Party;

(e)     Effectuate performance of and payments under the provisions of the Plan;

(f)     Hear and determine any and all objections to Claims, adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case;

(g)     Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, the Transaction Documents, and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or Confirmation Order;

(h)     Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under the Transaction Documents or other agreements, documents or instruments executed in connection with or related to the Plan, and the Loan Transaction;

(i)     Grant extensions of any deadline set forth in the Confirmation Order;

(j)     Consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(k)     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with implementation, consummation, or enforcement of the Plan, the Confirmation Order, the Loan Transaction, or completion of the USA Springs Project;

(l)     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(m)    Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(n)     Enforce all orders, judgments, discharge provisions, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case, the Debtor, the other Plan Parties, and the USA Springs Project;

(o)     Except as otherwise limited herein, recover all assets of the Plan Parties and property of the Estate and Plan Parties wherever located;

(p)     Hear and determine matters concerning state, local, and federal taxes, including in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(q)     Hear and determine any use, sale or lease of property pursuant to Section 363 of the Bankruptcy Code as applicable;

(r)     Hear and determine any requests for relief pursuant to Section 364 of the Bankruptcy Code as applicable;

(s)     Hear and determine all matters regarding any return of deposits and rights to pursue legal fee reimbursement;

(t)     Hear and determine all disputes involving the existence, nature, or scope of the Plan Parties' discharge;

(u)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(v)     Enter a final decree closing the Chapter 11 Case.

## K.     Effect of Confirmation

### 1.     Binding Effect

The provisions of the Plan shall be binding upon and inure to the benefit of the Plan Parties, Reorganized Debtor, all current and former Holders of Claims against and Interests in the Plan Parties and their respective successors and assigns, and all other parties-in-interest in the Chapter 11 Case and Persons affected by the Plan.

### 2.     Discharge of Plan Parties

All consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against or Interests in the Plan Parties of any nature whatsoever, or against any of the Plan Parties' assets or properties.  Subject to the occurrence of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, entry of the Confirmation Order shall act as a discharge under section 1141(d)(1)(A) of the Bankruptcy Code from and of all Claims against, liens on, and Interests in each of the Plan Parties, their assets, and their properties, arising at any time before the entry of the Confirmation Order, regardless of whether a proof of Claim or proof of Interest therefor was filed, whether the Claim or Interest is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution hereunder.  Upon entry of the Confirmation Order, and subject to the occurrence of the Effective Date, any holder of such a discharged Claim or Interest shall be precluded from asserting against the Plan Parties and  Reorganized Debtor or any of their assets or properties any other or further Claim or Interest based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the date of entry of the Confirmation Order.  The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Plan Parties, subject to the occurrence of the Effective Date.

### 3.     Injunction

Pursuant to section 524 of the Bankruptcy Code, the discharge provided by Article XII.B of the Plan and section 1141 of the Bankruptcy Code shall act as an injunction against the commencement or continuation of any action, employment of process, or act to collect, offset, or recover the Claims and Interests discharged thereby.  Except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons which have held, hold, or may hold Claims against or Interests in the Plan Parties will be permanently enjoined, on and after the Confirmation Date, subject to the occurrence of the Effective Date, from (a) commencing or containing in any manner any action or other proceeding of any kind with respect to any such

Claim or Interest, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Plan Parties on account of any such Claim or Interest, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Plan Parties or against the property or interests in property of the Plan Parties on account of any such Claim or Interest, and (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Plan Parties or against the property or interests in property of the Plan Parties on account of any such Claim or Interest. The foregoing injunction will extend to successors of the Plan Parties (including, but not limited to, Reorganized Debtor) and their respective properties and interests in property.

    4.    <u>Releases</u>

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, to the fullest extent permitted by applicable law, the Plan Parties and Reorganized Debtor shall be presumed conclusively to have released the Releasees and their respective property, from any and all claims, obligations, rights, Causes of Action, demands, suits, proceedings, and liabilities, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, based in whole or in part on any act or omission transaction, state of facts, circumstances or other occurrences taking place prior to or on the Effective Date arising from or related in any way to the Plan Parties, the Estate, or the Reorganized Debtor, including, without limitation, those that any of the Plan Parties or the Reorganized Debtor would have been legally entitled to assert or that any Holder of a Claim or Interest or other Person would have been legally entitled to assert for or on behalf of any of the Plan Parties or the Estate or the Reorganized Debtor and further including those in any way related to the Chapter 11 Case or the Plan; *provided, however*, the foregoing provisions shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; and *provided, further*, (i) the foregoing release shall not operate to waive or release from any Causes of Action expressly set forth in and preserved by the Plan or Plan Supplement, and (ii) the Plan Parties and Reorganized Debtor shall have the right to pursue such rights of action, including the rights under section 502(d) of the Bankruptcy Code, as a defensive measure, including for purposes of setoff against distributions, if any, due to a holder of a Claim or Interest pursuant to the Plan, and such rights shall be exercised exclusively by Reorganized Debtor.

