UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re                      )

                        )      Chapter 11

USA Springs, Inc.[1]         )      Case No. 08-11816 (JMD)

                        )

            Debtor.      )

# THIRD AMENDED DISCLOSURE STATEMENT RELATING TO FIFTH AMENDED PLAN OF USA SPRINGS, INC. AND RELATED ENTITIES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED JULY 15, 2011

Riemer & Braunstein LLP
Alan L. Braunstein, Esq.
Three Center Plaza
Boston, MA 02108
(617) 523-9000
abraunstein@riemerlaw.com

COUNSEL TO THE DEBTOR

Sheehan Phinney Bass + Green P.A.
Bruce A. Harwood, Esq.
1000 Elm Street
Manchester, NH 03105
(603) 627-8139
bharwood@sheehan.com

LOCAL COUNSEL TO THE DEBTOR

DATED: July 15, 2011

---

[1] The affected entities are: USA Springs, Inc., a Delaware corporation (the Debtor), USA Springs, Inc., a New Hampshire corporation, Garrison Place Real Estate Investment Trust, Just Cause Realty Trust, Sweet Review Realty Trust, and Amici Real Estate Trust.

TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................4
      A.   General...............................................................................................4
      B.   Claims Summary ...............................................................................4

II.   BACKGROUND ...............................................................................................5
      A.   Overview of the USA Springs Project...................................................5
      B.   Corporate/ Capital Structure ................................................................7
      C.   Management of the Debtor ...................................................................7
      D.   Permits and Water Rights ....................................................................7
      E.   Third Party Contracts and Relationships ..............................................9
      F.   The USA Springs Project and the Nottingham Community.......................10

III.  ASSETS OF, CLAIMS AGAINST AND INTERESTS IN THE PLAN
      PARTIES .......................................................................................................10
      A.   Assets Related to the USA Springs Project ..........................................10
      B.   Asset Valuation..................................................................................11
      C.   Secured Claims ..................................................................................11
      D.   Administrative Expense Claims and Priority Tax Claims......................13
      E.   General Unsecured Claims ..................................................................14
      F.   Equity/ Beneficial Interests.................................................................14

IV.   CHAPTER 11 CASE ......................................................................................14
      A.   Overview-- Events Leading to the Chapter 11 Case .............................14
      B.   The Bankruptcy Proceeding ...............................................................14
      C.   Appointment of The Official Committee of Unsecured Creditors .........17
      D.   Employment of Debtor Professionals ..................................................18
      E.   Claims Bar Date .................................................................................18

V.    SUBSTANTIVE CONSOLIDATION............................................................19
      A.   Substantive Consolidation In General .................................................19
      B.   Substantive Consolidation of the Plan Parties Under the Plan ..............19
      C.   Legal Authority in Support of Substantive Consolidation .....................20
      D.   Substantive Consolidation of the Plan Parties Is Appropriate...............22
      E.   Substantive Consolidation Order.........................................................24
      F.   Reservation of Rights .........................................................................24

VI.   MALOM TRANSACTION.............................................................................24

VII.  SUMMARY OF THE CHAPTER 11 PLAN....................................................26
      A.   Introduction.......................................................................................26
      B.   Unclassified Claims and Treatment......................................................26
      C.   Classification and Treatment of Classified Claims and Interests ...........28
      D.   Acceptance or Rejection of the Plan....................................................31

| | E. | Means For Implementation of the Plan | 31 |
|---|---|---|---|
| | F. | Treatment of Executory Contracts and Unexpired Leases | 34 |
| | G. | Provisions Governing Distributions | 36 |
| | H. | Procedures for Resolving Disputed Claims | 37 |
| | I. | Conditions Precedent to Effective Date and Consummation of the Plan | 38 |
| | J. | Retention of Jurisdiction | 39 |
| | K. | Effect of Confirmation | 41 |
| | L. | Miscellaneous Provisions | 43 |

| **VIII.** | **VOTING ON AND CONFIRMATION OF THE PLAN** | | **46** |
|---|---|---|---|
| | A. | General | 46 |
| | B. | Acceptance Necessary for Confirmation | 47 |
| | C. | Voting Procedures | 47 |

| **IX.** | **CONFIRMATION AND CONSUMMATION PROCEDURE** | | **47** |
|---|---|---|---|
| | A. | Solicitation of Votes | 47 |
| | B. | The Confirmation/ Disclosure Statement Hearing | 47 |
| | C. | Confirmation | 48 |
| | D. | Consummation | 50 |

| **X.** | **RISK FACTORS** | | **51** |
|---|---|---|---|
| | A. | General | 51 |
| | B. | Certain Bankruptcy Law Considerations | 51 |
| | C. | Approval and Closing of the Malom Transaction | 52 |

| **XI.** | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES** | **52** |
|---|---|---|

| **XII.** | **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** | | **52** |
|---|---|---|---|
| | A. | Liquidating Plan Under Chapter 11 | 53 |
| | B. | Liquidation Under Chapter 7 | 53 |
| | C. | Dismissal of the Chapter 11 Case | 53 |

| **XIII.** | **CONCLUSION AND RECOMMENDATION** | **53** |
|---|---|---|

# I. INTRODUCTION

USA Springs, Inc., a Delaware corporation (the "Debtor") and the Related Entities submit this third amended disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the Bankruptcy Code, to Holders of Claims and Interests in connection with the Fifth Amended *Plan of USA Springs, Inc. and Related Entities Under Chapter 11 of the Bankruptcy Code,* dated July 15, 2011, as the same may be amended from time to time (the "Plan").

**All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Plan.**

## A. General

The information contained herein has been prepared by the Debtor in good faith and in reliance upon its books and records. The financial information herein has not been subject to an audit.

The Debtor believes that this Disclosure Statement complies with the requirements of the Bankruptcy Code. The Debtor also believes that this Disclosure Statement meets the "adequate information" standard established by bankruptcy courts in the First Circuit, including this Bankruptcy Court in In re Ferretti, 128 B.R. 16 (Bankr. D. N.H. 1991). Disclosure of all factors is not necessary in every case and the precise information required is to be governed by the facts and circumstances presented in this Chapter 11 case. Id.

The statements contained in this Disclosure Statement are generally made as of the date hereof, unless another time is specified, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the information set forth herein since the date of this Disclosure Statement or the date of the materials relied upon in preparation of this Disclosure Statement.

This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Plan Parties or any other party, or be deemed conclusive advice on the tax or other legal effects of the Plan on Holders of Claims or Interests.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself. Each Holder of a Claim or an Interest should read, consider and carefully analyze the terms and provisions of the Plan. If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan are controlling.

**This amended Disclosure Statement is with respect to material and relevant changes in the new Plan.** The Bankruptcy Court has previously found that the Debtor's Second Amended Disclosure Statement contained adequate information and otherwise complied with section 1125 of the Bankruptcy Code.

## B. Claims Summary

In connection with the closing of the contemplated Malom Transaction, below is a summary of classification and treatment of classified Claims and Interests.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Roswell Secured Claim | Impaired | Entitled to Vote |
| 2 | Other Secured Claims | Impaired | Entitled to Vote |
| 3 | Tax Municipalities Secured Claims | Unimpaired | Not Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Mechanic's Lien Claim | Impaired | Entitled to Vote |
| 6 | Insider Claims | Impaired | Entitled to Vote |
| 7 | Interests | Unimpaired | Not Entitled to Vote |

As prescribed by the Bankruptcy Code and the Bankruptcy Rules, Claims asserted against, and Interests in, the Plan Parties are placed into "Classes." The Plan designates seven (7) separate Classes of Claims and Interests. The classification of Claims and the treatment of each Class are discussed in the Plan and in Article VII of this Disclosure Statement.

Under the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" are entitled to vote to accept or reject the Plan. The Claims in Classes 1, 2, 4, 5, and 6 are Impaired and are entitled to vote. A creditor that is Impaired and entitled to vote that previously cast a vote on the Prior Plan or did not cast a vote on the Prior Plan may change a prior vote or vote in the first instance by completing and mailing the Replacement Ballot to the address provided. The Replacement Ballot has to be received by the Debtor's counsel by the August 18, 2011 deadline (the "Voting Deadline") as set forth in the notice of combined hearing on the Plan and the Disclosure Statement (the "Procedure Notice").

The following are **NOT** entitled to vote on the Plan (or are deemed to have rejected the Plan) without voting. Therefore, they will not receive Replacement Ballots with the Disclosure Statement:

- **Administrative Expense Claimants**
- **Holders of Fee Claims**
- **Holders of Priority Claims**
- **Tax Municipalities Secured Claims**
- **Claimants whose Claims are Disputed Claims**
- **Holders of Interests**

## II.   BACKGROUND

### A.   Overview of the USA Springs Project

The Debtor, a Delaware corporation, was formed in 1997 by Francesco Rotondo ("Mr. "Rotondo"), the current President of the Debtor, to develop and operate a commercial water

bottling production facility in Nottingham, New Hampshire. The completed facility is expected to be on approximately 200 acres, with 4,000 plus feet of frontage on a highway that connects Portsmouth (approximately 9 miles away) and Concord (approximately 18 miles away). Prior to the Petition Date, the necessary power and infrastructure were on site and the Debtor commenced construction of a 176,000 square feet manufacturing facility. In summary, the USA Springs Project achieved the following milestones before the bankruptcy filing:

- The building foundation and steel frame are in place and the overall building is 45% completed.

- Site engineering, surveying, structural design are 100% completed.

- Architectural design is 75% completed.

- Bottling equipment design and development is 50% completed.

- Three wells have been drilled, tested, and capped on-site, resulting in an initially certified sustainable pumping rate of 307,528 gallons per day (214 gallons per minute) of pure water.

- The State's Large Ground Water Withdrawal Permit, among others, has been acquired.

- An extensive groundwater and wetland-monitoring program required by the Large Ground Water Withdrawal Permit has been in place and active.

- Perimeter surveys of the land and all engineering design for the plant has been completed and approved.

- Excavation and construction of new wetlands, detention ponds, entrance roads, parking lots, production well roads, and easements have been brought to near completion.

- Wetlands identification and intensity soil mapping, and topographic land survey have been completed.

- Land use master plan completed- including septic and water discharge designs.

The involved parties have spent approximately $17,000,000 with respect to the USA Springs Project, including, but not limited to land acquisition, engineering, well drilling and monitoring, hydrogeology, construction, power service access, utilities, permitting, remediation, security, closing costs and loan interest payments, public relations, real estate taxes, land development, and existing building improvements.

## B. Corporate/ Capital Structure

As of the Petition Date, Mr. Rotondo owned approximately 46% of the Debtor's common stock. Approximately 37 other individuals or entities owned common stock in the Debtor ranging from 0.125% to 10%.

The Debtor owns 100% of the common stock of U.S.A. Springs, Inc., a New Hampshire corporation ("N.H. Corp."). N.H. Corp. was organized on or about June 9, 1997. Its President and Chairman of the Board is Mr. Rotondo. N.H. Corp.'s main asset is the Large Ground Water Withdrawal Permit discussed herein.

The Debtor is also the sole beneficiary under the following trusts of which Mr. Rotondo is the sole trustee:

(i) The Garrison Place Real Estate Investment Trust ("Garrison Trust"): The Garrison Trust was created by a Declaration of Trust dated April 23, 1998. The Garrison Trust is the title holder for the 100 acre parcel located in Nottingham, NH (with a portion of the land in Barrington, NH) on which the water production wells and the bottling facility are to be located.

(ii) Just Cause Realty Trust ("Just Cause Trust"): The Just Cause Trust was created by a Declaration of Trust dated June 2, 2003. Just Cause Trust is the title holder for the 14 acre parcel, located in Nottingham, NH to the west of the bottling plant site, on which a certain office building and industrial warehouse are to be located.

(iii) Sweet Review Realty Trust ("Sweet Review Trust"): The Sweet Review Trust was created by a Declaration of Trust dated April 25, 2006. Sweet Review Trust holds title to the 76 acre parcel of vacant land, located in Nottingham, NH immediately to the west of the Just Cause Trust site, on which a cellular tower is located.[2]

## C. Management of the Debtor

The following persons comprise the Board of Directors and executive officers of the Debtor: Mr. Rotondo (president, treasurer, and director); Jeffrey DeLucia (vice president and director); Rocci DeLucia (clerk); Marco Rotondo (director); William Gianopoulos (director); and William Barlett (director). The Related Entities are not operating entities.