    5.    <u>Exculpation</u>

The Exculpated Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Chapter 11 Case, the formulating, negotiating, preparing, disseminating, implementing, administering the Plan, or otherwise, the Plan Supplement, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Plan Parties or confirming or consummating the Plan; *provided, however*, that the foregoing provisions shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

**L.     Miscellaneous Provisions**

1.     Payment of Statutory Fees

All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing or otherwise, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid by Reorganized Debtor.

2.     Severability of Plan provisions

If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

3.     Successors and Assigns

The rights, benefits and obligations of any Person named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

4.     Waiver of Enforcement of Subordination

All Claims against and Interests in the Plan Parties and all rights and claims between or among Holders of Claims and Interests relating in any manner whatsoever to Claims against and Interest in the Plan Parties, based on claimed subordination rights (if any), shall be deemed satisfied by the distributions under the Plan to Holders of Claims and Interests having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date, and all actions related to the enforcement of such subordination rights shall be permanently enjoined. Distributions to the various Classes of Claims and Interests hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any claimed subordination rights or otherwise, so that each holder of a Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.

5.     Modification and Amendment of Plan Documents

The Debtor may alter, amend, or modify the Plan, related Disclosure Statement, and Plan Supplement, including exhibits or schedules thereto under section 1127(a) of the Bankruptcy

Code at any time prior to the Confirmation Date, including with respect to an Alternative Transaction or Liquidating Plan, as applicable, as set forth in Article V.A.

After the entry of the Confirmation Order but before the Effective Date, the Debtor may, without approval of the Bankruptcy Court and without notice to all Holders of Claims and Interests, insofar as it does not materially adversely affect the interest of Holders of Claims and Interests, correct any defect, omission or inconsistencies in the Plan, related Plan documents in such manner and to such extent as may be necessary to expedite the execution of the Plan.

After the entry of the Confirmation Order and the Effective Date, the Debtor or the Reorganized Debtor, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistencies in the Plan and related Plan documents, or the Confirmation Order in such manner as may be necessary to carry out the purposes and provisions of the Plan.

6.    Dissolution of Committee

On the Effective Date, the Committee shall dissolve and its respective members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to the Chapter 11 Case; *provided*, *however*, that the Committee and its Professionals, as applicable, shall be retained with respect to (i) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, and (ii) the Chapter 5 Claims that may be pursued by the Committee as set in Article V.F.

7.    Revocation, Withdrawal, or Non-Consummation

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent Chapter 11 plan(s). If the Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the Plan and no acts taken in preparation for Consummation of the Plan shall: (i) constitute or be deemed to constitute a waiver or release of any Claim by or against, or any Interests in any Plan Party or any other Person; (ii) prejudice in any manner the rights of any Plan Party or any other Person in any further proceedings involving a Plan Party; or (iii) constitute an admission of any sort by any Plan Party or any other Person.

8.    Exemption From Registration; Section 1145 of the Bankruptcy Code

In connection with the consummation of the Plan, the Plan Parties will rely on section 1145 of the Bankruptcy Code to the extent it is applicable, to exempt the issuance of the New Common Stock from the registration requirements of the Securities Act of 1933 and of any state securities or "blue sky" laws. Section 1145 of the Bankruptcy Code exempts from registration the distribution of a debtor's securities under a Chapter 11 plan if such securities are offered or sold in exchange, or primarily in exchange, for a claim against, or equity interest in, or a claim for an administrative expense in a case concerning, such debtor.