## D. Permits and Water Rights

The Debtor, through the Debtor Related Entities, has obtained and maintained all relevant permits, including a building permit and the Large Groundwater Withdrawal Permit issued by the New Hampshire Department of Environmental Services. The permits that the USA Springs Project benefits from include the following:

---

[2] The Debtor has an arrangement with a third party who pays approximately $842 per quarter with respect to the cellular tower.

| Permit | Agency/ Bureau/Division | Permit Type |
| --- | --- | --- |
| Large Groundwater Withdrawal [(LGWP-2004-003] | State of NH; DES | Operating |
| NHDOT Highway Entrance (06-351-9296] | State of NH; DOT | Construction |
| Site Specific [WPS-7147] | State of NH; DES | Construction |
| Site Specific [WPS-7147-A] | State of NH; DES | Construction |
| Site Specific – Alteration of Terrain [WPS-7147-C] | State of NH; DES | Construction; see new permit WPS-7147-D |
| Site Specific – Alteration of Terrain [WPS-7147-D] | State of NH; DES | Construction |
| Dredge & Fill (Wetlands) [2001-00716] | State of NH; DES | Construction |
| Dredge & Fill (Wetlands) [2004-02817] | State of NH; DES | Construction |
| Dam Permit [184.22] | N/A | Construction and Operating |
| Septic System [CA 2005572713] | DES/ Subsurface Systems | Construction |
| Groundwater Management [GWP-200302008-N-01] | State of NH; DES | Construction |
| Certificate of No Further Action [20302008] | State of NH; DES | Construction |
| Site Plan Review State Permit Conditions [2001-00716] | State of NH; DES | Construction |
| Non-Domestic Waste Hold Tank [DES# 200211005] | State of NH; DES | Operating |
| New Source Bottled Water [USA-1, USA-2, USA-4] | State of NH; DES | Operating |
| Building Permit (foundation) [141-06] | Town of Nottingham; Building Department | Construction |

| Building Permit (building) [085-07] | Town of Nottingham; Building Department | Construction |
|---|---|---|
| Declaration of Restrictive Covenant [NAE-2004-2551] | State of NH; DES | Construction |
| Declaration of Restrictive Covenant-Attachment A [NAE-2004-2551] | State of NH; DES | Construction |
| Work Stat Notification [NAE-2004-2551] | US Army Corps of Engineers; New England District | Construction |

The permits are transferrable and, if expired, are renewable (subject to certain prerequisites). The Town of Nottingham had filed an objection to an initial Disclosure Statement, dated as of May 24, 2010, pursuant to which the Town maintained that the building permits issued by the Town had lapsed, and other permits may have lapsed or may lapse in the near future. The permitting process and permit structure has been handled by the Debtor's professionals throughout the 7 year process with great care and attention. Although the permits have been obtained at various times over the past 6 years, all actions necessary to activate the permits and to maintain them have been taken and the Debtor believes that its interests in the various permits have in effect been vested. The Debtor, at its option, will assume all permits, licenses, and related documents, as applicable.

Also, pursuant to the Large Ground Water Withdrawal Permit discussed above, prepetition, three 500+ feet deep bedrock wells have been drilled on the property, from which the water was tested by the University of New Hampshire for quality. These wells have a permitted capacity to pump 307,528 gallons per day (214 gallons per minute) to supply the production of water for three production lines. The USA Springs Project will use the most highly recognized bottling process equipment in the industry and the Debtor intends to continue working closely with the leading companies of designing water bottling facilities, such as Sidel Solutions, Inc. together with Husky Injection Molding Systems, Inc. who have designed the manufacturing processes for the USA Springs Project.

**E.      Third Party Contracts and Relationships**

The USA Springs Project has in place several third party relationships and/or contracts related to building construction, site work, acceleration and deceleration lane construction; wetlands monitoring; ground water monitoring; civil surveying and engineering; Large Ground Water Withdrawal Monitoring program; site land management; site security; and Storm Water Pollution Protection Plan, which include the following:

(i) Agreement, dated as of February 5, 2010, with Aho Construction Inc. with respect to building construction. Aho is a major creditor and the Debtor intends to assume the contract in connection with the Plan, which will eliminate the Breach of Contract Claim filed by this Creditor.

(ii) Letter agreement, dated as of July 7, 2006, with MyKrowaters with respect to certain monitoring requirements. This entity is a Committee Member.

(iii) Independent Contractor Agreement, as of 2007, with Diom Inc. (n/k/a Dynamic Industrial Operations Management) with respect to security services. This entity is a Committee Member. The Debtor intends to assume the contract in connection with the Plan, which will eliminate the Breach of Contract Claim filed by this Creditor.

(iv) Letter Agreement, dated as of December 26, 2006, with Frank DeLucia & Son Inc. with respect to site work. A principal owner of this entity acts as an officer of the Debtor.

(v) Postpetition agreement(s) with NHSC Inc., as of 2009, with respect to wetlands monitoring and reporting. This entity is a Committee Member.

Except as set forth in the Plan, the Debtor believes there will be no Cure amount associated with the assumption of any of the above mentioned prepetition contracts or agreements, to the extent deemed Executory Contracts.

## F.     The USA Springs Project and the Nottingham Community

Despite an apparent contentious relationship between the Nottingham Community and the Debtor that pervaded the pre-petition and post-petition period, counsel to the Debtor has endeavored to (1) ascertain the nature of the concerns and disputes; and (2) make a serious effort to reach out and/or respond to community representatives and certain individuals in the Community raising particular issues. The Debtor will also attempt to address many of these concerns within the context of the Plan and engage in the negotiation process with third parties. The efforts to promote harmony contemplated by the Debtor are sincere; and while the Debtor is aware that there remain several recalcitrant individuals who claim they will "stop at nothing" to derail and destroy the Debtor's efforts to successfully reorganize, the Debtor will, as it has done, challenge those who seek to deprive the Debtor of its vision for success and to foster an optimum working relationship within the Community.

Once operational, the Reorganized Debtor expects to create approximately 200 new jobs, including new positions for management, sales and marketing, warehouse positions, quality control, and plan operations. Also, the projected tax revenue to the community would be substantial, including with respect to real estate taxes.

## III.                    ASSETS OF, CLAIMS AGAINST AND INTERESTS IN THE PLAN PARTIES

## A.     Assets Related to the USA Springs Project

The Debtor has listed in its bankruptcy Schedules its ownership interests in the Debtor Related Entities and/or their assets as discussed above. In addition to the main assets discussed above, the Debtor also made a deposit of $125,000 prepetition related to a water right option. There are also the following water supply letters of interest that the Debtor received prepetition through personal relationships of Mr. Rotondo:

(i)     A conditional contract with the International Organization for Diplomatic Relations in Malta (the "IODR") for the supply of bottled water by the Debtor to the IODR for a period of ten (10) years with annual payments by the IODR of approximately Seventy Million Dollars ($70,000,000).

(ii)    A preliminary letter of intent with Martini & Rossi for the supply of bottled water by the Debtor to Martini & Rossi for a period of five (5) years with annual payments by Martini & Rossi of approximately: (1) Eighty Five Million Dollars ($85,000,000) in year 1; (2) Eighty Eight Million Dollars ($88,000,000) in year 2; (3) Ninety One Million Dollars ($91,000,000) in year 3; (4) Ninety Three Million Dollars ($93,000,000) in year 4; and (5) Ninety Six Million Dollars ($96,000,000) in year 5.

(iii)   A preliminary letter of intent with presso Hotel Escuela for the supply of bottled water by the Debtor to presso Hotel Escuela for a period of two (2) years with an annual payment by presso Hotel Escuela of approximately Seventy Five Million Dollars ($75,000,000) in year 1 and Seventy Seven Million Dollars ($77,000,000) in year 2.

Moreover, postpetition, pursuant to the Jurisdiction Agreement discussed below in Article IV, the Debtor received the benefit of a certain tract or parcel of land in the Town of Raymond, County of Rockingham, New Hampshire, title to which is held by the Amici Trust. A certain shareholder and director of the Debtor is the beneficiary of the Amici Trust. The Amici Trust was created by a Declaration of Trust dated April 10, 2007. Its sole trustee is Ralph Faiella, Jr., a business associate of Mr. Rotondo.

**B.      Asset Valuation[3]**

Prepetition, on or about September 13, 2007, Real Property Services in North Andover, MA valued the real estate assets (excluding mineral rights) at approximately $27,000,000 (market value) and $41,000,000 (prospective value assuming completion and occupancy of the building under construction). Pursuant to this prepetition appraisal, based on completion of all improvements as designed and planned, the results for the three valuations approaches used were as follows: cost approach $43,000,000; income approach $39,000,000; and sale comparison approach $41,500,000. In connection with a prepetition pollution liability insurance quote, a value of approximately $100,000,000 was associated with the water rights for the USA Springs Project. Postpetition, in 2010, the Debtor ordered an appraisal and the value of the real estate assets is expected to be approximately $22,000,000 (not including water rights). The Debtor has not yet paid for and is not in possession of such latest appraisal.

**C.      Secured Claims**

In addition to raising equity, the Debtor has funded its activities prepetition through various private loans and a first mortgage construction loan from Roswell Commercial Mortgage, LLC ("Roswell").

---

[3] References to real estate assets do not include Amici Trust real estate.

1. <u>First Lien Secured Claim</u>

The Debtor Related Entities, as borrowers (the "<u>Borrowers</u>") are indebted to Roswell pursuant to a certain Term Commercial Note, dated March 26, 2007, in the amount of $8,400,000 secured by substantially all assets of the Debtor in connection with the Prepetition Credit Agreement. The Debtor and Mr. Rotondo have each guaranteed the obligations of the Borrowers to Roswell pursuant to certain Continuing Guaranty, dated as of March 26, 2007. The interest rate under the Term Commercial Note is fixed rate of twelve and 9/10[th] percent (12.9%).[4]

The funds related to the Prepetition Credit Agreement were used, among others, for certain mortgage and loan payoffs, payment of site development costs to certain contractors, closing costs, and some construction related to the USA Springs Project. The Roswell loan matured on March 31, 2009. Roswell filed its revised proof of claim on October 27, 2008 (as amended on 8/28/09) in the amount of $8,559,170.80 as prepetition claim, not including certain fees, and post petition interest (this proof of claim amount includes $7,744,798.20 as principal, $759,416.54 for interest, and $44,936.14 for late fees). According to the Stipulation (as defined below), the Roswell proof of claim is allowed as of the Petition Date *provided that* the Debtor reserved its right to challenge any accounting issues, interest calculations, or the reasonableness of other charges incurred from the Petition Date to the date of final payment. In connection with the Stipulation (as defined below), the Debtor paid $10,000 to Roswell to reduce Roswell's claim, including interest, costs and attorneys' fees.

Under the Stipulation (as defined below), Roswell has assigned to Riemer and SPB+G the first $35,000 of recoveries arising under the Roswell's mortgages and security interests, and also assigned to counsel to the Committee the next $7,500 Roswell shall be entitled to an unsecured claim in the bankruptcy case in an amount equal to such carveout as set forth in the Stipulation (to the extent applicable).

In addition, pursuant to the Stipulation (as defined below), all claims existing at the Petition Date or as of the date of such Stipulation in favor of the Debtor, or any of the Debtor Related Entities or Mr. Rotondo and against Roswell, or any of its officers, directors, shareholders, members, managers or agents were waived, released, and discharged. Such claim allowance, waivers and releases contained in the Stipulation shall not be binding upon a subsequent Chapter 7 Trustee in the Debtor's case.[5]

2. <u>Other Mortgages/Liens</u>

In addition to the Roswell loan, in connection with the improvements, construction and development of the USA Springs Project, the Debtor and/or the Debtor Related Entities raised

---

[4] During the term of the note, payments of interest are to be paid only on an initial advance of principal in the amount of $5,452,334 and upon such principal as may from time to time have been advanced and outstanding until the maturity date or sooner if the note is accelerated for an event of default.

[5] Moreover, the Debtor has contended that the Roswell secured claim may be vulnerable to a trustee. Additionally, the amount of the claim is similarly believed subject to a potential challenge and reduction for penalties and other potential charges that may not be permissible, especially if the case were to be converted to Chapter 7.

additional funds from individuals and entities by granting additional mortgages. As of the Petition Date, the following mortgages remained outstanding:

(a) On about July 2007, Garrison Trust granted mortgage(s) to Dorothy Sajous in connection with two loans in the original amount of $250,000 each.

(b) On or about August 2007, Garrison Trust granted a mortgage to Richard Mignault and Donna L. Mignault in connection with a loan in the original amount of $200,000.

(c) On or about August 2007, Garrison Trust granted a mortgage to William C. Gianopoulos in connection with a loan in the original amount of $480,000.

(d) On or about December 2007, Just Cause Trust granted a mortgage to Frank Carozza in connection with a loan in the original amount of $300,000.

Aho Construction has asserted a mechanic's lien against assets of the Debtor, among others, in the amount of $206,330.

3.    Secured Debt of Amici Trust

By mortgage, dated May, 2007, Amici Trust granted a mortgage in connection with a $200,000 note executed by Amici Trust for the benefit of Richard and Donna Mignault. The August 2007 mortgage for the benefit of Richard Mignault and Donna Mignault by the Garrison Trust discussed above relates to the same obligation.

**D.    Administrative Expense Claims and Priority Tax Claims**

1.    Administrative Expense Claims

Certain individuals or entities have filed, submitted, or alleged claims of approximately $550,000 for postpetition services in connection with the USA Springs Project (including over $100,000 from certain officers currently rendering services). Such third party services related to, among other things, voluntary monitoring of the site and security. The Debtor reserves its rights to object to all Administrative Expense Claims.

2.    Real Estate Tax Claims

The real estate tax bills, of May 6, 2010, from the Town of Nottingham reflect taxes due of approximately $300,000. The Debtor also expects to pay real estate taxes due to Town of Barrington (with respect to the portion of the Garrison Trust land) and the Town of Raymond (with respect to Amici Trust real estate) on a smaller scale. The Debtor expects to pay real estate taxes in full under the Plan.

3.    Fee Claims

Taking into account further services to be incurred, the Debtor anticipates that the Fee Claims of all retained professionals that will be outstanding and unpaid as of the Effective Date will be approximately $3,000,000. This amount is merely an estimate and subject to change.

### E. General Unsecured Claims

The total of General Unsecured Claims, as scheduled and/or filed by the Debtor, is approximately $3,500,000 (not including the Breach of Contracts Claims). This amount includes Insider Claims of approximately $814,000 which will be subordinated to all other Allowed Claims, including the other Allowed Deferred Claims.

### F. Equity/ Beneficial Interests

As noted above, as of the Petition Date, Mr. Rotondo owned approximately 46% of the Debtor's common stock. Approximately 37 other individuals or entities owned common stock in the Debtor ranging from 0.125% to 10%. The Debtor owns 100% of N.H. Corp. and is the sole beneficiary of Garrison Trust, Just Cause Trust, and Sweet Review Trust. As stated above, a certain shareholder and director of the Debtor is the beneficiary of Amici Trust.