9.    Notices

Any notice, request, or demand required or permitted to be made or provided to or upon a Plan Party or Reorganized Debtor under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

USA Springs, Inc.
155 Old Turnpike Road
Nottingham, NH  03290
Attn:   Francesco Rotondo

with copies to:

Alan L. Braunstein, Esq.
Riemer & Braunstein LLP
Three Center Plaza
Boston, MA  02108
(617) 523-9000
abraunstein@riemerlaw.com

and

Bruce A. Harwood, Esq.
Sheehan Phinney Bass + Green P.C.
1000 Elm Street
P.O. Box 3701
Manchester, NH  03105-3701
(603) 627-8139
bharwood@sheehan.com

10.    Term of Injunctions or Stays

Except as otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

## VIII.   VOTING ON AND CONFIRMATION OF THE PLAN

### A.    General

The Debtor submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to all known Holders of Claims and Interests that are Impaired for the purpose of disclosing that information which the Bankruptcy Court has determined as material, important

and necessary for such Holders of Claims and Interests to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan.

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan including that (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, and (iv) the Debtor's disclosures as required by chapter 11 of the Bankruptcy Code have been adequate and have included information concerning all payments made or promised by the Debtor in connection with the Plan. The Debtor believes that all of these requirements will have been met by the date of the Confirmation Hearing and will seek rulings of the Bankruptcy Court to such effect at that hearing.

## B.     Acceptance Necessary for Confirmation

The Bankruptcy Code also requires that the Plan shall have been accepted by the requisite votes of Impaired Classes entitled to vote (except to the extent that "cram-down" is available under section 1129(b) of the Bankruptcy Code, as described below); that the Plan be feasible (that is, that there be a reasonable prospect that the Debtor will be able to perform its obligations under the Plan without further financial reorganization); and that the Plan be in the "best interests" of all Impaired Creditors (that is, that Impaired Creditors will receive pursuant to the Plan value at least equal to the value they would receive in a liquidation under Chapter 7). To confirm the Plan, the Bankruptcy Court must find that all of these requirements are met. Thus, even if the Impaired Classes entitled to vote accept the Plan by the requisite votes, the Bankruptcy Court must make independent findings respecting the Plan's feasibility and whether it is in the best interests of the Creditors before it may confirm the Plan. These statutory conditions to confirmation are discussed below.

## C.     Voting Procedures

Those Classes entitled to vote on the Plan, as determined by the Bankruptcy Court, may cast their votes for or against the Plan by completing, dating and signing the Ballot accompanying this Disclosure Statement Order and approved Disclosure Statement or any separate notice and returning the Ballot as specified in the Disclosure Statement Order or any separate notice. In order to be counted, all Ballots must be received by the Voting Deadline. Each Person casting a Ballot is responsible for ensuring that the Ballot is received by the Voting Deadline. Any Ballot received after the Voting Deadline will not be counted.

## IX.     CONFIRMATION AND CONSUMMATION PROCEDURE

## A.     Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in each of Class 1 (Other Priority Claim), Class 2 (Firs Lien Secured Claim), Class 3 (Other Secured Claim), Class 4 (General Unsecured Claim), and Class 5 (Interests) are Impaired, and the Holders of Claims in each of such Classes are entitled to vote to accept or reject the Plan. Any Claimant holding a Claim in an Impaired Class under the Plan may vote on the Plan so long as such Claim

is not a Disputed Claim, has not been disallowed, and is not the subject of a pending objection. Nevertheless, if a Claim is a Disputed Claim or is the subject of such an objection, the Holder thereof may vote if, prior to the Voting Deadline, such Holder obtains an order of the Bankruptcy Court, or the Bankruptcy Court approves a stipulation between the Debtor and such Holder fully or partially allowing such Claim, whether for all purposes or for voting purposes only.

As to Classes of Claims entitled to vote on a plan, Section 1126 of the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two thirds in dollar amount and more than one half in number of the claims of that class that have timely voted to accept or reject a plan. Detailed voting instructions are provided with the Ballot accompanying the Disclosure Statement Order or in any separate notice.

## B.     The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The information regarding the Confirmation Hearing will be as set forth in the Disclosure Statement Order or any separate notice. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to the classification of Claims or Interests or to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds of the objection, and the amount and class of the Claim. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the Debtor by the deadline set forth in the Disclosure Statement Order or any separate notice. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014

## C.     Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of the Plan are that the Plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible, and (iii) to the extent that any holder of a Claim or Interest in an impaired class does not vote for the Plan, it will receive or retain under the Plan property of a value that is not less than the amount that would have been received or retained if the Debtor were liquidated under chapter 7 of the Bankruptcy Code (often called the "best interest" test).