## IV.    CHAPTER 11 CASE

### A. Overview-- Events Leading to the Chapter 11 Case

During and after its battle during the licensing and permitting stages, the USA Springs Project encountered significant operational and financial difficulties. The Roswell loan was not sufficient to complete construction of the bottling plant and development initiatives. On or about December, 2007, the Borrowers stopped making payments under the Roswell loan and Roswell later started foreclosure proceedings on or about May, 2008. Suffering from the weakened credit lending environment, the Debtor could not timely obtain a refinancing loan and was forced to seek Chapter 11 protection.

### B. The Bankruptcy Proceeding

1.    <u>Conversion to Chapter 7 and Reconversion to Chapter 11</u>

On June 27, 2008, the Debtor filed its voluntary petition for relief in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code. On April 1, 2009, the Debtor's Chapter 11 proceeding was converted to a proceeding under chapter 7 of the Bankruptcy Code[6] due to certain oversight of prior counsel to the Debtor. The Debtor filed an Emergency Motion to Reconsider Order Converting Case to chapter 7 ("<u>Motion to Reconsider</u>") on April 6, 2009. The Court allowed the Motion to Reconsider on May 21, 2009 in connection with the Stipulation (as defined below). The Court also docketed an Order Re-Converting Case to Chapter 11 on that same date.

2.    <u>Stipulation with Roswell</u>

---

[6] During the Chapter 11 Case and prior to conversion, the Debtor had filed a boilerplate "plan" – but without any disclosure statement, (which plan was never pursued), and the Committee had filed a motion to conduct a public auction sale to which Roswell objected.

In connection with the Debtor's request for the Court to reconvert the Debtor's case to Chapter 11 pursuant to the Motion to Reconsider, the Debtor, the Debtor Related Entities, and Roswell entered into certain Stipulation on Motion to Reconsider Order Granting Motion to Convert Case, dated as of April 27, 2009, as amended, supplemented and in effect from time to time (the <u>Stipulation</u>"). Pursuant to the Stipulation, a sale of assets of the Debtor and the Related Entities is contemplated in the absence of a confirmed Chapter 11 plan. The Stipulation, which was approved on May 21, 2009, provides for certain initial deadlines which have been extended several times by the Debtor pursuant to Orders of the Bankruptcy Court.

3.    Jurisdiction Agreements

In connection with the Stipulation, the Debtor and the Debtor Related Entities entered into a Jurisdiction Agreement, dated as of May 27, 2009 (as in effect from time to time, the "<u>Related Entities Jurisdiction Agreement</u>"), submitting themselves and their assets to the jurisdiction of the Bankruptcy Court. Amici Trust also entered into a separate Jurisdiction Agreement, dated as of May 27, 2009 (as in effect from time to time, the "<u>Amici Jurisdiction Agreement</u>", and collectively with the Related Entities Jurisdiction Agreement, the "<u>Jurisdiction Agreements</u>"), submitting itself and its assets to the jurisdiction of the Bankruptcy Court. Amici Trust's property value, net of any outstanding mortgage, has been made available to the Debtor's estate, intended to be solely for the benefit of creditors of the USA Springs Project exclusive of Roswell. The effect of the Jurisdiction Agreements will become moot upon confirmation of the Plan and substantive consolidation of the Debtor and Related Entities as contemplated under the Plan.

4.    Exclusivity Extensions

The exclusivity period under section 1121 of the Bankruptcy Code was reinstated when the Court converted the Debtor's case to Chapter 11 pursuant to section 706 of the Bankruptcy Code. Pursuant to section 348(b) of the Bankruptcy Court, the exclusivity periods under section 1121 of the Bankruptcy Code started on May 21, 2009, the date the Bankruptcy Court reconverted the Debtor's case to Chapter 11 (not the Petition Date, June 27 2008). Therefore, post-reconversion, the initial period for the Debtor to file its Chapter 11 plan was September 18, 2009 and the Debtor's exclusive period to solicit votes for such plan was November 17, 2009. The Debtor has obtained several extensions for exclusivity from the Bankruptcy Court.

5.    Committee Lawsuit

In connection with the closing of the Prepetition Credit Agreement, certain parties received payments from the Borrowers. As requested by the Committee, the Debtor's counsel has (i) sent demand letters to all such third parties in connection with the prepetition payments, and (ii) requested for execution of tolling agreements by such third parties. Facing a June 27, 2010 two-year statute of limitation, on June 24, 2010, the Committee filed a complaint with the Bankruptcy Court naming as defendants: the Debtor, the Debtor Related Entities, certain officers and directors of the Debtor, and Roswell for, among other things, recovery of money/property, including with respect to the Chapter 5 Claims, subordination of claim or interest, substantive consolidation, and other bankruptcy causes of action. Such Committee Lawsuit is not with respect to actual fraud but alleges, among other things, "fraudulent conveyance" or the transfer of property for less than full consideration. Some of the defendants have filed answers to the

complaint and motions to dismiss are pending. The Committee Lawsuit has been stayed by an Order of the Court entered on May 31, 2011, pursuant to which all related deadlines are stayed until thirty (30) days after the earlier of (i) the Effective Date of the Plan; (ii) entry of an order converting the Chapter 11 case to Chapter 7; (iii) entry of an order appointing a trustee; or (iv) entry of an order, after notice and opportunity for hearing, terminating the stay for cause shown; *provided that* no party may move to terminate the stay for cause before August 11, 2011.

6.    Other Litigation

The Debtor also had paid, prepetition, certain deposits to three financial institutions in connection with loan applications totaling approximately $150,000. On June 2, 2010, the Debtor's counsel commenced adversary proceedings with the Bankruptcy Court against two of such defendants for, among others, recovery of money/property. The Bankruptcy Court has entered default judgments against the defendants. As set forth in the Plan, such Judgments may be pursued in connection with implementation of the Plan.

Both prepetition and post-petition, certain third parties have made every effort to interfere with the Debtor obtaining financing and the completion of the USA Springs Project.[7] This includes post petition attacks which have included false and misleading statements and efforts to "relitigate" decided matters, the purpose of which is apparently to interfere with any transaction relating to the USA Springs Project. The Debtor believes that such actions may constitute violations of the automatic stay under the Bankruptcy Code (to the extent taken place post-petition) or civil torts. The Debtor reserves all rights to seek appropriate redress for any stay violations or any torts, including intentional interference by third parties with the Debtor's contractual or advantageous relations. The Debtor or the Reorganized Debtor, as applicable, may bring any such actions post-Confirmation.

7.    Committee's 2004 Examination Motions

The Committee filed several motions for 2004 examinations and for production of documents in this Chapter 11 Case which were allowed by the Bankruptcy Court, including:

(i)    Motion for Order Compelling Roswell Commercial Mortgage, LLC to Appear for Rule 2004 Examination and to Produce Documents, which was allowed by the Bankruptcy Court on June 26, 2009;

---

[7] There are third party non-creditors including non-residents of Nottingham or Barrington who have crusaded against the Debtor in every respect, going so far as repeatedly (1) delivering unsolicited inflammatory communications with at least one known interested party (who has disregarded and dismissed such third party's characterization of the permit status and other contentions adverse to the Debtor); and (2) communicating with the press in a manner that even goes so far as to attack neutral professionals and neutral officials. Whether or not these third parties were initially retained by a competitor, as some suspect, the Debtor (and even the creditors who have expertise in the particular environmental, permitting, monitoring and remediation process) have contradicted each of these allegations. It is the Debtor's contention that the manner in which such misguided and vindictive commentary has been provided is unsubstantiated and arguably in violation of the automatic stay. In fact, at the least one party remains convinced that these efforts are being orchestrated by potential competitors who are seeking to thwart the efforts of the Debtor so as to eliminate competition and/or force a liquidation and create a means to acquire the site and water rights at a price significantly less than their optimum value.

(ii) Motion for Order Compelling Debtor to Appear for Rule 2004 Examination and to Produce Documents, which was allowed by the Bankruptcy Court on July 15, 2009;

(iii) Assented to Motion for Order Compelling TD Bank, NA and to Produce Documents Pursuant to Rule 2004, which was allowed by the Bankruptcy Court on April 14, 2010;

(iv) Motion for Order Compelling Dale Cornwell to Appear for Rule 2004 Examination and to Produce Documents, filed on May 24, 2010;

(v) Motion for Order Compelling Joseph Fitzgibbons to Appear for Rule 2004 Examination and to Produce Documents, filed on May 24, 2010;

(vi) Motion for Order Compelling Armand Hyatt to Appear for Rule 2004 Examination and to Produce Documents, filed on May 24, 2010; and

(vii) Motion for Order Compelling the McLane Graf Law Firm to Appear for Rule 2004 Examination and to Produce Documents, filed on May 24, 2010.

On or about March 25, 2010, the Debtor made available to the Committee several documents in response to the 2004 examination motion related to the Debtor.

8.    Prior Commitments and Proposed Transactions

The Debtor has filed prior Chapter 11 plans and other pleadings with the Bankruptcy Court based on letters of interest or commitment documents from third party investors, lenders, and/or other plan funders. Such plan funders have either defaulted or failed to provide the Debtor with a definitive closing date in order to facilitate confirmation of previously proposed Chapter 11 plans. As a result, the Debtor has been in negotiations with other parties, including Malom.

**C.    Appointment of The Official Committee of Unsecured Creditors**

On July 15, 2008, the United States Trustee for the District of New Hampshire (the "U.S. Trustee") appointed the official committee of unsecured creditors of the Debtor (the "Committee") pursuant to section 1102 of the Bankruptcy Code, as reconstituted or changed on June 24, 2009. The original members of the Committee were: (i) W.C. Cammett Engineering, Inc., (ii) DIOM, LLC (Dynamic Industrial Operations Management), and (iii) NHSC, Inc. (n/k/a Morse & Long, Inc.). On June 24, 2009, the U.S. Trustee appointed a new committee comprising of the original members and added MyKrowaters, Inc. as an additional member.

The Committee initially retained Harman Law Office of New Hampshire as its legal advisor. After the reconversion of the Debtor's case to Chapter 11 (discussed above), the Committee retained Bernstein, Shur, Sawyer, & Nelson, P.A. as co-counsel. Each of these professionals submitted an application to the Bankruptcy Court for an order authorizing its retention and the Bankruptcy Court entered the respective orders on July 18, 2008 and May 22, 2009.

Since the formation of the Committee, the Debtor has kept the Committee informed about its affairs and negotiations with interested parties and has sought the concurrence of the Committee in connection with certain actions taken by the Debtor outside of the ordinary course of business.

## D.    Employment of Debtor Professionals

To assist it in carrying out its duties as Debtor in Possession and to otherwise represent its interests in the Chapter 11 Case, the Debtor initially employed, with authorization from the Bankruptcy Court, the following professionals: (a) Earl D. Munroe, Esq. at Munroe & Chew as bankruptcy counsel, and (b) Brian McCaffrey, as local counsel.[8] Pursuant to the Stipulation and in connection with the reconversion of the Debtor's case to Chapter 11, the Debtor agreed to employ going forward (i) Riemer & Braunstein LLP ("Riemer") as new bankruptcy counsel, and (ii) the law firm of Sheehan Phinney Bass + Green, Professional Association ("SPB+G") as local bankruptcy counsel. The Debtor filed separate applications to employ Riemer and SPB+G, which were allowed on May 28, 2009 and May 27, 2009, respectively. On or about October 5, 2009, the Debtor also filed an application to employ CRG Partners Group LLC as its financial advisors, which was allowed on October 8, 2009.

## E.    Claims Bar Date

The bankruptcy docket reflects the initial deadlines for creditors to file proofs of claim in the Chapter 11 Case as October 27, 2008 (for creditors other than governmental authorities) and December 29, 2008 (for governmental authorities). On June 24, 2009, the Debtor filed a Motion for Order (I) Establishing Procedures and Bar Date for Filing Proofs of Claim and Certain Administrative Expense Claim Requests, and (II) Approving Form and Manner of Notice Thereof, which was allowed. The order approving the initial bar date motion established September 1, 2009 as the deadline for creditors to file proofs of claim for prepetition liabilities and certain administrative expense claim requests in the Chapter 11 Case (the "Initial Bar Date Order").[9]

On August 4, 2010, the Bankruptcy Court entered an order establishing August 30, 2010 as the deadline for creditors to file claims against the Related Entities.

---

[8] The initial application to employ was with respect to Munroe & Chew, and Hyatt & Flynn PLLC. Hyatt & Flynn PLLC was subsequently replaced by Brian McCaffrey.

[9] The Initial Bar Date Order also provides that any person or entity that holds a claim that arises from the rejection of an executory contract or unexpired lease authorized by this Court by an order dated on or before the date of the Initial Bar Date Order  must file a proof of claim on or before the latest of (a) the bar date; (b) thirty (30) days following the effective date of any Chapter 11 plan confirmed by this Court; (c) such date as the Court may fix in the applicable order authorizing the rejection of such contract or lease; and (d) thirty (30) days following the effective date of such rejection.

# V.    SUBSTANTIVE CONSOLIDATION

## A.    Substantive Consolidation In General

Substantive consolidation is an equitable remedy whereby the assets and liabilities of different entities may be consolidated and dealt with as if the assets were held by, and the liabilities were incurred by, a single entity.  Thus, if the Plan Parties are substantively consolidated under the Plan, the assets of the substantively consolidated Plan Parties would be collapsed into a common fund for the payment of their prepetition liabilities, and any intercompany claims between any of the substantively consolidated Plan Parties would be extinguished.  Consequently, a creditor of one of the substantively consolidated Plan Parties is treated as a creditor of the substantively consolidated group of Plan Parties, and issues of individual corporate ownership of property and individual corporate liability on obligation are ignored.