1.      Acceptance.

Classes 1 to 5 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2. <u>Confirmation Without Acceptance by All Impaired Classes</u>

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired Class' failure to accept a plan, the plan shall be confirmed, at the plan proponent's request in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity holders that is Impaired under, and has not accepted, the plan. The Debtor will be seeking nonconsensual confirmation of the Plan with respect to each Class of Claims that is entitled to vote to accept or reject the Plan if such Class rejects the Plan. The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit or schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

3. <u>Unfair Discrimination and Fair and Equitable Tests.</u>

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, nonaccepting Class. The requirement that the Plan be "fair and equitable" with respect to each Impaired, nonaccepting Class is also known as the "absolute priority rule" when applied to unsecured creditors. The Bankruptcy Code provides the following non exclusive definition of the phrase "fair and equitable," as it applies to secured creditors, unsecured creditors, and equity holders:

> *Secured Creditors.* With respect to any holder of a secured claim that rejects a plan, the Bankruptcy Code requires that either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds is provided in clause (i) or (ii) of this subparagraph. This test will not be applicable because the Allowed Claims of the Secured Creditors are to be paid in full under the Plan.

> *Unsecured Creditors.* With respect to any class of unsecured claims that rejects a plan, the Bankruptcy Code requires that either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the rejecting class of unsecured creditors will not receive or retain any property under the plan. The test will be applicable if Class 4 (General Unsecured Claims) rejects the Plan.

> *Equity Holders.* With respect to any class of equity interests that rejects a plan, the Bankruptcy Code requires that either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest, or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any

property under the plan. This test will be applicable if Class 5 (Interests) rejects the Plan.

The Debtor believes that the Plan and the treatment of all classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

4.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization.

The Debtor believes the Plan is feasible. The proceeds from the Loan Transaction will be sufficient to make all payments required under and as set forth in the Plan, and to finish construction of the USA Springs Project.

5.    Best Interest Test/ Liquidation Analysis

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each Holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test." To determine what Holders of Claims and Interests of each Impaired Class would receive if the Plan Parties were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Plan Parties' assets and properties in the context of a chapter 7 liquidation case.

The value of any distribution in a chapter 7 case would obviously be less than the value of distribution under the Plan which contemplates payment in full of all Allowed Claims. The costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those which might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by a debtor during a Chapter 11 case and allowed in a Chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals. In addition, Claims would arise by reason of the breach or rejection of obligations incurred, including contracts or leases which would otherwise be assumed in a successful Chapter 11 Case. The foregoing types of claims, costs, expenses, and fees and such other claims which may arise in a liquidation case or result from a pending Chapter 11 case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Chapter 11 priority and unsecured claims, as well as equity holders. In addition, distributions in a chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distribution. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a period in order for a chapter 7 trustee and its professionals to become knowledgeable about this Chapter 11 Case and the related Claims. In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale. All of the foregoing would likely further reduce Cash available for distribution.

After considering the effects that chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors in the Chapter 11 Case, the Debtor has determined that confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtor under chapter 7 of the Bankruptcy Code. Considering the Plan contemplates payment in full to Holders of Claims and Interests, the Debtor does not believe that a separate liquidation analysis is necessary. The Debtor reserves its rights to file such liquidation analysis in the event the Debtor is pursuing an Alternative Transaction where Creditors are not receiving 100% of their Allowed claim amount as set forth in the Plan.

**D.      Consummation** The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the Plan and the impact of the failure to meet such conditions, *see* Article X of the Plan.  The Plan is to be implemented pursuant to the provisions of the Bankruptcy Code.

## X.      RISK FACTORS

**A.      General**

There are various important considerations and risk factors the Impaired Classes to consider in determining whether to vote to accept or to reject a plan of reorganization. However, under the Plan, the Debtor expects to pay all Impaired Classes in full on the Effective Date or as soon as reasonably practicable and, therefore, certain risks associated with the operation of the Debtor's business, future financial performance, liability factors, other business risk factors are less applicable here.

**B.      Certain Bankruptcy Law Considerations**

There are other plan related factors that Creditors should consider, such as the following:

1.      Risks of Non-Confirmation

There can be no assurance that the Bankruptcy Court will confirm the Plan.  A Claim or an Interest Holder might challenge the adequacy of the disclosure or the balloting procedures as not being in compliance with the Bankruptcy Code.  Even if the Bankruptcy Court were to determine that the disclosure procedures were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any statutory conditions to confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed  by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting Classes of Claims and Interest Holders will not be less than the value of distributions such creditors and interest holders would receive if the Plan Parties were liquidated under Chapter 7 of the Bankruptcy Code.  There can be no assurance that the Bankruptcy Court will conclude that these requirements have been met, but the Debtor believes that the Bankruptcy Court should be able to find that the Plan will not be followed by a need for further financial reorganization and that all Classes of Claims and Interests will receive

distributions greater than what would be received following a liquidation pursuant to chapter 7 of the Bankruptcy Code.