## B.    Substantive Consolidation of the Plan Parties Under the Plan

Pursuant to the Stipulation and the Jurisdiction Agreements, the Plan contemplates and is predicated upon entry of the Confirmation Order effecting the substantive consolidation of the Plan Parties and their assets for the purposes of all actions associated with confirmation and consummation of the Plan.  On the Confirmation Date, subject to the occurrence of the Effective Date: (a) all inter-company Claims by and among the Plan Parties shall be eliminated and extinguished; (b) all assets and liabilities of the Plan Parties shall be treated as though they were merged; (c) all prepetition cross-corporate guarantees of the Plan Parties, if any, shall be eliminated; (d) any obligation of any Plan Party and all guarantees thereof executed by one or more of the Plan Parties shall be deemed to be one obligation of the consolidated Plan Parties; (e) any Claims filed or to be filed in connection with any such obligation and such guarantees shall be deemed one Claim against the consolidated Plan Parties; (f) each and every Claim filed in the Chapter 11 Case shall be deemed filed against the consolidated Plan Parties and shall be deemed a single obligation of all of the Plan Parties under the Plan on and after the Confirmation Date; (g) all duplicative claims (identical in both amount and subject matter) filed against more than one of the Plan Parties will be automatically expunged so that only one Claim survives against the consolidated Plan Parties but in no way shall be deemed Allowed solely by reason of Article IX of the Plan; and (h) the consolidated Plan Parties will be deemed, for purposes of determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one entity, so that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to a particular Plan Party may be offset against claims against such Plan Party or another Plan Party.  On the Confirmation Date, and subject to the occurrence of the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Plan Parties, all Claims based upon guarantees of collection, payment or performance made by the Plan Parties as to the obligations of another Plan Party or of any other Person shall be discharged, released and of no further force and effect.  The foregoing shall be effective without necessity of any merger or like transaction under applicable non-bankruptcy laws.

## C.    Legal Authority in Support of Substantive Consolidation

The authority of a bankruptcy court to substantively consolidate the estates of multiple entities is not specifically provided in the Bankruptcy Code. The Bankruptcy Court's ability to order substantive consolidation derives from its general equitable powers under section 105(a) of the Bankruptcy Code, which provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). See F.D.I.C. v. Colonial Realty Co., 966 F.2d 57, 59 (2d Cir. 1992); In re Bonham, 229 F.3d 750, 764 (9th Cir. 2000) ("[T]he power of substantive consolidation derives from the bankruptcy court's general equity powers as expressed in [section] 105 of the Bankruptcy Code"); see 2 COLLIER ON BANKRUPTCY §105.09[1][b] (15th ed. rev. 2007); In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988) (substantive consolidation is within the court's equitable powers). Despite the absence of a specific Bankruptcy Code provision regarding substantive consolidation, courts, including courts within the First Circuit, are willing to allow debtors to substantively consolidate their cases under certain circumstances. See In re Dehon, Inc., 2004 WL 2181669 (Bankr. D. Mass. 2004); In re Smith and Kourian, 216 B.R. 686 (1st Cir. BAP 1997) (substantive consolidation permissible); In re Hemingway Transport, Inc., 954 F.2d 1 (1st Cir. 1992) (in dicta, describing broad factors for allowing substantive consolidation); In re Snider Bros., Inc., 18 B.R. 230 (Bankr. D. Mass. 1982).

Invocation of the doctrine of substantive consolidation is not limited to situations where the related entities are all debtors in pending bankruptcy cases. This is so because either way the doctrine addresses the underlying relationship of the "parties," the lack of separateness and the impact on creditors, as discussed below. See, e.g., In re Bonham, supra, 229 F. 3d at 762; In re Munford, Inc., 115 B.R. 390, 397-398 (Bankr. N.D. Ga. 1990); In re Kroh Bros. Dev. Co., 117 B.R. 499, 501-502 (W.D. Mo. 1989); In re Tureaud, 45 B.R. 416, 417-418 (Bankr. N.D. Okla. 1985), aff'd, 59 B.R. 973 (N.D. Okla. 1986); Soviero v. Franklin Nat'l Bank, 328 F. 2d 446 (2d Cir. 1964).

Courts have moved away from the traditional "veil piercing" analysis[10] and have adopted the more liberal test that balances the benefits of consolidation against the potential harms. Augie/Restivo, supra; In re Auto-Train Corp., Inc., 810 F.2d 270 (D.C. Cir. 1987) (the tests from these leading cases are referred to by most commentators, and shall be referred to herein, as the "Augie/Restivo" and "Auto-Train" tests, respectively). Although the respective tests set forth different factors, both tests are aimed at the same general equitable policy, namely, balancing the

---

[10] The doctrine of substantive consolidation was formerly compared to a corporate "veil piercing" analysis. See In re Standard Brand Paints Co., 154 B.R. 563, 567 (Bankr. C.D. Cal. 1993) (citations omitted) (discussing history of doctrine). Implicit in such analysis was an examination of whether there was fraud or misconduct in the way the corporations were maintained and used. Courts applying the veil piercing standard would cite to a myriad of factors when considering whether consolidation was appropriate. Consolidation under the historical analysis was reserved for cases involving "fraud or neglect of corporate formalities and accounting procedures." Id. at 568. See also, In re Vecco Constr. Indus., Inc., 4 B.R. 407 (Bankr. E.D. Va. 1980) (discussing the seven "Vecco factors"). Ultimately, the Vecco factors became merely "examples of information that may be useful to courts charged with deciding whether there is a substantial identity between the estates to be consolidated and whether consolidation is necessary to avoid some harm or realize some benefit". East Group Properties v. Southern Motel Assoc., Ltd., 935 F. 2d 245, 250 (11th Cir. 1991).

benefits of consolidation against potential harms. In re Standard Brand Paints Co, 154 B.R. 563, 568 (Bankr. C.D. Cal. 1993); see also 2 COLLIER ON BANKRUPTCY §105.09[2][b]. The tests are more liberal than those for veil piercing because they focus upon economic factors rather than on the existence of fraud or misconduct. For that reason, courts tend to permit substantive consolidation in a wider range of cases. The United States Court of Appeals for the Eleventh Circuit explained this trend as follows:

> There is a "modern" or "liberal" trend toward allowing substantive consolidation, which has its genesis in the increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business purposes.

Eastgroup Properties v. Southern Motel Assoc., Ltd., 935 F.2d 245, 249 (11th Cir. 1991) (citations omitted).

The Auto-Train test examines three factors, all of which must be satisfied in order to warrant substantive consolidation:

> (a)     The movant must show a unity of interest and identity between the entities to be consolidated;

> (b)     The movant must show that consolidation is necessary to avoid some harm or to realize some benefit; and

> (c)     Where a creditor will be prejudiced, the benefits of consolidation must heavily outweigh the harm.

Auto-Train, supra, 810 F.2d at 276. Once a movant has made a prima facie case for consolidation, "[t]he burden then shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation." In re Bonham, supra, 22 F.3d at 766 (following the Augie/Restivo test, but explaining the Auto-Train analysis).

In contrast to the Auto-Train test, the analysis developed by the Second Circuit in Augie/Restivo is a simple, two-factor disjunctive test. Under the Augie/Restivo test, where a court is asked to substantively consolidate two or more entities, the court should consider:

> (a)     whether creditors dealt with the entitles as a single economic unit and did not rely on their separate identity in extending credit; or

> (b)     whether the affairs of the debtor are so entangled that consolidation will benefit all creditors.

Augie/Restivo, supra, 860 F.2d at 518.

The Auto-Train and Augie/Restivo tests are similar in that they balance the benefits and harms of consolidation; however, the Augie/Restivo test is decidedly more liberal, as satisfaction of either factor is sufficient to find in favor of consolidation. Notably, the United States Court of Appeals for the First Circuit, in dicta, cited to and echoed the language of Augie/Restivo when discussing substantive consolidation:

> Consolidation is permitted only if it is first established that the related debtors' assets and liabilities are so intertwined that it would be impossible, or financially prohibitive, to disentangle their affairs ... The trustee may request consolidation to conserve for creditors the monies which otherwise would be expended in prolonged efforts to disentangle the related debtors' affairs. Nevertheless, the bankruptcy court must balance the potential benefits of consolidation against any potential harm to interested parties.

In re Hemingway Transport, Inc., supra, 954 F.2d at 11 n. 15, citing Augie/Restivo, among other cases. In In re Birch, 72 B.R. 103 (Bankr. D. N.H. 1987) (joint husband and wife proceeding), the Court applied tests strikingly similar to Augie/Restivo, but with somewhat greater emphasis on whether or not there was an ability to unscramble the affairs of the target parties. Other courts within the First Circuit have referred to the Auto-Train test when considering whether to order substantive consolidation *nunc pro tunc* in order to take account of the alleged harm to creditors. See In re Mars Stores, Inc., 150 B.R. 869, 879-880 (Bankr. D. Mass. 1993) (noting that after a prima facie showing has been made that substantive consolidation will benefit creditors, the burden at trial rests with the objecting creditor to prove it relied upon the separate credit of one of the entities to be consolidated and would accordingly be prejudiced by consolidation); In re Dehon, Inc., supra. And, more recently the Third Circuit adopted the Augie/Restivo test in In re Owens Corning, 419 F. 3d 195, 211 (3d Cir. 2005).

In the First Circuit, bankruptcy courts appear unsettled as to which standard should be used. In re Dehon, Inc., supra, 2004 WL 2181669 at *4. But, "(o)ne principle...remains constant: substantive consolidation should be approached with a concern for equitable treatment to all *creditors* involved." Id. None of the tests weighs the interests of outside third parties, a point "consistent with the core goal...to maximize the assets of Debtors to satisfy their creditors' claims." Id.

## D.     Substantive Consolidation of the Plan Parties Is Appropriate

The Debtor believes that substantive consolidation of the Plan Parties is required for purposes of the Plan and the distributions to be effected under the Plan. The Debtor believes that substantive consolidation of the Plan Parties will facilitate the implementation of the Plan, enabling the Debtor (i) to pledge for the Malom Transaction all the assets, as contemplated, and (ii) to treat Holders of Claims with greater similarity and fairness and avoid the enormous difficulties of otherwise attempting to parse out the assets and liabilities, such as they may be, of the entities that are separate in name only. Also, substantive consolidation of the Debtor and the Debtor Related Entities is appropriate in this case because, in every real sense, the USA Springs Project was operating as though the Debtor Related Entities were not separate and distinct entities from the Debtor. Substantive consolidation with respect to Amici Trust is appropriate in this case because along with the Debtor Related Entities, Amici Trust agreed of record to submit its assets to the jurisdiction of this Court for purposes of a sale or plan.

The Debtor believes that, in addition to being justified pursuant to applicable law, substantive consolidation of the Plan Parties is in the best interests of the creditors. Given the consolidated nature of the USA Springs Project, the Debtor's creditors, as well as the creditors of the Debtor Related Entities, functionally dealt with the Debtor and the Debtor Related Entities as one entity. It would be an injustice to such creditors to subject them to the uncertainties that would flow from a failure to recognize the reality of their dealings in connection with the USA Springs Project. The Debtor is not aware of any creditors of the Debtor Related Entities who or which do not consider themselves creditors of the USA Springs Project, and, therefore, none should be prejudiced by substantive consolidation. The Debtor believes that the recovery of virtually all creditors of the substantively consolidated Plan Parties will be higher or approximately equal, under the Plan, as it would be if there were no substantive consolidation. Substantive consolidation is an essential element of the Plan.

In addition, based on the facts identified herein, it is clear that the applicable tests are met in this case:

Auto-Train Test. There is a unity of interest and identity among the Debtor and Debtor Related Entities, consolidation is necessary both to avoid harm and realize benefit, and while the Debtor is not aware of any prejudice to creditors, if there is any such prejudice the harm is significantly outweighed by the benefit to the creditor body, especially through the promulgation of a plan under the Malom Transaction. The unity of interest and identity, as noted earlier, flows from over a decade of doing business as essentially one entity and attempting to finance such entity, and now reorganize such entity as one integral operation, recognized by the creditors as such. The Debtor and Debtor Related Entities shared common owners and managers; they maintained consolidated financial and payment systems; they failed to maintain separate bank accounts or inter-company records; they failed to draw distinctions among the entities in their dealings with creditors; they borrowed money on a joint basis; and they operated out of a common location. Substantive consolidation will be beneficial to the Debtor's Estate and to all the creditors of the USA Springs Project because it will enable the Malom Transaction to occur and will save administrative costs by simplifying administration of the assets and liabilities.

Augie/Restivo Test. Based on the facts identified herein, and without limiting the generality of the foregoing, and as noted above, creditors dealt with the Debtor and Debtor Related Entities as a single economic unit without relying on their separate identities in extending credit or, in the alternative, the affairs of the Debtor and the Debtor Related Entities are so entangled that consolidation will benefit all creditors. Not only has the Debtor and its management and ownership considered the Debtor and Debtor Related Entities as one enterprise, as evidenced in the Schedules, but also the creditors have. Billing was commonly done to USA Springs or USA Springs, Inc. Roswell's secured loan required the joint liability of the Debtor (as a guarantor) and the Debtor Related Entities. The formation of the USA Springs Project was geared toward an anticipated, but unrealized, unified business goal, a successful bottling facility, that has yet to be finalized. Business was done from one location. There was no separation of management. The accounting, banking and tax preparation were essentially done jointly. There were no separate employees. There is nothing to suggest to the Debtor that the creditors viewed

the Debtor and the Debtor Related Entities as other than a unified entity in all material dealings. Lastly, as noted earlier the Debtor and the Garrison Trust made certain payments or pledged certain assets as an accommodation to the Amici Trust.

Furthermore, the Debtor and Related Entities have in effect admitted that substantive consolidation with respect to the USA Springs Project is warranted. The Debtor's Schedules reflect the indebtedness of the Debtor Related Entities. Likewise, each of the Debtor Related Entities and Amici Trust filed the Jurisdiction Agreements described above, by which they agreed to submit their assets to a plan or sale put forward by the Debtor in the pending case. The Debtor submits that under the facts of this case, substantive consolidation of the Plan Parties not only is warranted, but also is the only equitable means of protecting creditors' interests.