### 2. Risk of Non-Occurrence of the Effective Date

Although the Debtor believes that the Effective Date may occur very quickly after the Confirmation Date, there can be no assurance as to such timing.

### 3. Substantive Consolidation Risks

The Plan is premised upon substantively consolidating of the Plan Parties and their assets as set forth in Article X of the Plan. The Debtor can provide no assurance, however, that (a) the Bankruptcy Court will enter an order granting the Debtor's request for substantive consolidation contemplated by the Plan; or (b) the Bankruptcy Court will overrule any objection that a party-ill-interest might have to such substantive consolidation.

## C. Approval and Closing of the Loan Transaction

The Plan is premised upon consummation of the Loan Transaction. The Debtor can provide no assurance, however, that the Bankruptcy Court will approve the Loan Transaction. Also, the Plan Parties currently anticipate that they will be able to close the Loan Transaction. There are many factors outside of the Plan Parties' control, however. Moreover, it is possible that the Debtor may not be able to meet various closing conditions, and that the Lender would elect to cancel the Loan Transaction as a result of these failures. Consequently, the Plan Parties can provide no assurance that they will be successful in consummating the Loan Transaction.

## XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim or Interest will depend, among other things, upon the origin of the Holder's Claim or Interest, when the Holder's Claim or Interest becomes Allowed, when the Holder receives payment in respect of its Claim or Interest, whether the Holder reports income using the accrual or cash method of accounting, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to his Claim or Interest. Accordingly, the federal, state, local and other tax consequences of the Plan to the Holders of Claims and Interests may vary based on the individual circumstances of each Holder. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO IT UNDER THE PLAN.

## XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan or an amended Plan with an Alternative Transaction is not confirmed, the potential alternatives include (i) liquidation of the Debtor's assets under Chapter 11 of the Bankruptcy Code (most likely considering the Committee's objection to extend further the

Debtor's Exclusivity Periods and the terms of the Stipulation); (ii) conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; or (iii) dismissal of the Chapter 11 Case.

## A.    Liquidating Plan Under Chapter 11

This option is contemplated under the Plan to the extent necessary. The Debtor could be liquidated pursuant to the provisions of a chapter 11 plan of reorganization, assuming no conversion to chapter 7 occurred. In a liquidation under chapter 11, the assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distribution to the holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially. Although preferable to a chapter 7 liquidation, the Debtor believes that any alternative liquidation under chapter 11 would still not smaller distributions to Creditors than those provided for in the Plan with potentially no distribution to Interests.

## B.    Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets. In chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtor. The Debtor believes that in liquidation under chapter 7, before Creditors receive any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the Estate. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the failure to realize the greater going-concern value of the applicable assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Article X,C. The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to Creditors than those provided for in the Plan and potentially no distribution to Interests.

## C.    Dismissal of the Chapter 11 Case

The Debtor believes that the dismissal of its Chapter 11 Case would result in Roswell foreclosing on the assets of the Debtor and the Debtor Related Entities which would result in smaller distributions being made to Creditors than those provided for in the Plan with potentially no distribution to Interests.

## XIII.  CONCLUSION AND RECOMMENDATION

For all the reasons set forth in this Disclosure Statement, the Plan Parties believe that confirmation and consummation of the Plan is preferable to all other alternatives and is in the best interests of Holders of Claims and Interests and, therefore, recommend confirmation of the Plan.

**[SIGNATURE PAGES FOLLOW]**

*DEBTOR*

USA SPRINGS, INC., a Delaware corporation

By _____

Name  Francesco Rotondo
Title  President

<u>*DEBTOR RELATED ENTITIES:*</u>

USA SPRINGS, INC.,
a New Hampshire corporation

By:
Name: Francesco Rotondo
Title: President

GARRISON PLACE REAL ESTATE
INVESTMENT TRUST

By
Francesco Rotondo, Trustee

SWEETBRIEVIEW REALTY TRUST

By
Francesco Rotondo, Trustee

JUST CAUSE REALTY TRUST

By
Francesco Rotondo, Trustee

*RELATED ENTITY:*

AMICI REAL ESTATE TRUST

By: _Ralph Faiella_

Ralph Faiella, Jr., Trustee