## E.     Substantive Consolidation Order

The Plan will serve as a motion seeking entry of an order substantively consolidating the Plan Parties and their assets, as set forth herein and in the Plan. Unless an objection to substantive consolidation is made in writing by any Creditor affected by the Plan as herein provided on or before the Plan Objection Deadline, an order substantively consolidating the Plan Parties and their assets, including as part of the Confirmation Order may be entered by the Bankruptcy Court. In the event any such objections are timely filed, a hearing with respect thereto will be scheduled by the Bankruptcy Court, which hearing may coincide with the Confirmation Hearing.

## F.     Reservation of Rights

The Debtor reserves the right at any time up to the conclusion of the Confirmation Hearing to withdraw its request for substantive consolidation, to seek Confirmation of the Plan as if there were no substantive consolidation, and to seek Confirmation of the Plan with respect to one or more Plan Parties even if Confirmation with respect to other Plan Parties is denied.

## VI.                              MALOM TRANSACTION

Malom is committed to, among other things, underwrite, credit enhance and securitize the US$60 Million debt offering to be made by the Debtor in the form of a structured note(s) (the "*Structured Note*"); cause the Structured Note to be listed on a Western European exchange; and privately place the Structured Note to subscribers with whom it enjoys pre-existing relationships.

In order for the Debtor to proceed with the Malom Transaction, it was necessary for a third party to invest (or loan) and deposit US $1,200,000.[11] to be used for certain remaining costs necessary for Malom to complete the Malom Transaction. Malom has received the required

---

[11] The initial documents filed with the Court regarding the Malom Transaction referred to a deposit of $2,400,000, representing the underwriting fee. Through further negotiations between the Debtor, Malom, and the Investor, the initial amount was reduced to $1,200,000 with any balance related to such underwriting fee to be reimbursed from the funding proceeds.

Deposit pursuant to the approved Investor Agreement. A summary of the material terms related to the Malom Transaction is set forth as follows: [12]

| General Terms/ Transaction | Malom will underwrite a certain US$60 Million debt offering to be made by the Debtor in the form of the Structured Note and to be privately placed to subscribers. |
|---|---|
| Collateral | All existing real and personal property assets including the improvements thereto, including without limitation any and all assets to be hereafter acquired with the proceeds of sale of the Structured Note. In addition to the real and personal property described above, the collateral shall include but not be limited to: (i) the common stock and/or membership interests or beneficial ownerships of any entity holding title to the real and personal property assets; (ii) the intellectual property of the foregoing including trademarks, service marks, trade names and copyrights of the Debtor, if any; (iii) all furniture, fixtures and equipment presently owned or hereafter acquired by the Debtor; (iv) certain permits and licenses; (v) any and all sale and service contracts; (vi) any cash deposits; and (vii) any accounts receivable. |
| Funding Commitment | Malom has issued the Funding Commitment. |
| Interest | Not to exceed 420 basis points over comparable maturing United States Treasuries to be fixed at the time of initial issuance of the Structured Note to the subscribers.<br><br>Interest to be paid annually in arrears with balloon payment of principal at maturity of the Structured Note. |
| Term/ Maturity | 5 years |
| Malom Fees | *Malom Success Fee*: 1.5% of the maturity face value of the Structured Note sold.<br><br>*Origination Fee*: Not to exceed 3.0% of the principal funding amount to be fixed at the time of initial issuance of the Structured Note to the subscribers.<br><br>*Initial Underwriting Fee*: $1,200,000 paid in accordance with the terms and conditions set forth in the Funding Commitment.<br>Any additional fees not covered by the initial underwriting fee shall be reimbursed to Malom separately from the funding proceeds. |

---

[12] This summary of material provisions of the Malom Transaction is intended solely to give the Bankruptcy Court and interested parties an overview of the material terms. Interested parties should refer to the applicable Transaction Documents for the complete terms thereof. To the extent that any inconsistency exists between the Plan and such Transaction Documents, the Transaction Documents shall control.

| Other Fees and Costs | As set forth in the Investor Agreement, the Investor shall be paid the Deposit Claim at closing. |
|---|---|
| Other Terms | The Debtor shall not terminate the Funding Commitment and/or fail to cooperate in the execution of documents necessary for the creation of the Structured Note and may not terminate any related agreements with Malom, absent a breach by Malom. In the absence of any breach by Malom, if with the consent of both the Debtor and Investor, the Debtor anticipatorily repudiates the funding to take place or refuses to accept the funds generated by Malom's activities on the terms set forth in the Funding Commitment, Malom shall not be obligated to refund the Deposit. |
| Closing Date | The closing date shall be on or before October 31, 2011. |

On July 5, 2011, the Court entered an order approving the Investor Agreement, the Funding Commitment, and the joint escrow instructions related to the Deposit. In connection with the Closing of the Malom Transaction, the Investor will be paid the Deposit Claim, which includes a success fee of $600,000.

## VII.      SUMMARY OF THE CHAPTER 11 PLAN

### A.     Introduction

THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN. THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN. THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN.

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.

### B.     Unclassified Claims and Treatment

     1.     Administrative Expense Claims

*Payment of Administrative Expense Claims:* Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim will be paid the unpaid amount of such Claim in Cash (a) on or as soon as practicable after the Effective Date; (b) or if such Claim is Allowed after the Effective Date, on or as soon as practicable after the date such Claim is Allowed; or (c) upon such other terms as may be agreed upon by such Holder and the Debtor; provided that Deferred Administrative Claims shall receive, in full and final satisfaction of such Allowed Claim, from the Reorganized Debtor (subject to the discharge or release of any lien with respect to the Postpetition Deposit Loan) deferred

distributions pursuant to the Deferral Terms and subject to other payments, if any, under Article III.D, and E of the Plan. Payment of Fee Claims from the Plan Funding shall be in addition to other payments, if any, under Article III.D of the Plan. Notwithstanding the foregoing, the Holder of an Allowed Administrative Expense Claim may receive such other, less favorable treatment as may be agreed upon by such Holder and the Debtor. Counsel for the Debtor may establish a reserve in an amount equal to the estimated Fee Claims on the Effective Date. As stated above, the Debtor anticipates Fee Claims of all retained professionals as of the Effective Date to be approximately $3,000,000. The Other Administrative Expense Claims (including Deferred Administrative Claims) are currently estimated at over $550,000.

*Bar Date for Professional Compensation and Fee Claims*: Each Professional who holds or asserts a Fee Claim incurred before the Effective Date shall be required to file with the Bankruptcy Court and serve on all parties required to receive notice a fee application within thirty (30) days after the Effective Date. The failure to file and serve the fee application timely and properly may result in the Fee Claim being forever barred and discharged unless otherwise ordered by the Court. A Fee Claim, with respect to which a fee application has been properly filed and served, shall become an Allowed Fee Claim to the extent allowed by Final Order of the Bankruptcy Court.

*Bar Date for Other Administrative Expense Claims (including Deferred Administrative Claims)*: To the extent not already filed, all Creditors asserting an Administrative Expense Claim (other than Fee Claims) that arose after September 1, 2009 must file with the Bankruptcy Court and serve on the Debtor and its counsel a supplemental Administrative Expense Claim on the earlier of: (i) any supplemental Administrative Expense Claim bar date fixed by a separate order of the Bankruptcy Court entered prior to the Confirmation Hearing (the "*Supplemental Administrative Claims Bar Date*"), or (ii) such other date as may be fixed in the Confirmation Order. Such notice of Administrative Expense Claims must include, at a minimum, (i) the name of the Holder of the Claim, (ii) the amount of the Claim, and (iii) the basis of the Claim. Failure to file and serve this notice timely and properly shall result in the Administrative Expense Claim being forever barred and discharged. An Administrative Expense Claim with respect to which notice has been properly filed and served shall become an Allowed Administrative Expense Claim if no objection is filed by such deadline as may be set in the Confirmation Order or any other order applicable thereto. If an objection is timely filed, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order of the Bankruptcy Court.

2.      Priority Claims

On the later of the Effective Date or the date within five Business Days after the date a Priority Claim, if any, becomes an Allowed Priority Claim, or, in each such case, as soon as practicable thereafter, such Holder of an Allowed Priority Claim will receive on account of such Claim Cash in an amount equal to the amount of such Allowed Priority Claim, which amount shall be payable out of the Escrow Account, subject to Article VII.B of the Plan. Notwithstanding the foregoing, the Holder of an Allowed Priority Claim may receive such other less favorable treatment as may be agreed upon by such Holder and the Debtor. The Debtor does not believe that there are Priority Claims.

## C. Classification and Treatment of Classified Claims and Interests

### 1. Classification and Treatment of Claims and Interest

The following table summarizes the Classes of Claims and Equity Interests under the Plan, as discussed in Article III of the Plan, and the treatment and projected recovery of such Classes under the Plan.

| Claims and Interests | Projected Claims (approximation) | Treatment of Allowed Claims in Class | Projected Recovery Under Plan |
|---|---|---|---|
| **Class 1:**<br><br>Roswell Secured Claim: Secured Claim of Roswell. | $8.5 million plus interest and legal fees at an amount to be agreed upon ($9,850,000 agreed amount under Prior Plan) | Within seven (7) days after the Effective Date, in full and final satisfaction of the Roswell Secured Claim, the Holder of such Claim shall receive from the Escrow Account the Roswell Secured Claim Distribution. | 100% of agreed amount under Prior Plan plus interest as set forth in the Plan |
| **Class 2:**<br><br>Other Secured Claims: Any and all other Secured Claims against the Plan Parties, but not including the Post-Petition Deposit Loan, the Roswell Secured Claim, the Mechanic's Lien Claim, and Tax Municipalities Secured Claim.<br><br>Deferred Secured Claims: Certain Other Secured Claims that are subject to the Deferral Terms by written consents of the Holders of such Claims or otherwise. | Non-deferred Other Secured Claims<br><br>$600,000<br><br><br>Deferred Secured Claims<br><br>$1,000,000 | Non-deferred Other Secured Creditors:<br><br>On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, or (b) the date within five Business Days after the date such Other Secured Claim becomes an Allowed Claim, each Holder of such Allowed Claim shall receive, in full and final satisfaction of the Allowed Claim, from the Escrow Account (subject to the discharge or release of any mortgage or other encumbrance) Cash in an amount equal to the amount of such Allowed Other Secured Claim.<br><br>Deferred Secured Claims:<br><br>Each Holder of Allowed Deferred Secured Claim shall receive, in full and final satisfaction of such Allowed Claim (subject to the discharge or release of any mortgage or other encumbrance) from the Reorganized Debtor distributions pursuant to the Deferral Terms. | Non-deferred Other Secured Creditors:<br><br>100%<br><br><br>Deferred Secured Claims: No distribution on the Effective Date of the Plan; Deferral Terms (as defined in the Plan shall apply. |
| **Class 3:**<br><br>Tax Municipalities Secured Claims: Claims of the Tax Municipalities arising from unpaid real estate taxes due and payable as of the Effective Date. | $400,000 | On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, or (b) the date within five Business Days after the date such Tax Municipalities Secured Claim becomes an Allowed Claim, each Holder of such Allowed Claim shall receive, in full and final satisfaction of the Allowed Claim, from the Escrow Account Cash equal to the unpaid portion of such Allowed Tax Municipalities Secured Claim plus interest thereon at a rate determined under applicable non- | 100% plus applicable interest |

| Claims and Interests | Projected Claims (approximation) | Treatment of Allowed Claims in Class | Projected Recovery Under Plan |
|---|---|---|---|
| | | bankruptcy law. | |
| **Class 4:**<br><br>General Unsecured Claims: Any Claim against any Plan Party that is not a/an (a) Administrative Expense Claim, (b) Secured Claims, (c) Priority Claim, (d) Insider Claim, (e) a Claim asserted on account of an Interest, or (f) Intercompany Claim.<br><br>Deferred Unsecured Claims: Certain General Unsecured Claims that are subject to the Deferral Terms by written consents of the Holders of such Claims or otherwise. | Non-deferred General Unsecured Claims<br><br>$1,200,000<br><br><br><br>Deferred Unsecured Claims<br><br>$1,500,000 | Non-deferred General Unsecured Claims :<br><br>On, or as soon as reasonably practicable after, the latest of (a) the Effective Date, or (b) the date within five Business Days after the date such General Unsecured Claim (including the prepetition Claim of Diom LLC in the amount of $256,250) becomes an Allowed Claim, each Holder of such Allowed Claim shall receive, in full and final satisfaction of the Allowed Claim, from the Escrow Account the Unsecured Claim Distribution.<br><br>Deferred Unsecured Claims:<br><br>Each Holder of Allowed Deferred Unsecured Claim shall receive, in full and final satisfaction of such Allowed Claim, from the Reorganized Debtor distributions pursuant to the Deferral Terms. | Non-deferred General Unsecured Claims: 100% plus interest as set forth in the Plan.<br><br>Deferred Unsecured Claims: No distribution on the Effective Date of the Plan; Deferral Terms (as defined in the Plan) shall apply. |
| **Class 5:**<br><br>Mechanic's Lien Claim of Aho Construction | $206,330 | On, or as soon as reasonably practicable after the Effective Date, the Holder of such Claim shall receive, in full and final satisfaction of the Allowed Claim, from the Escrow Account (subject to the discharge or release of its lien) Cash equal to such Allowed Mechanic's Lien Claim. | 100% |
| **Class 6:**<br><br>Insider Claims: Claims of the following Insiders: Francesco Rotondo, Marco Rotondo, and Laurie Delucia | $814,000 | Holders of Insider Claims shall receive, in full and final satisfaction of such Allowed Claims, from the Reorganized Debtor distributions pursuant to the Deferral Terms; provided that any distribution related to the Insider Claims shall be subordinated to the other Deferred Claims. | No distribution on the Effective Date of the Plan; Deferral Terms (as defined in the Plan) shall apply and any recovery is subordinated. |
| **Class 7:**<br><br>Interests: Existing rights and interests related to stock shares, beneficial interest or ownership interest in any of the Plan Parties | All Interests | On or as soon as reasonably practicable after the Effective Date, each Holder of an allowed Interest shall receive a pro rata share of the New Common Stock based on the current ownership Interests in the Debtor; provided that all New Common Stock shall be pledged to Malom in accordance with the terms of the Malom Transaction as set forth in the Funding Commitment. | Retain equity ownership |
| | | | |

2. Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims

The classification and treatment of Allowed Claims under the Plan take into consideration all Allowed Secondary Liability Claims. On the Effective Date, Holders of Allowed Secondary Liability Claims will be entitled to only one distribution in respect of such underlying Allowed Claim from the substantively consolidated Plan Parties. No multiple recovery on account of any Allowed Secondary Liability Claim will be provided or permitted.

3. Additional Recoveries/ Plan Funding Balance

Any balance or unused amount of the Plan Funding (including any savings from any reduction in Fee Claims and other Claims) and any collection related to the Judgments may be used by the Reorganized Debtor to pay (i) FIRST, the balance of any Allowed Fee Claims and post Effective Date fees to the extent not paid; (ii) SECOND, the Deferred Secured Claims, (iii) THIRD, the Deferred Administrative Claims, and (iv) FOURTH, pro rata distributions to Deferred Unsecured Claims. A trust may be established after the Effective Date for purposes of prosecuting the Lower Falls Litigation for the benefit of the Post Petition Deposit Loan, and the other Deferred Creditors. For the avoidance of doubt, no distribution pursuant to the Plan may be more than 100% of the Allowed Claim plus applicable interest, if any, including with respect to Article III.D and E of the Plan.

4. Committee Lawsuit

The Committee Lawsuit shall be deemed preserved for the benefit of the Deferred Creditors that have executed written consents upon full payment to Allowed General Unsecured Claims (not including Deferred Unsecured Claims) as set forth in Article III.B(6) of the Plan. A trust may be established after the Effective Date for purposes of prosecuting any remaining Claims in the Committee Lawsuit for the benefit of such Deferred Creditors.

5. Deposit Claim

The Deposit Claim shall be paid to the Investor at Closing without further order of the Bankruptcy Court pursuant to the Investor Agreement and the Investor Agreement Order.

6. Breach of Contract Claims

With respect to the Breach of Contract Claims, subject to payment of the prepetition amounts as set forth above and assumption of the Aho Contract and the Diom Contract, such Breach of Contract Claims shall be deemed expunged or disallowed on the Effective Date pursuant to the Plan.

7. Estimated Claims

With respect to the proposed distributions in Article III of the Plan, the Debtor has estimated the Claims. The Debtor does not expect any additional postpetition administrative Claims to be filed in the Bankruptcy Case. To the extent the actual Claims exceed the estimated

Claims, the Debtor reserves its right to modify the Disclosure Statement or the Plan (to the extent applicable) with the consent of affected parties or order of the Bankruptcy Court.

**D.      Acceptance or Rejection of the Plan**

1.      Each Impaired Class Entitled to Vote

Each Impaired Class that is to receive a distribution under the Plan shall be entitled to vote separately to accept or reject the Plan.  Each such Impaired Class shall receive a Replacement Ballot which will be used to cast its vote in respect to the Plan.

2.      Acceptance by Impaired Classes

A Class of Impaired Claims shall have accepted the Plan if the Plan is accepted by Holders of Claims that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims of such Class that have voted to accept or reject the Plan (not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code).

3.      Classes Entitled to Vote

Classes 1, 2, 4, 5, and 6 are Impaired Classes under the Plan and are entitled to vote to accept or reject the Plan.

4.      Non-Consensual Confirmation

The Debtor reserves the right to seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable.  The Debtor reserves the right to further alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**E.      Means For Implementation of the Plan**

1.      Proposed Transaction

On the Effective Date, the Plan Parties expect to consummate the Malom Transaction as set forth herein and in the Plan.  The net proceeds from the Malom Transaction (after the Plan Funding, the payment of the Deposit Claim, and the payment of applicable fees and other amounts to Malom) shall be used to complete the construction of the USA Springs Project and to fund the business operations. The Plan Funding portion will be used to create an escrow out of which the required payments under the Plan, as applicable, will be made.

Entry of the Confirmation Order will constitute the approval, pursuant to sections 105(a), 363 and 364 of the Bankruptcy Code, as applicable, effective as of the Effective Date, of the Malom Transaction and the Transaction Documents (including the Plan Supplement).  The Debtor will file notice of the Effective Date within five (5) Business Days after Closing.  Any Plan Supplement will be filed with the Bankruptcy Court within five (5) Business Days after the Effective Date or will be made available to each counsel to parties in interest upon request.

2.     Judgments and Lower Falls Litigation

The Judgments and the Lower Falls Litigation may be pursued by the Debtor, Reorganized Debtor or otherwise, in connection with implementation of the Plan.

3.     Substantive Consolidation

The Plan is predicated on the substantive consolidation of the Plan Parties and their assets, subject to the Effective Date, as set forth more fully in Article X of the Plan. All Intercompany Claims, if any, will be canceled as of the Effective Date.

4.     Corporate Existence and Vesting of Assets in Reorganized Debtor

The Reorganized Debtor will exist after the Effective Date as a corporate entity, with all the powers of a corporation under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law. Subsequent dissolution or non-dissolution of the Related Entities shall be at the Debtor's or Reorganized Debtor's discretion, as may be needed for the ultimate transaction.

Except as otherwise provided in the Plan or as contemplated by the Transaction Documents, as of the Effective Date, all real and personal property of the Estate and of the Plan Parties, including, without limitation, licenses and permits, shall be deemed transferred to and vested in the Reorganized Debtor, pursuant to section 1141 of the Bankruptcy Code, free and clear of Claims, Interests and liens and security interests of any sort. The applicable Plan Parties, after the Effective Date and at the request of the Debtor, shall cause deeds to be recorded effectuating this provision of the Plan.

On and after the Effective Date, Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, Reorganized Debtor may pay the charges that it incurs after the Effective Date for professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional Fee applications) without application to the Bankruptcy Court.

5.     Transmission of Instruments; Organizational Documents

On the Effective Date, Reorganized Debtor shall be authorized to (a) execute any new Organizational Document or other agreements, as applicable; and (b) file with applicable governmental authorities any necessary transaction document. On the Effective Date, the applicable Organizational Documents shall be deemed to be fully effective.

6.     Preservation of Rights of Action; Settlement of Causes of Action

Except as otherwise provided in the Plan, the Confirmation Order, or any previous order of this Court, the Reorganized Debtor shall, under 1123(b) of the Code retain and have the exclusive right, in its sole discretion, to enforce, sue on, settle, or compromise (or decline to do

any of the foregoing) all claims, rights, Causes of Action, suits, and proceedings, whether in law or equity, whether known or unknown, that the Plan Parties may hold against any Person (including any potential claims against third parties for interference with the USA Springs Project). Reorganized Debtor or its successor(s) may pursue such retained claims, rights, Causes of Action, suits, or proceedings as appropriate, in accordance with the best interests of Reorganized Debtor or its successor(s).

7.  Directors and Officers; Post-confirmation Management

On the Effective Date, the operation of Reorganized Debtor shall become the general responsibility of the Board of Directors of Reorganized Debtor, subject to, and in accordance with, any applicable Organizational Document and the Transaction Documents. The number of directors on Reorganized Debtor's Board of Directors shall initially be as set forth in certain documents related to the Organizational Document, to the extent different from the existing Board of Directors for the Debtor. It is anticipated that, post-confirmation, the Board of Directors will include Mr. Rotondo (current president and Director), and others as approved by Malom and Mr. Rotondo. On the Effective Date, the Board of Directors of Reorganized Debtor shall be deemed elected pursuant to the Confirmation Order, but shall not take office and shall not be deemed to be elected until the occurrence of the Effective Date.

8.  Release of Liens

Except as otherwise provided in the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article III of the Plan, all interests, mortgages, deeds of trust, liens or other security interests against the property of the Estate and any Plan Party will be fully released and discharged.

9.  Exemption From Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code: (i) the issuance, transfer or exchange of any securities, instruments or documents; (ii) the creation of any other lien, mortgage, deed of trust or other security interest; or (iii) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of or in connection with the Plan or the sale or assignment of any assets of the Debtor and any deeds (including deeds of real estate assets held by certain Plan Parties), bills of sale or assignments executed in connection with the Plan or the Confirmation Order, shall not be subject to any stamp tax, transfer tax, intangible tax, recording fee, or similar tax, charge or expense to the fullest extent provided for or allowable under section 1146(a) of the Bankruptcy Code, including without limitation any confirmatory deeds by which real property is transferred by any Related Entity to the Reorganized Debtor.

10. Implementation; Effectuating Documents; Further Transactions

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under the Plan and the Transaction Documents involving the structure, corporate or otherwise, of the Plan Parties will be deemed authorized and approved without any requirement of further

action by the Plan Parties, the Plan Parties' shareholders, boards of directors or trustees, as applicable.

Pursuant to the Confirmation Order and upon Confirmation of the Plan, (i) the Plan Parties or Reorganized Debtor, as applicable, shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan; (ii) the Plan Parties or Reorganized Debtor, as the case may be, may execute such documents and take such further actions as necessary to effectuate the Malom Transaction provided for in the Plan, without the need for any additional approvals, authorizations or consents; and (iii) the chairman of the Board of Directors, president, trustee or any other appropriate officer of each of the Plan Parties or Reorganized Debtor, as applicable, shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such other agreements and documents as may be necessary or appropriate to effectuate or further evidence the terms and conditions of the Plan and the other agreements referred to herein.

## F.  Treatment of Executory Contracts and Unexpired Leases

### 1.  Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Confirmation Date, all Executory Contracts or unexpired leases (as may be amended) of the Plan Parties, including the Aho Contract and the Diom Contract, shall be deemed assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except those Executory Contracts and unexpired leases that (a) have been rejected by order of the Bankruptcy Court, (b) are the subject of a motion to reject pending on the Confirmation Date, (c) are identified on a list to be filed with the Bankruptcy Court on or before the Confirmation Date  as to be rejected, or (d) are rejected pursuant to the terms of the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections.

Upon the assumption of the Aho Contract and the Diom Contract, the payment of the prepetition Claims as set forth in Article III of the Plan with respect to such parties shall constitute payment on account of all Claims of Aho Construction and Diom LLC against the Debtor and Related Entities, including, but not limited to, satisfaction of all Cure amounts, if any. The Plan Parties do not expect any other parties to file Claims related to Cure costs for the assumption of any other Executory Contract or unexpired leases.

Each such Executory Contract and unexpired lease that is assumed shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or unexpired lease, and (b) all Executory Contracts or unexpired leases appurtenant to the USA Springs Project, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, or other agreements, and any other interests in real estate or rights *in rem* related to such premises.

2.     <u>Payments Related to Assumption of Contracts and Leases</u>

Subject to Article VI.A of the Plan, any monetary amounts by which any Executory Contract or unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or unexpired lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur, at the Debtor's or Reorganized Debtor's option, following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption and/or assumption.

3.     <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>

To the extent a Claim for damages based upon the rejection of any Executory Contract or unexpired lease is Allowed by the Bankruptcy Court, such Claim shall be classified as a Class 4 General Unsecured Claim. The failure to file a Claim for damages based upon a rejected Executory Contract or unexpired lease, if any, within thirty (30) days following the later of the Effective Date, or the date, if after, the Executory Contract or unexpired lease is ordered rejected, shall forever bar such a Claim. The Debtor does not expect any such Claims to be filed.

4.     <u>Contracts of Entered Into After the Petition Date</u>

Contracts entered into after the Petition Date, if any, by any Plan Party, including any Executory Contracts and unexpired leases assumed by the Debtor, will be performed by such Plan Party or Reorganized Debtor, as the case may be, in accordance with the terms and conditions of such contracts in the ordinary course of its business. Such contracts and other obligations (including any assumed Executory Contracts and unexpired leases) will survive and remain unaffected by entry of the Confirmation Order, unless provided otherwise in such contract.

## G. Provisions Governing Distributions

### 1. Distributions for Claims Allowed as of the Effective Date

The Reorganized Debtor will make all distributions of Cash, New Common Stock, and other instruments or documents required under the Plan. Except as otherwise provided herein or as may be ordered by the Bankruptcy Court, all distributions with respect to all Allowed Claims shall be made from the Escrow Account, as set forth in the Plan. Except as otherwise provided in Article VII of the Plan, distributions to be made on the Effective Date to Holders of Claims that are Allowed as of the Effective Date will be deemed made on the Effective Date or as promptly thereafter as practicable. Distributions on account of Claims that become Allowed Claims after the Effective Date shall be made in accordance with the provisions of Article VIII of the Plan.

### 2. Interest and other Charges; Subordinated Claims

Except as otherwise provided herein, or as required under applicable law, (a) no Holder of an Allowed Claim shall be entitled to any payments on account of any (i) pre-Effective Date interest, (ii) fees and other charges, or (iii) fine, penalty, multiple or punitive damages; (b) Holders of Claims shall not be entitled to interest payments on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date; and (c) all subordinated claims (as described in section 510 of the Bankruptcy Code), if any, shall not receive any distribution under the Plan.

### 3. Place of Delivery of Distributions

Distributions to Holders of Allowed Claims shall be made by Reorganized Debtor (a) at the addresses set forth on the proofs of claim filed by such Holders (or the last known address of such Holders if no proof of claim is filed or if the Debtor has been notified of a change of address); (b) at the address set forth in any written notices of address changes delivered to Reorganized Debtor after the date of any related proof of claim, or (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Reorganized Debtor has not received a written notice of a change of address.

### 4. Undeliverable Distributions

a. *Holding of Undeliverable Distributions.* If any distribution to a Holder of an Allowed Claim is returned to Reorganized Debtor as undeliverable, no further distributions shall be made to such Holder unless and until Reorganized Debtor is notified in writing of such Holder's then-current address. Undeliverable distributions shall remain in the possession of Reorganized Debtor pursuant to Article VII.D of the Plan until such time as a distribution becomes deliverable.

b. *Failure to Claim Undeliverable Distributions.* Except as otherwise provided in the Plan, any Holder of an Allowed Claim or Interest that does not assert a Claim for an undeliverable distribution within 90 days after the later of (a) the Effective Date or (b) the date such claim became an Allowed Claim shall have its claim for such undeliverable distribution discharged and such Holder or successor to such Holder with respect to such property shall be forever barred

from asserting any such Claim against Reorganized Debtor, the Plan Parties or their properties. Any Cash held for distribution on account of such Claims shall be property of Reorganized Debtor, free of any restrictions thereon and any New Common Stock held for distribution on account of any such Claims or Interests shall be canceled and of no further force or effect.

      c.    *No Duty to Locate*.  Nothing contained in the Plan shall require the Debtor or Reorganized Debtor to attempt to locate any holder of an Allowed Claim or Interest. Notwithstanding the foregoing, the Reorganized Debtor may conduct a normal general search, including use of the Internet for the address of a Claim Holder.

      5.    <u>Compliance with Tax Requirements</u>

In connection with the Plan and all distributions hereunder, to the extent applicable, Reorganized Debtor will comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each Holder of an Interest that is to receive a distribution of New Common Stock pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of tax obligations, if any, imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.

      6.    <u>Setoffs</u>

Reorganized Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Plan Parties may have against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Parties of any such claim that the Plan Parties may have against the Holder of such Claim.

**H.    Procedures for Resolving Disputed Claims**

      1.    <u>Claims Objection and Resolution</u>

After the Confirmation Date, the Reorganized Debtor shall have the exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims or Interests. From and after the Effective Date, Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Reorganized Debtor may object to a Claim or Interest by the Claims Objection Bar Date. Nothing herein shall be deemed to be a waiver of any rights of a party of interest with standing to object to Fee Claims.

      2.    <u>Claims Allowance</u>

The Debtor or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor or Reorganized Debtor has previously objected to such Claim,

and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including to the extent possible during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor or Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court as provided for in the Plan.

### 3. Payments and Distributions on Disputed Claims

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim has become an Allowed Claim; *provided that*, the Debtor may establish a reserve in an amount equal to the Plan payment due in regard to such Disputed Claims.

With respect to the Breach of Contract Claims, subject to payment of the prepetition amounts, as set forth in the Plan, and assumption of the Executory Contracts, as applicable, such Breach of Contract Claims shall be deemed expunged or disallowed pursuant to the Plan.

### 4. Voting Rights of Holders of Disputed Claims

Pursuant to Bankruptcy Rule 3018(a), to the extent it becomes applicable, a Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is a Disputed Claim, unless an order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a). Such disallowance for voting purposes shall be without prejudice to the Holder of such Disputed Claim seeking to have such Disputed Claim become an Allowed Claim for purposes of distribution under the Plan.

## I. Conditions Precedent to Effective Date and Consummation of the Plan

### 1. Conditions Precedent to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with Article X.B of the Plan:

a. An order shall have been entered finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code.

b. The Confirmation Order in form and substance reasonably acceptable to the Debtor shall have been entered approving all provisions, terms and conditions of the Plan and shall not be subject to any injunction or stay applicable thereto.

c. The Substantive Consolidation Order in form and substance reasonably acceptable to the Debtor shall have been entered.

d. All actions, documents and agreements necessary to implement the Plan, including without limitation, such documents relating to the Malom Transaction, shall have been effected or executed and, as necessary, filed with the appropriate governmental authorities. All conditions precedent to such documents and agreements shall have been satisfied or been waived by Malom.

e. All conditions precedent to the obligations of Malom pursuant to Transaction Documents shall have been satisfied or waived by Malom.

f. The Closing shall have occurred, which shall be no later than October 31, 2011.

2. <u>Waiver of Conditions</u>

Except where prohibited by law, each of the conditions set forth in Article X.A of the Plan (other than clause 6) may be waived in whole or in part by the Debtor without any other notice to parties in interest or the Bankruptcy Court and without hearing.

## J. Retention of Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code and in compliance with LBR 3020-1, the Bankruptcy Court shall retain post-Effective Date jurisdiction over all matters involving the Plan Parties and arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Hear and determine objections to Claims, including with respect to allowance or priority of such Claims;

(b)     Consider and rule upon requests for compensation, including under sections 330, 331, and 503(b) of the Bankruptcy Code; provided, however, from and after the Effective Date, the payment of the fees and expenses of Professionals retained by Reorganized Debtor shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)     Hear and determine any dispute arising under the Plan or the Confirmation Order; implementation of the Plan and Confirmation Order and execution, implementation or enforcement of any necessary documents thereunder; and any requests to amend, modify or correct the Plan or Confirmation Order; provided that such matters are brought before the Bankruptcy Court prior to the point of substantial consummation;

(d)     Grant extensions of any deadlines set forth in the Confirmation Order, as may be appropriate; and

(e)     Enforce all discharge and related provisions under the Plan.

To the extent necessary, the Debtor shall show specific grounds at the Confirmation Hearing for additional retained jurisdiction not specifically provided for under LBR 3020-1, including as provided below:

(a)     Consider any modifications of the Plan and the Confirmation Order;

(b)     Hear and determine matters concerning transfer of property of the Debtor to the Reorganized Debtor free and clear of all liens and encumbrances;

(c)     Hear and determine matters concerning state, local, and federal taxes pursuant to section 1146 of the Bankruptcy Code, and determine the tax liability under section 505 of the Bankruptcy Code for the fiscal years in which the Debtor was in bankruptcy;

(d)     Hear and determine any adversary proceedings, motions, application or other pleadings related to matters that are core proceedings, including assumption or rejection of Executory Contracts, amount of rejection damages, assumption or cure amounts;

(e)     Enter a final decree closing the Chapter 11 Case;

(f)     Hear and determine pending adversary proceeding(s) and any other proceedings filed by the Debtor before entry of the final decree; and

(g)     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with

implementation, consummation, or enforcement of the Plan, the Confirmation Order, and the Malom Transaction.

In addition to the foregoing retention of jurisdiction, the Debtor may seek to conditionally reserve in the Confirmation Order jurisdiction with regard to the certain other matters, as may be applicable or necessary, by filing a motion on notice requesting such additional retention of jurisdiction pursuant to LBR 3020-1(b).

## K.    Effect of Confirmation

### 1.    Binding Effect

On the Effective Date, the provisions of the Plan shall be binding upon and inure to the benefit of the Plan Parties, Reorganized Debtor, all current and former Holders of Claims against and Interests in the Plan Parties and their respective successors and assigns, and all other parties-in-interest in the Chapter 11 Case and Persons affected by the Plan.

### 2.    Discharge of Plan Parties

All consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against or Interests in the Plan Parties of any nature whatsoever, or against any of the Plan Parties' assets or properties. Subject to the occurrence of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, entry of the Confirmation Order shall act as a discharge under section 1141(d)(1)(A) of the Bankruptcy Code from and of all Claims against, liens on, and Interests in each of the Plan Parties, their assets, and their properties, arising at any time before the entry of the Confirmation Order, regardless of whether a proof of Claim or proof of Interest therefor was filed, whether the Claim or Interest is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a distribution hereunder. Upon entry of the Confirmation Order, and subject to the occurrence of the Effective Date, any holder of such a discharged Claim or Interest shall be precluded from asserting against the Plan Parties and Reorganized Debtor or any of their assets or properties any other or further Claim or Interest based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the date of entry of the Confirmation Order. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Plan Parties, subject to the Plan and the occurrence of the Effective Date.

### 3.    Injunction

Pursuant to section 524 of the Bankruptcy Code, the discharge provided by Article XII.B of the Plan and section 1141 of the Bankruptcy Code shall, upon the Effective Date, act as an injunction against the commencement or continuation of any action, employment of process, or act to collect, offset, or recover the Claims and Interests discharged thereby. Except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons which have held, hold, or may hold Claims against or Interests in the Plan Parties will be permanently enjoined, on and after the Confirmation Date, subject to the occurrence of the Effective Date, from (a) commencing or containing in any manner any action or other proceeding of any kind with respect to any such Claim or Interest, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Plan Parties on account of any such

Claim or Interest, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Plan Parties or against the property or interests in property of the Plan Parties on account of any such Claim or Interest, and (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Plan Parties or against the property or interests in property of the Plan Parties on account of any such Claim or Interest. The foregoing injunction will extend to successors of the Plan Parties (including, but not limited to, Reorganized Debtor) and their respective properties and interests in property.

4.    Releases

Effective on the occurrence of the Effective Date, to the fullest extent permitted by applicable law, the Plan Parties and Reorganized Debtor shall be presumed conclusively to have released the Releasees and their respective property, from any and all claims, obligations, rights, Causes of Action, demands, suits, proceedings, and liabilities, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, based in whole or in part on any act or omission transaction, state of facts, circumstances or other occurrences taking place prior to or on the Effective Date arising from or related in any way to the Plan Parties, the Estate, or the Reorganized Debtor, including, without limitation, those that any of the Plan Parties or the Reorganized Debtor would have been legally entitled to assert or that any Holder of a Claim or Interest or other Person would have been legally entitled to assert for or on behalf of any of the Plan Parties or the Estate or the Reorganized Debtor and further including those in any way related to the Chapter 11 Case or the Plan; *provided, however*, the foregoing provisions shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; and *provided, further*, (i) the foregoing release shall not operate to waive or release from any Causes of Action expressly set forth in and preserved by the Plan, and (ii) the Plan Parties and Reorganized Debtor shall have the right to pursue such rights of action, including the rights under section 502(d) of the Bankruptcy Code, as a defensive measure, including for purposes of setoff against distributions, if any, due to a holder of a Claim or Interest pursuant to the Plan, and such rights shall be exercised exclusively by Reorganized Debtor.

5.    Exculpation

Upon the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with or related to the Chapter 11 Case, the formulating, negotiating, preparing, disseminating, implementing, administering the Plan, the Disclosure Statement, the Transaction Documents, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Plan Parties or confirming or consummating the Plan; *provided, however*, that the foregoing provisions shall have no effect on the liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

## L.      Miscellaneous Provisions

### 1.      Payment of Statutory Fees

All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing or otherwise, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid by Reorganized Debtor.

### 2.      Severability of Plan Provisions

If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 3.      Successors and Assigns

The rights, benefits and obligations of any Person named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person.

### 4.      Waiver of Enforcement of Subordination

All Claims against and Interests in the Plan Parties and all rights and claims between or among Holders of Claims and Interests relating in any manner whatsoever to Claims against and Interest in the Plan Parties, based on claimed subordination rights (if any), shall be deemed satisfied by the distributions under the Plan to Holders of Claims and Interests having such subordination rights, and such subordination rights shall be deemed waived, released, discharged, and terminated as of the Effective Date, and all actions related to the enforcement of such

subordination rights shall be permanently enjoined. Distributions to the various Classes of Claims and Interests hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any claimed subordination rights or otherwise, so that each holder of a Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.

5.    Modification and Amendment of Plan Documents

The Debtor may further alter, amend, or modify the Plan, related documents, if applicable, and Transaction Documents, including exhibits or schedules thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.

After the entry of the Confirmation Order but before the Effective Date, the Debtor may, without approval of the Bankruptcy Court and without notice to all Holders of Claims and Interests, insofar as it does not materially adversely affect the interest of Holders of Claims and Interests, correct any defect, omission or inconsistencies in the Plan, related Plan documents in such manner and to such extent as may be necessary to expedite the execution of the Plan.

After the entry of the Confirmation Order and the Effective Date, the Debtor or the Reorganized Debtor, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistencies in the Plan and related Plan documents, or the Confirmation Order in such manner as may be necessary to carry out the purposes and provisions of the Plan.

6.    Dissolution of Committee

On the Effective Date, the Committee shall dissolve and its respective members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to the Chapter 11 Case; _provided_, _however_, that the Committee and its Professionals, as applicable, shall not be dissolved with respect to (i) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, and (ii) subject to Article III.E of the Plan, the Committee Lawsuit.

7.    Revocation, Withdrawal, or Non-Consummation

The Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent Chapter 11 plan(s). If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the Plan and no acts taken in preparation for Consummation of the Plan shall: (i) constitute or be deemed to constitute a  waiver or release of any Claim by or against, or any Interests in any Plan Party or any other Person; (ii) prejudice in any manner the rights of any Plan Party or any other Person in any further proceedings involving a Plan Party; or (iii) constitute an admission of any sort by any Plan Party or any other Person.

Pursuant to the Investor Agreement Order, in the event the Malom Transaction is not consummated and the Effective Date fails to occur on or before the date agreed to by the Committee and the Debtor (at the June 29, 2011 hearing), the Committee may file a motion or motions seeking approval of a process for the disposition of all or substantially all of the assets of the Debtor and Related Entities. Unless specifically set forth herein, if the Effective Date fails to occur, nothing contained in the Plan and in the Confirmation Order shall be deemed to waive, limit or modify the rights and remedies of any parties under the Stipulation.

8.    Notices

Any notice, request, or demand required or permitted to be made or provided to or upon a Plan Party or Reorganized Debtor under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

USA Springs, Inc.
155 Old Turnpike Road
Nottingham, NH 03290
Attn:  Francesco Rotondo

with copies to:

Alan L. Braunstein, Esq.
Riemer & Braunstein LLP
Three Center Plaza
Boston, MA 02108
(617) 523-9000
abraunstein@riemerlaw.com

and

Bruce A. Harwood, Esq.
Sheehan Phinney Bass + Green P.A.
1000 Elm Street
P.O. Box 3701
Manchester, NH 03105-3701
(603) 627-8139
bharwood@sheehan.com

9.    Term of Injunctions or Stays

Except as otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

10. <u>Inconsistencies</u>

If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan control.

**VIII.**            **VOTING ON AND CONFIRMATION OF THE PLAN**

**A.**     **General**

The Debtor submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to all known Holders of Claims and Interests that are Impaired for the purpose of disclosing that information which the Bankruptcy Court has determined as material, important and necessary for such Holders of Claims and Interests to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan.

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan including that (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code, (iii) the Debtor has proposed the Plan in good faith, and (iv) the Debtor's disclosures as required by Chapter 11 of the Bankruptcy Code have been adequate and have included information concerning all payments made or promised by the Debtor in connection with the Plan. The Debtor believes that all of these requirements will have been met by the date of the Confirmation Hearing and will seek rulings of the Bankruptcy Court to such effect at that hearing.

## B.       Acceptance Necessary for Confirmation

The Bankruptcy Code also requires that the Plan shall have been accepted by the requisite votes of Impaired Classes entitled to vote (except to the extent that "cram-down" is available under section 1129(b) of the Bankruptcy Code, as described below); that the Plan be feasible (that is, that there be a reasonable prospect that the Debtor will be able to perform its obligations under the Plan without further financial reorganization); and that the Plan be in the "best interests" of all Impaired Creditors (that is, that Impaired Creditors will receive pursuant to the Plan value at least equal to the value they would receive in a liquidation under Chapter 7). To confirm the Plan, the Bankruptcy Court must find that all of these requirements are met. Thus, even if the Impaired Classes entitled to vote accept the Plan by the requisite votes, the Bankruptcy Court must make independent findings respecting the Plan's feasibility and whether it is in the best interests of the Creditors before it may confirm the Plan. These statutory conditions to confirmation are discussed below.

## C.       Voting Procedures

Those Classes entitled to vote on the Plan, as set forth herein and in the Procedure Notice, may cast their votes for or against the Plan by completing, dating and signing the Replacement Ballot accompanying this Disclosure Statement and returning the Replacement Ballot as specified in the Procedure Notice. In order to be counted, all Replacement Ballots must be received by the Voting Deadline. Each Person casting a Replacement Ballot is responsible for ensuring that the Replacement Ballot is received by the Voting Deadline. Any Replacement Ballot received after the Voting Deadline may not be counted.

## IX.                    CONFIRMATION AND CONSUMMATION PROCEDURE

## A.       Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in each of Class 1 (Roswell Secured Claim), Class 2 (Other Secured Claim), Class 4 (General Unsecured Claim), Class 5 (Mechanic's Lien Claim), and Class 6 (Insider Claims) are Impaired, and the Holders of Claims in each of such Classes are entitled to vote to accept or reject the Plan. Any Claimant holding a Claim in an Impaired Class under the Plan may vote on the Plan so long as such Claim has not been disallowed, and is not the subject of a pending objection. Nevertheless, if a Claim is a Disputed Claim and  is the subject of such an objection, the Holder thereof may vote if, prior to the Voting Deadline, such Holder obtains an order of the Bankruptcy Court, or the Bankruptcy Court approves a stipulation between the Debtor and such Holder fully or partially allowing such Claim, whether for all purposes or for voting purposes only.

As to Classes of Claims entitled to vote on a plan, section 1126 of the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two thirds in dollar amount and more than one half in number of the claims of that class that have timely voted to accept or reject a plan. Detailed voting instructions are provided with the Procedure Notice accompanying the Disclosure Statement and other Plan documents.

## B.       The Confirmation/ Disclosure Statement Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The information regarding the Confirmation Hearing, which will be combined with the hearing on the Disclosure Statement, will be as set forth in the Procedure Notice. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to the classification of Claims or Interests or to Confirmation must be made in writing and must specify in detail the name and address of the objector, all grounds of the objection, and the amount and class of the Claim. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the Debtor by the deadline set forth in the Procedure Notice. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014

## C.      Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of the Plan are that the Plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible, and (iii) to the extent that any holder of a Claim or Interest in an impaired class does not vote for the Plan, it will receive or retain under the Plan property of a value that is not less than the amount that would have been received or retained if the Debtor were liquidated under chapter 7 of the Bankruptcy Code (often called the "best interest" test).

### 1.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired Class' failure to accept a plan, the plan shall be confirmed, at the plan proponent's request in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity holders that is Impaired under, and has not accepted, the plan. The Debtor will be seeking nonconsensual confirmation of the Plan with respect to each Class of Claims that is entitled to vote to accept or reject the Plan if such Class rejects the Plan. The Debtor reserves the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit or schedule, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### 2.      Unfair Discrimination and Fair and Equitable Tests.

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, nonaccepting Class. The requirement that the Plan be "fair and equitable" with respect to each Impaired, nonaccepting Class is also known as the "absolute priority rule" when applied to unsecured creditors. The Bankruptcy Code provides the following non exclusive definition of the phrase "fair and equitable," as it applies to secured creditors, unsecured creditors, and equity holders:

> *Secured Creditors.* With respect to any holder of a secured claim that rejects a plan, the Bankruptcy Code requires that either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds is provided in clause (i) or (ii) of this subparagraph.

> *Unsecured Creditors.* With respect to any class of unsecured claims that rejects a plan, the Bankruptcy Code requires that either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the rejecting class of unsecured creditors will not receive or retain any property under the plan. The test may be applicable if Class 4 (General Unsecured Claims) rejects the Plan.

> *Equity Holders.* With respect to any class of equity interests that rejects a plan, the Bankruptcy Code requires that either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest, or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan. This test is not applicable because Class 7 (Interests) is not Impaired under the Plan.

The Debtor believes that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

3.     Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization.

The Debtor believes the Plan is feasible. The proceeds from the Malom Transaction will be sufficient to make all payments required under and as set forth in the Plan, and to finish construction of the USA Springs Project.

4.     Best Interest Test/ Liquidation Analysis

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each Holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test." To determine what Holders of Claims and Interests of each Impaired Class would receive if the Plan Parties were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Plan Parties' assets and properties in the context of a chapter 7 liquidation case.

The value of any distribution in a Chapter 7 case would obviously be less than the value of distribution under the Plan which contemplates payment in full of all Allowed Claims. The costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those which might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by a debtor during a Chapter 11 case and allowed in a Chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals. In addition, Claims would arise by reason of the breach or rejection of obligations incurred, including contracts or leases which would otherwise be assumed in a successful Chapter 11 Case. The foregoing types of claims, costs, expenses, and fees and such other claims which may arise in a liquidation case or result from a pending Chapter 11 case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-Chapter 11 priority and unsecured claims, as well as equity holders. In addition, distributions in a Chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distribution. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a period in order for a chapter 7 trustee and its professionals to become knowledgeable about this Chapter 11 Case and the related Claims. In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale. All of the foregoing would likely further reduce Cash available for distribution.

After considering the effects that Chapter 7 liquidation would have on the ultimate proceeds available for distribution to Creditors in the Chapter 11 Case, the Debtor has determined that confirmation of the Plan will provide each Holder of an Allowed Claim or Interest with a recovery that is not less than such Holder would receive pursuant to liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. Considering the Plan contemplates payment of no less than the Allowed Claim to Holders of Claims and Interests (unless a Creditor consents to other treatment), the Debtor does not believe that a separate liquidation analysis is necessary. In addition, the Debtor does not believe that more detailed financial information and projections are necessary considering the Plan proposes to pay no less than the Allowed Claims of Creditors (unless a Creditor consents to other treatment) even before the USA Springs Project becomes fully operational.

**D.** **Consummation** The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the Plan and the impact of the failure to meet such conditions, *see* Article X of the Plan. The Plan is to be implemented pursuant to the provisions of the Bankruptcy Code.

# X.       RISK FACTORS

## A.     General

There are various important considerations and risk factors the Impaired Classes must consider in determining whether to vote to accept or to reject a plan of reorganization. However, under the Plan, the Debtor expects to pay all Impaired Classes on the Effective Date or as soon as reasonably practicable and, therefore, certain risks associated with the operation of the Debtor's business, future financial performance, liability factors, other business risk factors are less applicable here, except as to those electing to defer payment.

## B.     Certain Bankruptcy Law Considerations

There are other plan related factors that Creditors should consider, such as the following:

### 1.     Risks of Non-Confirmation

There can be no assurance that the Bankruptcy Court will confirm the Plan. A Claim or an Interest Holder might challenge the adequacy of the disclosure or the balloting procedures as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court were to determine that the disclosure procedures were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any statutory conditions to confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to non-accepting Classes of Claims and Interest Holders will not be less than the value of distributions such creditors and interest holders would receive if the Plan Parties were liquidated under Chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that these requirements have been met, but the Debtor believes that the Bankruptcy Court should be able to find that the Plan will not be followed by a need for further financial reorganization and that all Classes of Claims and Interests will receive distributions greater than what would be received following a liquidation pursuant to chapter 7 of the Bankruptcy Code.

### 2.     Risk of Non-Occurrence of the Effective Date and Funding

Although the Debtor believes that the Effective Date may occur very quickly after the Confirmation Date, there can be no assurance as to such timing and actual funding by Malom.

### 3.     Substantive Consolidation Risks

The Plan is premised upon substantively consolidating of the Plan Parties and their assets as set forth in Article X of the Plan. The Debtor can provide no assurance, however, that (a) the Bankruptcy Court will enter an order granting the Debtor's request for substantive consolidation contemplated by the Plan; or (b) the Bankruptcy Court will overrule any objection that a party-ill-interest might have to such substantive consolidation.

### C.    Approval and Closing of the Malom Transaction

The Plan is premised upon consummation of the Malom Transaction. The Debtor can provide no assurance, however, that the Bankruptcy Court will approve the Malom Transaction. Also, the Plan Parties currently anticipate that they will be able to close the Malom Transaction. There are many factors outside of the Plan Parties' control, however, and it is possible that the Debtor may not be able to meet various closing conditions, and that Malom would elect to cancel the Malom Transaction as a result of these failures. Consequently, the Plan Parties can provide no assurance that they will be successful in consummating the Malom Transaction.

### XI.                  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim or Interest will depend, among other things, upon the origin of the Holder's Claim or Interest, when the Holder's Claim becomes Allowed, when the Holder receives payment in respect of its Claim, whether the Holder reports income using the accrual or cash method of accounting, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to its Claim or Interest. Accordingly, the federal, state, local and other tax consequences of the Plan to the Holders of Claims and Interests may vary based on the individual circumstances of each Holder. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES PECULIAR TO IT UNDER THE PLAN.

### XII.                  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (i) liquidation of the Debtor's assets under Chapter 11 of the Bankruptcy Code (most likely considering the Stipulation and the Investor Agreement Order); (ii) conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or (iii) dismissal of the Chapter 11 Case.

## A.  Liquidating Plan Under Chapter 11

The Debtor could be liquidated pursuant to the provisions of a Chapter 11 plan of reorganization, assuming no conversion to Chapter 7 occurred.  In a liquidation under Chapter 11, the assets could be sold in a more orderly fashion over a longer period of time than in a liquidation under Chapter 7.  Thus, a Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Because a trustee is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a trustee must be appointed.  Any distribution to the holders of Claims under a Chapter 11 liquidation plan probably would be delayed substantially may be reduced due to potential rejection of certain prepetition Executory Contracts.  Although preferable to a Chapter 7 liquidation, the Debtor believes that any alternative liquidation under Chapter 11 would still not smaller distributions to Creditors than those provided for in the Plan with potentially no distribution to Interests.

## B.  Liquidation Under Chapter 7

If no Chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets.  In Chapter 7, a trustee would be appointed to promptly liquidate the assets of the Debtor.  The Debtor believes that in liquidation under Chapter 7, before Creditors receive any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured claims that would be expected, would cause a substantial diminution in the value of the Estate.  The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of prepetition Executory Contracts in connection with the failure to realize the greater going-concern value of the applicable assets.  A discussion of the effect that a Chapter 7 liquidation would have on the recovery of Holders of Claims is set forth in Article IX.C hereof.  The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to Creditors than those provided for in the Plan and potentially no distribution to Interests.

## C.  Dismissal of the Chapter 11 Case

The Debtor believes that the dismissal of its Chapter 11 Case would result in Roswell foreclosing on the assets of the Debtor and the Debtor Related Entities, which would result in smaller distributions being made to Creditors than those provided for in the Plan with potentially no distribution to Interests.

## XIII.  CONCLUSION AND RECOMMENDATION

For all the reasons set forth in this Disclosure Statement, the Plan Parties believe that confirmation and consummation of the Plan is preferable to all other alternatives and is in the best interests of Holders of Claims and Interests. They, therefore, recommend acceptance and confirmation of the Plan.

*DEBTOR*:

USA SPRINGS, INC., a Delaware corporation

By: _____

Name:  Francesco Rotondo

Title:  President

*DEBTOR RELATED ENTITIES:*

USA SPRINGS, INC.,
a New Hampshire corporation

By: _____
Name: Francesco Rotondo
Title: President


GARRISON PLACE REAL ESTATE
INVESTMENT TRUST

By: _____
     Francesco Rotondo, Trustee


SWEET REVIEW REALTY TRUST

By: _____
     Francesco Rotondo, Trustee


JUST CAUSE REALTY TRUST

By: _____
     Francesco Rotondo, Trustee

*RELATED ENTITY:*

AMICI REAL ESTATE TRUST

By: _Ralph Faiella_
Ralph Faiella, Jr., Trustee